I3D8HIL1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everybody.

3          Bring in the jury.

4          MS. MILLER:  Your Honor, we had an issue.

5          THE COURT:  Tell me the issue.

6          MR. LAX:  It's very simple.  At the conference last

7  Thursday, you ruled that the cell phone video filmed by the

8  woman in the cab could not be played with audio.  Plaintiff

9  takes the position that the court ruled in the opposite way and

10 that it could be played with audio.  So we just wanted to clear

11 that up.

12         MR. SHANIES:  Yes, your Honor.

13         THE COURT:  I ruled both ways?

14         MR. LAX:  You ruled one way in the way that I just

15 articulated.

16         THE COURT:  It could not be played audio.

17         MR. SHANIES:  No, your Honor.

18         THE COURT:  It could be played with audio?

19         MR. SHANIES:  Yes.  This was the subject of a motion

20 in limine.  We discussed this.  Your Honor concluded that while

21 we were not allowed to argue what could be heard on the audio

22 was the same gun, gun, gun that could be heard on the radio

23 transmission.  That's the reason for that ruling.

24         THE COURT:  I think I ruled originally at the trial

25 that the audio function was largely made of evidence that would

I3D8HIL1

1    be inadmissible.

2            MR. SHANIES:  Your Honor, if I may, you asked us at

3    the pretrial conference, where we discussed this motion in

4    limine, why you ruled the way you did at trial.  No one could

5    recall, but your Honor ultimately ruled that it reflects the

6    jury's ability to hear what was going on outside the car.

7            THE COURT:  One minute.

8            MR. SHANIES:  If there is any dispute -- there

9    shouldn't be any dispute, but we should get the transcript.

10           THE COURT:  Let's get the transcript.

11           Do you have a transcript of the conversation?

12           MR. SHANIES:  No, Judge.

13           THE COURT:  Of the audio.

14           MR. SHANIES:  I was saying transcript of the pretrial

15    conference where your Honor ruled on this issue.  Or perhaps

16    your Honor's law clerk remembers.

17           But we have come to a point where we get rulings in

18    limine and then at the last second Corp. counsel comes in and

19    moans about it and gets your Honor to reverse the ruling.  It's

20    hard to try a case this way.

21           THE COURT:  I ruled that the audio should come in

22    because that makes it complete.  But it occurs to me, seeing

23    another audio, that it could be filled with statements and

24    exclamations that I would rule inadmissible.

25           So if the audio is to come in, you need to tender to

I3D8HIL1

1  me a transcript of what was said on the audio so I can make

2  rulings.  Or we can -- how long will it take to play the whole

3  thing?  Five minutes?

4           MR. SHANIES:  No, five seconds.

5           THE COURT:  So I will listen.  I can listen to it

6  also.

7           MR. SHANIES:  Yes.  There are no declarative

8  statements in the audio, and certainly it's not being offered

9  for the truth of any statements.

10           THE COURT:  We want to bring the jury in.  We will do

11  it at the first recess.

12           MR. SHANIES:  This audio is going to be put in through

13  the first witness.  The first witness is one of the people who

14  recorded this iPhone recording.

15           THE COURT:  I have the transcript of the iPhone

16  recording.  It adds nothing of any value.

17           MR. SHANIES:  What is of value, your Honor, is not

18  being said inside the car but the ability to hear noises from

19  outside the car.

20           THE COURT:  We have already covered the noises and

21  they are not audible.  I ruled already that you can't use that

22  to say gun, gun, gun or anything else.

23           MR. SHANIES:  You ruled we couldn't argue.  The only

24  reason for ruling that we couldn't argue it is because both

25  audios were coming in.

I3D8HIL1

1          THE COURT:  Play it.  Play it now.

2          (Audio played)

3          MR. SHANIES:  There are disputed issues of fact as to

4    what these witnesses' ability to hear what was going on outside

5    the car was.  And this audio from this video reflects that, and

6    I think it's important that the jury see it.  It's relevant for

7    that reason.

8          THE COURT:  If it becomes a point, then we can review

9    this issue on redirect.  We will see what it is.  But at this

10   point in time just the video.

11         MR. SHANIES:  So I understand, if there is any

12   question about any witness's ability to hear what is going

13   on --

14         THE COURT:  You will raise the issue again.

15         At the recess, we will mark that page.

16         MR. SHANIES:  Understood.

17         (Continued on next page)

18

19

20

21

22

23

24

25

I3DAAHIL4                        Oliver - Direct

```
 1    A.  Yes, and in a modified squat position.

 2    Q.  In a modified squat position?

 3    A.  Yes.

 4    Q.  One of your feet was on the ground to the left of

 5    Mr. Hill's body.  One of your feet was on the ground to the

 6    right of his body, correct?

 7              THE COURT:  You were straddling him, correct?

 8    A.  I was straddling him.  I didn't have my body weight on him.

 9              THE COURT:  What part of his body were you straddling?

10              THE WITNESS:  I was above his buttocks toward his

11    lower back.

12    Q.  At some point during the struggle you heard a gunshot,

13    correct?

14    A.  Yes.

15    Q.  At no point prior to hearing the gunshot did you see

16    Sergeant Quigley at that scene; is that correct?

17    A.  I don't recall seeing Sergeant Quigley.

18    Q.  Prior to the gunshot you do not recall seeing Sergeant

19    Quigley?

20    A.  Prior to the gunshot I don't recall seeing Sergeant

21    Quigley.

22    Q.  Now I believe you just testified, officer, that you did not

23    put any weight on Mr. Hill's back; is that correct?

24              MS. SPEIGHT:  Objection.

25              THE COURT:  Overruled.
```

I3DAAHIL4                    Oliver – Direct

1          THE WITNESS:  Mr. Hill was, he arced his body in such

2     a manner that it threw me forward and I had to brace myself

3     with my right hand.

4          THE COURT:  On what did you brace?

5          THE WITNESS:  On the concrete on the ground.  At that

6     time officer -- I heard "gun", "gun", "gun", "gun", "gun".  And

7     as I'm turning back around to my left-hand side I see Mr. Hill

8     arm is already extended.

9          THE COURT:  Which arm?

10         THE WITNESS:  His left arm is already extended.

11         THE COURT:  Which way?

12         THE WITNESS:  It was extended.  I want to say the

13    sidewalk was right there.

14         THE COURT:  You've got to have words.  Extended

15    towards you or away?

16         THE WITNESS:  Extended about 45 degrees to his

17    left-hand side.

18         THE COURT:  So if it was on his left-hand side he

19    would be twisting his body away from you?

20         THE WITNESS:  No.  I was parallel with his body.

21         THE COURT:  Had he thrown you off the straddle?

22         THE WITNESS:  No.  I stopped myself from being thrown

23    off by bracing my hand on the ground.

24         THE COURT:  And you were still straddling him?

25         THE WITNESS:  I was still straddling him at that

1    point, yes, your Honor.

2              THE COURT:  You were on his right side?

3              THE WITNESS:  No.  I was across his body.  I was

4    straddling his body.

5              THE COURT:  So diagonally across his body.  Straddling

6    means one knee or one leg on one side and --

7              THE WITNESS:  I had one leg across his body.  So my

8    left leg was across his body and he is centered in the middle.

9              THE COURT:  And your right knew was on the ground?

10             THE WITNESS:  My right knee was on the ground and I

11   was on my left foot in a modified squat position.

12             THE COURT:  Let me see.  You're bracing yourself with

13   your right hand on the pavement, right?

14             THE WITNESS:  Yes.

15             THE COURT:  And your right knee is on the pavement, as

16   well?

17             THE WITNESS:  That's correct.

18             THE COURT:  And your left leg is sort of straddling

19   over him?

20             THE WITNESS:  Yes.

21             THE COURT:  Without much weight on it because your

22   weight's on the right side?

23             THE WITNESS:  Yes.

24             THE COURT:  And you see him with his left hand, say

25   again.

I3DAAHIL4                          Oliver - Direct

 1          THE WITNESS:  After he kind of arced his body I braced

 2   my hand on the ground and at the same time I'm hearing "gun",

 3   "gun", "gun", "gun", "gun".

 4          THE COURT:  Did you see it.

 5          THE WITNESS:  I turned my shoulder and looked over my

 6   left hand on my left side.  I see Mr. Hill left arm is extended

 7   about 45 degrees roughly.

 8          THE COURT:  Out?

 9          THE WITNESS:  Out.

10   Q.  Is his arm off the ground?

11   A.  His arm -- well, he was laying on the ground.  So his arm

12   was semi off the ground.  I'm not sure of how many inches but

13   his arm was off the ground.

14   Q.  His arm was raised off the ground?

15   A.  Yes.

16   Q.  And out to his left?

17   A.  Yes.

18          THE COURT:  Was he still arcing his back?

19          THE WITNESS:  I don't know at that point.

20   Q.  He stopped arching at that point?

21   A.  I don't remember.  I was focused on the gun.

22   Q.  And within seconds you heard a gunshot in your right ear;

23   is that correct?

24   A.  Yes.

25   Q.  And after Mr. Hill was shot did you see anyone kick a gun?

I3DAAHIL4                          Oliver - Direct

1   A.  I don't remember that.

2   Q.  You don't recall seeing someone kick a gun?

3   A.  It may have but I don't recall showing it.  After hearing

4   that shot I had tunnel vision.  Like I almost blanked out.  I

5   didn't know what happened.

6   Q.  My question is, do you recall seeing someone hit kick a

7   gun?

8              MS. SPEIGHT:  Objection.

9              THE COURT:  He is explaining he can't remember because

10  he couldn't see.

11  Q.  So then the answer would be "no"?

12             MS. SPEIGHT:  Objection.

13             THE COURT:  The answer is what he gave, Mr. Shanies.

14  Q.  Did you kick a gun?

15  A.  No.

16  Q.  Did you pick up a gun?

17  A.  No.

18  Q.  Did you place a gun on the curb?

19  A.  No.

20  Q.  Did you see any other person pick up a gun?

21  A.  No.

22  Q.  Did you see any other person put a gun on a curb?

23  A.  No.

24  Q.  Did you take any effort to secure the gun?

25  A.  No.

I3D8HIL5                        Oliver - Cross

```
 1   A.  Well, after trying to get the first arm -- can you repeat
 2   that?
 3   Q.  Sure.
 4           THE COURT:  What happens after you try to get the
 5   first arm and didn't succeed?
 6   A.  After we tried to get the first arm, I remember I was
 7   changing from arm to arm.  So I mean, I was going back and
 8   forth from arm to arm, because he was so stiff I was having
 9   trouble with his arms, so I was going back and forth between
10   arms.
11   Q.  What is the next thing that happened?
12   A.  The next thing that happened?  I remember at one point we
13   did get his right arm from underneath of his body, but his left
14   arm was still underneath of him, and I am yelling to him, Yo,
15   give me your hands, give me your hands, and he kind of
16   chuckled, like that ain't going to happen.
17   Q.  Did he say that?
18           THE COURT:  He kind of what?
19           THE WITNESS:  Chuckled.
20           THE COURT:  Like laughed?
21           THE WITNESS:  Like that ain't going to happen.
22           THE COURT:  "That ain't going to happen," did he say
23   that.
24           THE WITNESS:  That's what he said.
25   Q.  What happened next?
```

I3EAAHIL1                         Quigley - Direct

1    of the house are secure, I find a gun under the bed.  I look

2    under the bed.  I see a gun.  I don't touch it.  Nobody touches

3    it.  I call Evidence Collection.  Evidence Collection comes.

4    They would photograph.  They would they have their procedures

5    to process a firearm.

6            In a uncontrolled environment which was what happened

7    that night, it was not controlled.  There was traffic.  There

8    was people.  There was public.  There was no crime scene set up

9    at that time that I said what I said.  It would be OK for a cop

10   to kick a gun over with their foot, even pick a gun up, place

11   it somewhere safe where it is not to be, where it could can be

12   secured without someone accidently touching it or kicking it.

13           As far as it being loaded or unloaded, a firearm being

14   loaded or unloaded an officer would not -- it wouldn't be ideal

15   for a cop to unload a gun.  So they would leave it in the state

16   that it was.  They would just secure it how I described.

17           THE COURT:  So what was the point of kicking it away?

18           THE WITNESS:  That's what that Officer Ouk kicked it

19   away out of his hands.  That I think -- if you ask me why did

20   he do that, I think in case -- I don't know why he did that.

21           THE COURT:  Only Officer Ouk can answer that.

22           THE WITNESS:  That's for him to answer that.

23           THE COURT:  I'm asking what an officer is commonly

24   supposed to do when he receives a command "secure that fucking

25   gun".

I3E8HIL2                    Quigley – Cross

1            (In open court)

2            THE COURT:  Members of the jury, I am going to ask you

3    to take a short recess, about ten minutes.  Leave your books

4    closed on your chairs.  Don't discuss the case.

5            (Jury exits courtroom)

6            THE COURT:  This is a voir dire outside the presence

7    of the jury.

8            MS. MILLER:  Do you want me to do that?

9            THE COURT:  Yes.

10            MS. MILLER:  So I guess the way to do it is to play it

11    to see if --

12            THE COURT:  Whatever you want to do.

13            MS. MILLER:  Just begin at 1:07.

14            (Audio played)

15            THE COURT:  Stop.  I think she wants to start before

16    that.  Line it up where you want to start.

17            MS. MILLER:  1:07 I think gives a little context to

18    it.

19            MR. LAX:  I am just going to turn the speaker so it is

20    more in your and the witness's direction.

21            THE COURT:  Start at line "90 yellow."

22            (Audio played)

23            MS. MILLER:  Stop.

24    BY MS. MILLER:

25    Q.  Mr. Quigley, the gun, gun, gun, gun, whose voice is that?

I3E8HIL2                    Quigley – Cross

1    A.  I believe it to be Officer Tirol's.

2              THE COURT:  You say you believe.  Is that what you

3    recognize?

4              THE WITNESS:  Yes.

5              THE COURT:  Have you heard him speak?

6              THE WITNESS:  Yes.

7              THE COURT:  You have heard him speak over a radio?

8              THE WITNESS:  Yes.

9              THE COURT:  Before?

10             THE WITNESS:  Yes.

11             THE COURT:  And that sounds like his voice?

12             THE WITNESS:  It sounds like his voice.

13             THE COURT:  Go ahead.

14   BY MS. MILLER:

15   Q.  Just to give it some context, what is it that we are

16   listening to, what is that?

17   A.  It's an open carrier.  It's what we described before, it

18   was a radio that the button was depressed.

19             MS. MILLER:  Then if we can continue.

20             MR. LAX:  We paused at 1:15 for the record, and we are

21   now pressing play.

22             (Audio played)

23   Q.  Do you recognize that voice?  Who is that?  Not by person,

24   but by title.

25             MR. SHANIES:  Objection to the form.

I3E8HIL2                          Quigley - Cross

 1              THE COURT:  Overruled.

 2    A.  That's the radio dispatcher.

 3              THE COURT:  How do you know?

 4              THE WITNESS:  I have heard his voice before.  I have

 5    heard the recording before as well.

 6              THE COURT:  I don't mean recording for this case.

 7              THE WITNESS:  I have heard his voice before.

 8              THE COURT:  On police duties?

 9              THE WITNESS:  Yes.

10              MS. MILLER:  Go ahead.

11              MR. LAX:  Playing from 1:18.

12              (Audio played)

13              MS. MILLER:  Stop there.

14    BY MS. MILLER:

15    Q.  Who is that?  Do you recognize that voice?

16    A.  I believe that's me.

17    Q.  What are you saying?

18    A.  85, Hamilton and West 9th.

19              MS. MILLER:  We can continue a little bit more.

20              (Audio played)

21              MS. MILLER:  Stop right there.

22    Q.  Whose voice is that?

23    A.  I believe it's Officer Gonzalez.

24              MS. MILLER:  We can continue.

25              (Audio played)

I3E8HIL2                          Quigley - Cross

1              MS. MILLER:  Stop right there.

2    Q.  The "get a bus over here," do you know who is saying that?

3    A.  I'm not sure.

4              MS. MILLER:  Then if we play just a little bit more.

5              (Audio played)

6              MS. MILLER:  Stop right there.

7    Q.  Whose voice is that?

8    A.  It sounds like Benny Gonzalez.

9              MS. MILLER:  That's all I need, your Honor.

10             THE COURT:  "We need a bus forthwith," what does that

11   mean?

12             THE WITNESS:  A bus means ambulance and forthwith

13   means right away.

14             MR. SHANIES:  May I voir dire, your Honor?

15             THE COURT:  You may.

16   BY MR. SHANIES:

17   Q.  Mr. Quigley, how do you know that was an open carrier?

18   A.  That's the only explanation that that radio would transmit

19   what was going on at that time.

20             THE COURT:  What is it again, open carrier, what does

21   that mean?  What is an open carrier?

22             THE WITNESS:  It's when an radio was

23   unintentionally -- the button on the radio was unintentionally

24   depressed.

25             THE COURT:  How do you do that?

I3E8HIL2                    Quigley - Cross

1           THE WITNESS:  If you're sitting in a car, sometimes

2      the seat belt does it.  In this instance, if you're crouched

3      over, bending down, a piece of equipment hits another piece of

4      equipment, it hits the floor, it bunches up against another

5      copy, the button on the radio is very sensitive and it can

6      easily be pressed.

7      Q.  Did that happen here?

8      A.  I believe so.

9      Q.  Did you see that happen?

10     A.  No, I did not.

11     Q.  So you don't know if it was an open carrier, correct?

12     That's an assumption?

13     A.  No.  It's an open carrier.  You don't see open carriers,

14     you hear them.  And so, in my line of work, you hear the

15     transmission and you hear that it's unintentional, and that's

16     an open carrier.  You hear it, and that's how you determine

17     what an open carrier is.  You don't see open carriers.

18     Q.  Did you see Officer Tirol at the moment that that

19     transmission was made?

20     A.  He was to my left.  I maybe saw a piece of him, maybe not.

21     Q.  Did you see what he was doing or not doing with his radio?

22     A.  I did not see what he was doing with his radio.

23     Q.  The radio dispatcher, who was that?

24     A.  That's a person that gives out --

25     Q.  This radio dispatcher that we heard on the recording.

I3E8HIL2                      Quigley – Cross

1    A.   Who is he?

2    Q.   Yes.

3    A.   His name?

4    Q.   Yes.

5    A.   I don't know his name.

6    Q.   And the person that said, what's the location, who said

7    that?

8    A.   The radio dispatcher.

9    Q.   It was the radio dispatcher also who said what's the

10   location?

11   A.   I believe so, yes.

12   Q.   That wasn't a different officer responding and asking

13   what's the location?

14   A.   It may have been.  If I could hear it again, I could answer

15   it.

16   Q.   Sure.

17            (Audio played)

18   Q.   The person who said are you going to call an 85 is the

19   dispatcher, correct?

20   A.   Yes.

21   Q.   And the person who said what's the location was not the

22   dispatcher?

23   A.   Correct.

24   Q.   Who was it?

25   A.   I don't know.

I3E8HIL2                    Quigley - Cross

1              MR. SHANIES:  Continue playing.

2              (Audio played)

3              MR. SHANIES:  Stop there.

4    Q.  Who is that?

5    A.  I believe the first person was me.

6    Q.  Are you sure?

7              THE COURT:  I believe?

8              THE WITNESS:  I believe the first person was me.

9    Q.  Are you certain it was you?

10   A.  Fairly certain, yes.

11   Q.  Yes, it was you?

12   A.  Yes.

13   Q.  And the second transmission?

14   A.  Can you play it?

15             MR. LAX:  What am I playing?

16             MR. SHANIES:  We can start at "what's the location."

17             (Audio played)

18             MR. SHANIES:  Stop.

19   Q.  The first one, Hamilton and West 9th, was you?

20   A.  Yes.

21   Q.  The next one, West 9th and Hamilton shots fired, who was

22   that?

23   A.  I believe it was Benny Gonzalez.

24   Q.  When you say you believe, do you know that it was Benny

25   Gonzalez?

I3E8HIL2                        Quigley — Cross

1    A.  From his voice, it sounds like it was Benny Gonzalez.

2    Q.  So believe, sounds like, are you identifying that as the

3    voice of Benny Gonzalez, yes or no?

4    A.  Yes.

5            THE COURT:  He can say or clarify however he wants,

6    Mr. Shanies.

7    Q.  Mr. Quigley, do you recall hearing those transmissions that

8    night?

9    A.  I recall making a transmission that night.

10   Q.  Making all of those transmissions?

11   A.  A transmission that night.

12   Q.  Other than your transmission, do you recall hearing the

13   other transmissions that are being played here?

14   A.  Verbatim, no.  I do recall other officers on the scene

15   making radio transmissions.

16   Q.  Was your radio on division?

17   A.  I don't recall what channel my radio was.

18   Q.  This is division channel that we are listening to, correct?

19   A.  Yes, it is.

20   Q.  Do you recall in your patrol guide hearing that you were on

21   tac A that evening?

22   A.  Yes, I do.

23   Q.  So you were not receiving division radio transmissions?

24   A.  I didn't use my radio to make the transmission.

25   Q.  So you didn't hear these that night?

I3E8HIL2                          Quigley – Cross

1    A.   I didn't use my radio to make the transmission that I made.

2    I took a radio from another officer.

3              MR. SHANIES:   Your Honor, we object.

4              THE COURT:   Overruled.   Sufficient authenticity and

5    reliability has been shown, the standards for admitting

6    relevant evidence.   The evidence is relevant.

7              We will call back the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I3E8HIL4                        Tirol - Direct

1    A.   I was -- once I saw it, I started yelling, gun, gun, he's

2    got a gun, drop the gun, drop the gun.  And I tried taking it

3    with my two hands, and while trying to take it, I was trying to

4    make sure that the muzzle wasn't pointing towards me.  So at

5    the same time I was trying to put it in a direction where it

6    was in a safe manner and I lost grasp of it, and at that point

7    Mr. Hill had the gun in his left hand free.

8    Q.   Free where?

9    A.   In the air.

10   Q.   Where?

11   A.   I don't remember a direction.  I lost grasp of it and his

12   arm had swung around free.

13   Q.   Swung around where?

14   A.   I don't understand your question exactly.

15            THE COURT:  Mr. Smallman is basically asking you for

16   directions.

17            Right, Mr. Smallman?

18            MR. SMALLMAN:  Yes, sir.

19            THE COURT:  So when Hill pulled the gun out of his

20   sash, try to describe for the jury what movements he made with

21   the gun.

22            THE WITNESS:  So, basically, he had the gun like in

23   this type motion, and I was trying to --

24            THE COURT:  Which type motion?

25            THE WITNESS:  Like this, basically like this.

I3E8HIL4                          Tirol - Direct

1           THE COURT:  Is he standing?

2           THE WITNESS:  He was reaching for his stomach,

3      waistband --

4           THE COURT:  Is he standing.

5           THE WITNESS:  No.  He is on his stomach.

6           THE COURT:  So how can he reach for his sash if he is

7      on his stomach?

8           THE WITNESS:  He is on his stomach area reaching for

9      his waistband.

10           THE COURT:  Is his stomach off the ground?

11           THE WITNESS:  He basically rises it.

12           THE COURT:  He rises?

13           THE WITNESS:  He rises and he pulls it out.

14           THE COURT:  What is holding him stable on the ground?

15           THE WITNESS:  What do you mean?

16           THE COURT:  He is on his knees, right?

17           THE WITNESS:  He basically pries himself, he created

18      space, and he was able to pull the gun out from his waistband

19      area.

20           THE COURT:  How did he balance himself?

21           THE WITNESS:  I just remember he was pushing off,

22      basically creating space from the ground to the stomach, and

23      that's when the firearm came out.

24           THE COURT:  It came out and where did it go, to his

25      left, to his right, above his head?

I3E8HIL4                          Tirol - Direct

1           THE WITNESS:  It was towards his left, towards like

2    his legs area, and that's when I tried to take it.

3           THE COURT:  The witness indicates that the gun started

4    to rise from the sash to an area probably near his hip,

5    extended from his hip.

6           Then what happened?  You tried to reach it?

7           THE WITNESS:  I put my hands on it and I tried to take

8    it.  At the same time I'm trying to take it, but at the same

9    time I didn't want to pull it with the muzzle facing towards

10   me, so I was trying to put it in a motion where the muzzle was

11   in a safe manner while I was able to take it.

12          THE COURT:  Trying to point the muzzle to the ground?

13          THE WITNESS:  Just trying to put it in a safe manner.

14   I didn't want to pull it towards you.

15          THE COURT:  Your officers were all around you, so you

16   had to be careful about not directing it at any of the other

17   officers.

18          THE WITNESS:  At that time I was just focused on -- my

19   eyes were on the gun.  So when I was trying to pull it, I lost

20   grasp of it, and that's when he was able to swing it free.

21          THE COURT:  So he swung it free, and now you're

22   indicating that he pointed it shoulder height to the left?

23          THE WITNESS:  Yeah.  He swung it out.  It would be to

24   the left side.

25          THE COURT:  Then what did he do?

I3EAAHIL5                              Ouk - Direct

1   Q.  You placed handcuffs on Mr. Hill, correct?

2   A.  Yes.

3   Q.  Sometime after Sergeant Quigley shot Mr. Hill in the head

4   you saw a black firearm; is that correct?

5   A.  Yes, I did.

6   Q.  Where did you see that firearm?

7   A.  It was to his left side on the curb.

8   Q.  It was on top of the curb?

9   A.  It was on the curb, yes.

10  Q.  On the street?

11          THE COURT:  Well, the curb is the stone that comes up

12  from the pavement of the street to the sidewalk.

13          THE WITNESS:  Yes.

14          THE COURT:  Which is elevated over the street.

15          THE WITNESS:  Yes.

16          THE COURT:  So what part of the curb did you see the

17  gun on, on the sidewalk or in the street?

18          THE WITNESS:  The elevated street part of the curb.

19          THE COURT:  The elevated street, is that the sidewalk?

20          THE WITNESS:  Yeah, the sidewalk but very close to the

21  street.

22          THE COURT:  Very close to the curb?

23          THE WITNESS:  Yes.

24          THE COURT:  Just over the curb on the sidewalk?

25          THE WITNESS:  Yes.

I3EAAHIL5                          Ouk - Direct

| | |
|---|---|
| 1 | THE COURT:  How far was that from Mr. Hill? |
| 2 | THE WITNESS:  Probably like two arm lengths. |
| 3 | THE COURT:  Two arm lengths away? |
| 4 | THE WITNESS:  Yeah. |
| 5 | Q.  Did you touch the gun? |
| 6 | A.  No. |
| 7 | Q.  Did you kick the gun? |
| 8 | A.  No. |
| 9 | Q.  Did you slide the gun with your foot? |
| 10 | A.  No. |
| 11 | Q.  Did you see any other officer touch the gun? |
| 12 | A.  No, I didn't. |
| 13 | Q.  Did you see any other officer kick the gun? |
| 14 | A.  No, I didn't. |
| 15 | Q.  Did you see any other officer slide the gun with his foot? |
| 16 | A.  No. |
| 17 | Q.  Were you directed to secure the gun? |
| 18 | A.  I was directed to stay, yeah, watch the gun. |
| 19 | Q.  Who gave you that direction? |
| 20 | A.  I don't remember who exactly but. |
| 21 | Q.  And what did you do to secure the gun? |
| 22 | A.  I just basically stood around it. |
| 23 | THE COURT:  Can't hear you. |
| 24 | A.  I just basically stood over it to make sure. |
| 25 | Q.  Did you take any action associated with securing the gun? |

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I3EAAHIL5                         Ouk - Direct

1   A.  No.

2   Q.  How long did you stay there securing the gun?

3   A.  Probably 15/20 minutes.

4   Q.  Did you have custody of the gun at that point?

5   A.  Like I said, I just stood over it.  I didn't touch it.

6   Q.  You believed that you had custody of the gun?

7   A.  Yes.

8   Q.  You're familiar with the term "chain of custody"?

9   A.  Yes.

10  Q.  So you were part of the chain of custody; is that right?

11  A.  I was watching over the gun.

12          THE COURT:  While you were watching the gun 15 or 20

13  minutes did anyone touch it?

14          THE WITNESS:  No.

15          THE COURT:  Did anyone come near to touch it?

16          THE WITNESS:  No.

17          THE COURT:  Would you have allowed anybody to touch

18  it?

19          THE WITNESS:  No.

20  Q.  Did someone relieve you from securing the gun?

21  A.  Someone did relieve me.

22  Q.  And you surrendered custody of gun to another police

23  officer?

24  A.  I just like I said, I just left the scene and let him watch

25  over the gun.

I3EAAHIL5                       Rodriguez - Cross

1    A.  He had one handcuff on.

2    Q.  OK.

3    A.  He wasn't fully cuffed.  Just one handcuff was on one arm.

4    Q.  How soon did you arrive at the scene after you heard the

5    gunshot go off?

6    A.  Very, very quickly.

7    Q.  And did there come a point where you observed a gun on the

8    ground?

9    A.  Yes, I did.

10   Q.  Where was that located?

11   A.  It was to the left of Mr. Hill.  It was on the ground.

12   Q.  How far, if you know?

13   A.  About a arm length or two arm lengths.

14           MR. LAX:  No further questions, your Honor.

15           THE COURT:  Was it on the -- I'm sorry.  Do you want

16   to cross-examine, Mr. Wertheimer?

17           MR. WERTHEIMER:  No, your Honor.

18           THE COURT:  Was the gun that you saw on the street, on

19   the curb within on the sidewalk, near the curb.

20           THE WITNESS:  I don't recall, your Honor, but I know I

21   seen a firearm on the ground.

22           THE COURT:  One or two arms lengths away?

23           THE WITNESS:  Correct, your Honor.

24           THE COURT:  On which side of Mr. Hill?

25           THE WITNESS:  To the left of Mr. Hill's body.

I3F8HIL3

1          MR. SHANIES:  That is plaintiff's last witness.  The

2     only thing we have remaining to do is to read into evidence the

3     selection of the 911 call, per your Honor's ruling.

4          THE COURT:  That will take a few minutes?

5          MR. SHANIES:  That will take a few seconds.

6          THE COURT:  Do it now.

7          MR. SHANIES:  Yes, your Honor.

8          This is a selection of a 911 call placed by Lateasha

9     Alston on September 20, 2012.

10          "OPERATOR:  Operator 2035, what is your emergency?

11          "CALLER:  I am in a car with my husband and my kids,

12     and we just watched a police officer shoot a man in the head.

13     I am on Clinton and Hamilton.  I'm driving and I -- the guy was

14     giving a hard time, but they shot him in the head."

15          THE COURT:  The plaintiff rests.

16          MR. SHANIES:  Yes, your Honor.

17          THE COURT:  Come up.

18          (Continued on next page)

19

20

21

22

23

24

25

I3J8HIL3

1          That's it.  See you tomorrow morning at 10:00.

2          Deliver your books to Ms. Jones who will return them

3     to you tomorrow morning.

4          (Jury exits courtroom)

5          THE COURT:  We are going to distribute two copies to

6     each side of the charge and two copies of the verdict sheet.

7          We will have our charging conference at 3:30 this

8     afternoon.

9          MS. MILLER:  Your Honor, I had one housekeeping

10    matter, which is on Exhibit C, I just want to make sure that we

11    are clear on that.  C was a radio transmission, and I just want

12    to be clear for the record that your Honor admitted it in

13    evidence from 1 minute 7 seconds to 1 minute 43 seconds.

14         THE COURT:  My recollection is I have.

15         What is your, Mr. Shanies?

16         MR. SHANIES:  I believe that is correct.

17         THE COURT:  It's in.

18         MS. MILLER:  Thank you.

19         Also, for the record, to renew our motion, both for

20    dismissal of the case in general and also for qualified

21    immunity.

22         THE COURT:  Say it again.

23         MS. MILLER:  Renewing our motion pursuant to Rule 50.

24         THE COURT:  It's renewed.

25         MS. MILLER:  Included in that is qualified immunity.

I3J8HIL3

1          THE COURT:  Of course.

2          Anything else?

3          MS. MILLER:  No, sir.

4          THE COURT:  See you at 3:30.

5          (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              AFTERNOON SESSION

                                 3:30 p.m.

             THE COURT:  Good afternoon.  Please be seated.

             We've marked that Court Exhibit Three.  It's the
proposed jury charge given out.

             As I've written at the top page this draft is subject
to change until it's delivered to the jury.  This is the only
time you'll see the draft.  I'm not giving you the different
changes I make unless it's substantive and then I'll produce
that particular page.  There are various captions as you see.
They're guidance to help us find what you need to find I don't
intend to read them to the jury.

             My habit is to read charges extemporaneously.  I
stand.  I watch the jury carefully.  If I feel the jury is not
understanding everything, I'll repeat and summarize.  I'll do
whatever I need to do to make sure that it is understood.  My
experience from previous cases is that juries do understand the
charge.  And I found in many years of practice that when you
give a document to a party there is no assurance that the party
will have read nor understand the document.

             Within a jury system where each are equal, some people
are more experienced than others in reading documents.  I don't
want anybody in the jury to ever -- the role of judge.  If I
need a clarify instructions it's much better if they come out
and say they need clarification.

1              With that introduction, let's proceed this way.

2     What's the first page in which the plaintiff has a change to

3     suggest?

4              MR. SHANIES:  Page one, your Honor.

5              THE COURT:  Yes.

6              MR. SHANIES:  Minor change.  Second to last line, we

7     suggest changing "laws" to "law".  There's only one claim under

8     one statute, 1983.

9              THE COURT:  Correct.  Thank you.

10             Next?

11             MR. SHANIES:  The next page is six.  The issue we have

12    here, so the second paragraph here correctly summarized the

13    nature of the plaintiff's claim.  The third paragraph however

14    we think has some extraneous statements in this such as:

15             "Defendant asserts that he acted properly as an

16    officer of the New York City Police Department, that Mr. Hill

17    was resisting arrest".

18             What it really should have is the defendant's

19    contention that he had probable cause to believe Mr. Hill posed

20    a threat of death or serious physical injury to himself and/or

21    his fellow officers.  The concern here is it would mislead the

22    jury to think that acting properly as an officer of the New

23    York City Police Department is some sort of defense to an

24    excessive force claim or that Mr. Hill was resisting arrest.

25             We think that those two clauses should be stricken for

I3JAAHIL4                    Charge Conference

1     clarity.

2             THE COURT:  Ms. Miller.

3             MS. MILLER:  Ms. Speight's handling this, your Honor.

4             MS. SPEIGHT:  We disagree.  We wouldn't want those

5     statements omitted.

6             THE COURT:  He is focusing on the word "properly" in

7     the first line, paragraph three.

8             MS. SPEIGHT:  That's fine.  That doesn't need to be

9     removed, your Honor.

10        THE COURT:  What's fine?  What Mr. Shanies says?

11        MS. SPEIGHT:  No.  What the text reads.

12        THE COURT:  I think it's their summary, Mr. Shanies,

13    is what I read to the jury originally.  I'll leave it alone and

14    there are specific instructions later on that made it quite

15    clear.

16            MR. SHANIES:  Our next issue is on page 8.

17            MS. SPEIGHT:  Your Honor, would you like us to mention

18    if we have a change on the page?

19            THE COURT:  Up to page eight.

20            MS. SPEIGHT:  We have one minor change on page six

21    we'd like.

22            THE COURT:  Yes.

23            MS. SPEIGHT:  The second paragraph where it says:

24            "The plaintiff claims that the force used against

25    Tyjuan Hill";

1          We would like just like to add to make clear lethal

2     force, "the plaintiff claims that the lethal force claimed by

3     defendant Quigley was excessive and unreasonable."

4          THE COURT:  Mr. Shanies.

5          MR. SHANIES:  Well, we've previously hashed this issue

6     out about the pre-lethal force.

7          THE COURT:  Do you want to it the way it is?

8          MR. SHANIES:  Yes.

9          THE COURT:  I agree with you.

10         Page 8?

11         MR. SHANIES:  So, your Honor, this is a fairly major

12    issue regarding the fourth element of the claim.  And I believe

13    there is a separate instruction that deals specifically with

14    this element which is on page 14.  The instruction as it

15    currently reads says that:

16         "In performing the alleged act the defendant acts with

17    an intent to he deprive Mr. Hill of his constitutional right

18    with active reckless disregard of that right."

19         We believe that that's not a correct instruction.  And

20    we rely on the case of Dancey v. McGinley which was decided

21    actually shortly after the first trial of this case and

22    specifically deals with what level of intent, if any, needs to

23    be proven.

24         THE COURT:  Second Circuit case?

25         MR. SHANIES:  Yes.

 1                THE COURT:  Dancey v. McGinley.  What's the citation?

 2                MR. SHANIES:  843 F.3d 93.

 3                THE COURT:  Tell me about the case.

 4                MR. SHANIES:  Plaintiff who was punched in the jaw --

 5     I have to confess I don't have intimate familiarity with the

 6     facts of the case.

 7                THE COURT:  Does Mr. Wertheimer?

 8                MR. SHANIES:  He may.

 9                MR. WERTHEIMER:  Yes, your Honor.  The facts of the

10     case had that one of the officers involved in the action I

11     believe pushed the plaintiff over the trunk of a car and that

12     led to him breaking his jaw.  And the question was whether the

13     officer in that case had to intend to brake his jaw and

14     therefore use excessive force when he did so even though he

15     intended to push him.  That was undisputed.

16                The Second Circuit overturned the district court in

17     that case because it didn't instruct that the only intentional

18     act that was necessary was the pushing, not that the ultimate

19     injury result from that act, as long as that push was

20     considered unreasonable, objectively unreasonable under the

21     circumstances, that that was all that was necessary for

22     excessive force to be found by the jury in that case.

23                MR. SHANIES:  So, your Honor, here is why it becomes

24     an issue in this case.

25                THE COURT:  I understand why.  Suppose I add this

1    phrase after constitutional right; by shooting Mr. Hill without

2    legal basis to do so or acted with reckless disregard of that

3    right?

4            MR. SHANIES:  I believe that the Dancey case

5    specifically says that an instruction that a defendant intended

6    or was recklessly intended to violate or recklessly disregarded

7    a right was not a direct instruction.

8            THE COURT:  What do you want me to say?

9            MR. SHANIES:  We think that the instruction should be

10   that the defendant took some intentional or reckless action

11   that was objectively unreasonable and proximately caused

12   Mr. Hill's injury.

13           THE COURT:  I think that drops the standard to low.  I

14   have to read Dancey and come up with it before summations

15   tomorrow or I'll send you what I'm going to do by e-mail.

16           What does the defendant say?

17           MS. SPEIGHT:  We'll take a look at that case as well

18   but it doesn't sound to us like it really changes anything

19   because here the intent is not to cause the effect -- but to

20   the extend you make the addition that you suggested shooting

21   without legal basis without intent to do so that we would be

22   fine with that.

23           THE COURT:  All right.  Mr. Shanies.

24           MR. SHANIES:  Page ten and that goes on to page 12.

25   This is the substantive instruction on excessive force.

I3JAAHIL4                      Charge Conference

1           THE COURT:  OK.

2           MR. SHANIES:  Couple issues here.  One, we would ask

3    that the Court instructions begin with an affirmative statement

4    of what the standard is for an excessive force claim.  It says

5    that a plaintiff proves by a preponderance of the evidence that

6    a defendant used greater first than a reasonable officer would

7    have used under the circumstances.

8           That language gets buried in this instruction after

9    issues like prostitution and when they can make an arrest and

10   we think it would be much clearer if we start with the actual

11   legal standard.  In the case of lethal force the issue is

12   whether the defendant had probable cause to believe that

13   plaintiff posed a substantial death to the officer or others.

14   Those two pieces of excessive force instruction are really the

15   essence of what the jury should be getting here and we suggest

16   at the outset that they be placed prominently at the beginning

17   of the instructions.

18           THE COURT:  What would you put in the beginning?

19           MR. SHANIES:  After the first paragraph you would say

20   that:

21           "To prove a claim for excessive force, plaintiff must

22   prove by a preponderance of the evidence that the defendant

23   used greater force than a reasonable officer would have used

24   under the circumstances."

25           THE COURT:  I will do that.  The first sentence you

1    are not objecting to.  It sets up what plaintiff has to prove.

2    The second is a summary of the allegations of both sides.  So

3    there's context.  The third deals with a right to arrest.  I

4    would say first that there was a lawful arrest --

5                MR. SHANIES:  If I may, your Honor, there was no

6    dispute, your Honor, that it was a lawful arrest.

7                THE COURT:  The jury has to understand context.  It

8    doesn't make any difference.  Then it goes on to describe how

9    the police may act in the context of affecting that request.  I

10   think that's a logical progression.

11               MS. SPEIGHT:  We don't object, your Honor.

12               MR. SHANIES:  Your Honor, our feeling is that --

13               THE COURT:  I understand.  You've made your point.

14               MR. SHANIES:  So the next issue is the last sentence

15   of the second paragraph which states that the defendant claims

16   that he was acting "within his immunity as a police officer".

17               THE COURT:  Yes.

18               MR. SHANIES:  We believe that that clause would end

19   "within his community as a police officer" should be taken out.

20   There is no immunity issue for the jury to, we don't define

21   immunity.  We don't explain what immunity a police officer and

22   really it's not for the jury to be considering.  In any case,

23   we think that would introduce confusion and blur the findings

24   here.

25               THE COURT:  I've heard that there's a mixed question

1  and that these instructions are necessary to talk about how to

2  deal with and what his state of mind has to be.  And part of

3  that state of mind is to understand as a police officer what

4  the scope of his immunity is.  He has to know what he can do.

5  And that's the purpose of this clause and I think I should keep

6  it.

7          Do you agree, Ms. Speight?

8          MS. SPEIGHT:  Yes, your Honor.

9          THE COURT:  I'm going to keep it.

10          MR. SHANIES:  The next issue is on page 11, then the

11  paragraph that's continued from the previous page, the final

12  sentence says:

13          A policeman is not required to retreat from the scene.

14  If the person arrested poses a danger to the policeman or

15  another the policeman may use lethal force.

16          So we now have poses a danger as justifying lethal

17  force but that's not the correct standard.  It has to be a

18  probable cause to believe that there's a significant threat of

19  death or serious physical injury to the officer or others, not

20  simply poses a danger.  So we think that needs some

21  clarification.

22          THE COURT:  What do you want?

23          MR. SHANIES:  If the person arrested --

24          THE COURT:  Well, they add the word "probable".

25          MR. SHANIES:  I think it should say:

1          A policeman is not required to retreat from the

2     scene -- the sentence is a little bit awkward because it then

3     goes into "if".  Perhaps, a policeman is not required to

4     retreat from the scene, period.  And then if the officer has

5     probable cause to believe that the person poses a significant

6     threat of death or a serious physical injury to the policeman

7     or to another, the policeman -- then the rest of it is fine.

8     It's just the issue is poses a danger misstating the standard

9     for using lethal force.

10          THE COURT:  Give me your language again.

11          MR. SHANIES:  We would --

12          THE COURT:  If the policeman -- go ahead.

13          MR. SHANIES:  Yes.  If the policeman as probable cause

14    to believe that --

15          THE COURT:  Just a minute.  Go ahead.

16          MR. SHANIES:  Probable cause to believe the person

17    arrested poses a significant threat of death or serious bodily

18    injury.

19          THE COURT:  So here is how it's going to read:

20          "A policeman also is not required to retreat from the

21    scene.  If a policeman has probable cause to believe a person

22    arrested poses a significant threat of death or serious bodily

23    harm to the policeman or to another, the policeman may use

24    lethal force against that person and has immunity from

25    liability if that is what happened."

1          MR. SHANIES:  Putting aside our objection to the

2    immunity issue I think that correctly states the standard.

3          THE COURT:  Go ahead, Ms. Speight.

4          MS. SPEIGHT:  We have no objection to that revision.

5    We do have one suggestion for that same paragraph.

6          THE COURT:  Yes.

7          MS. SPEIGHT:  The second sentence going into the third

8    probable cause to believe a person being arrested poses a

9    significant threat to kill or inflict serious bodily injury, we

10   would just prefer that it continually use the same language as

11   to be consistent poses a significant threat of death as opposed

12   to kill.

13         THE COURT:  You want me to say "of death" rather than

14   "to kill".

15         MS. SPEIGHT:  Yes, your Honor.

16         THE COURT:  Yes, Mr. Shanies.

17         MR. SHANIES:  So the next also relates to this

18   paragraph.  We would ask for a sentence following that final

19   sentence stating the converse proposition which is that if the

20   policeman does not have probable cause to believe that the

21   person poses a significant threat of death or serious bodily

22   harm, the police officer may not use lethal force.

23         THE COURT:  I resist redundancy.  That's redundant.

24         MR. SHANIES:  Respectfully, your Honor, we see a lot

25   of ways where the jury can find there is not excessive force

I3JAAHIL4                        Charge Conference

1    and in many cases it's not balanced by a statement that if the

2    officer does exceed the standard that it would be excessive

3    force.

4            THE COURT:  It's said in the last sentence and now I'm

5    defining excessive force in.  It's said in the last paragraph.

6    I'm sorry.  There's a balance in this paragraph and this is the

7    definition.  Then I go in to say the question is whether the

8    totality of the circumstances provided probable cause, et

9    cetera.

10           MR. SHANIES:  One suggestion for that --

11           THE COURT:  I'm going to leave it the way it is.

12           MR. SHANIES:  OK.  I'm moving into the next paragraph

13   where your Honor says, what the question is I think you

14   correctly state the question but it's not followed by any

15   direct guidance as to what the jury says.  I think it would be

16   useful for them to know that if they find a probable cause did

17   exist then lethal force is justified if they find that probable

18   cause did not exist, then the defendant was not authorized to

19   use lethal force.  And then --

20           THE COURT:  One minute.  The last paragraph sums it

21   all up.  It says:

22           If the defendant used excessive force then he exceeded

23   the bounds of his lawful authority and violated Mr. Hill's

24   constitutional rights.  If the defendant did not use excessive

25   force and it did not exceed the boundaries of his lawful

1    authority and did not violate -- Nope.  I'm leaving it the way

2    it is.

3              MR. SHANIES:  Our next issue is with respect to the

4    sentences in the second paragraph about --

5              THE COURT:  Page?

6              MR. SHANIES:  Still page 11.  I'm looking right in the

7    middle of page where it says Mr. Hill posed a significant

8    threat of death or serious physical injury to the officer or

9    others.

10             THE COURT:  Yes.

11             MR. SHANIES:  I think for charity since we heard from

12   many officers in this case that that should say "the defendant

13   or others".  That's just a clarification.

14             THE COURT:  What do you want me to do?

15             MR. SHANIES:  Change officer to defendant in that line

16   and the following line.

17             THE COURT:  No.  This is a general statement.  It

18   talks about what an officer generally has to be convinced and

19   we -- it's a general statement.  I'll leave it the way it is.

20             MR. SHANIES:  So on the next line where it says that

21   it's the circumstances known by the officer on the scene,

22   again, if that's not specified to refer to the defendant, that

23   could mean any of the officers on the scene and --

24             THE COURT:  No.  It's a general statement.  I don't

25   think that's correct.  I'm leaving it the way it is.

I3JAAHIL4                        Charge Conference

1          MR. SHANIES:  OK.  Our next issue is the final

2     sentence about split second decisions and rapidly evolving

3     circumstances.  We're familiar with that language from the

4     general standards for excessive force but we don't believe it's

5     useful here where we're dealing specifically with deadly force

6     and the crux of the jury's inquiries is the probable cause.

7          THE COURT:  Same rule.  Whether it's deadly force or

8     not has to be taken into consideration of the circumstances and

9     how they're changing.  I decline to change that.

10          MR. SHANIES:  The next issue in the final paragraph on

11     page 11 there are two references to Hill.  We would ask that it

12     be kept consistent and it says "Mr. Hill" or "Tyjuan Hill".

13     The third to last line and the second to last line.

14          THE COURT:  I've got it.

15          MR. SHANIES:  That's all we have for this part.

16          THE COURT:  Next?

17          MR. SHANIES:  The next is page 14 we have the same

18     issue about --

19          THE COURT:  The defendant have anything up to page 14?

20          MS. SPEIGHT:  No, we don't, your Honor.

21          MR. SHANIES:  This, your Honor, I think this is

22     subject to what your Honor said about reviewing the Dancey case

23     but this is the same issue about what level of intent is

24     required.

25          THE COURT:  Yes.  I'll tell you.

1          MR. SHANIES:  That may be all we have.

2          No.

3          THE COURT:  Here it says the intent to commit the

4     acts.

5          MR. SHANIES:  So the issue there is that the defendant

6     need not have intended each and every act so as long as the

7     defendant intentionally took some act that constituted a

8     seizure and proximately caused the injury.  So for example, if

9     Mr. Quigley took his gun out and shoved it into Mr. Hill's head

10    and a jury found that that was unreasonable use of force, even

11    if Mr. Quigley did not intend to fire his weapon, if the jury

12    finds that doing so was unreasonable under the circumstances.

13         THE COURT:  No.  I am going to keep the act.  I think

14    this is a better statement than my lead-in statement.  But I'm

15    talking about acts that deprive which you say is the law and

16    which I adopt.  I'm leaving this the way it is.

17         MR. SHANIES:  Our next issue come on page 25.  This is

18    a minor change in the second paragraph.  It says:

19         You may have heard evidence that the witnesses have

20    discussed facts of "their lawyers", we'd ask that that be with

21    "the lawyers".  Some of the discussions we're talking about

22    were had not between attorney and client but between attorney

23    and witness.

24         THE COURT:  I'm taking out the word "their".

25         MR. SHANIES:  Yes, your Honor.

1          The next issue is page 28 particular investigative

2    techniques not required, we think that this instruction should

3    be taken out entirely.  I think it's vague and broad.

4    Statements like law enforcement techniques are not your concern

5    are overly broad in this case, where the actions of the

6    defendants and the actions of other police officers which

7    certainly could be said to relate to law enforcement techniques

8    are very much the jury's concern here.  And your Honor

9    sustained certain objections and made certain rulings during

10   the trial about certain investigative techniques but I don't

11   think that kind of jury instruction would be helpful.

12         THE COURT:  It is the standard jury instruction.  For

13   example, in this case a juror could himself ask himself why is

14   there no fingerprint evidence?  That's an investigative

15   technique.  But you can argue the absence of fingerprint

16   techniques if you want to.  I'm going to give this instruction.

17   It's pared down.  The Sand recommendation is much like this.

18         MR. SHANIES:  We would ask that there be some language

19   in there about the actions of the defendant and witnesses can

20   be evidence of their state of mind.  The concern we have here

21   is that by saying law enforcement techniques are not the jury's

22   concern.  Everything that happened here could be described a

23   law enforcement technique and I think the jury needs to

24   understand that it can consider Mr. Quigley's actions, the

25   actions of other officers who testified in this case in

I3JAAHIL4                    Charge Conference

1    evaluating the credibility of their testimony and then --

2            THE COURT:  I say that.  The end of page 14 it says:

3        "No one can peer into another's mind.  The issue of

4    intent is determined by reasonable inferences from the facts

5    and circumstances surrounding an event."

6            MR. SHANIES:  Your Honor, the issue really is not with

7    explanation of the content of intent.  It's whether and to what

8    extent intent is required in this case.  And I would ask that

9    your Honor not rule on this issue but review the Dancey case

10   because it speaks specifically about unintentional discharges

11   and the fact that they could still be excessive force.  And I

12   think there is a reasonable view of the evidence here that

13   there was an unintentional discharge that flowed from an

14   unintentional use of force.  So I think it very important that

15   we get this instruction correct.

16           THE COURT:  Elaborate on that.  What do you mean?

17           MR. SHANIES:  So the Dancey case --

18           THE COURT:  Talk about the facts of this case quickly

19   and there is no dispute about this.  Comes upon the scene,

20   claims that he hears "gun", "gun", "gun", "gun", contends --

21   and this is disputed -- that he saw a gun in Hill's hands and

22   shot him.  So what is the negligence here?  Everything is

23   intentional.

24           MR. SHANIES:  Well, your Honor, I think there is a

25   reasonable view of the facts and, obviously, the presence or

1   non presence ever a gun -- I am assuming that the jury credits

2   our theory of the case which is that there was no gun being

3   pointed at Mr. Quigley -- but there is reasonable view of the

4   facts here which is that Mr. Quigley took his gun out.  He ran

5   up on the scene.  He jammed his gun into the back of Tyjuan

6   Hill's head and intentionally or unintentionally pulled the

7   trigger of that gun and fired a shot into Tyjuan Hill's head.

8   In any either case it would still be excessive force under the

9   applicable law.

10          THE COURT:  Yes.  Because of the high probability that

11   the gun would go off.  I'll take that into consideration.

12          MR. SHANIES:  Thank you.  That's our last issue, so we

13   can defer to the defendants.

14          THE COURT:  Ms. Speight.

15          MS. SPEIGHT:  We would object to that to the argument

16   that that is an inference.

17          THE COURT:  I will hear from both you of you.  I'll

18   give you some proposed language for a change and I'll review it

19   again with you.

20          MS. SPEIGHT:  Thank you, your Honor.  We don't have

21   any further revision.

22          THE COURT:  OK.  See you tomorrow at ten o'clock.

23          MR. LAX:  Your Honor, we do want to just discuss the

24   verdict sheet for one second.

25          THE COURT:  Oh, right.  That would be Court exhibit --

I3JAAHIL4                         Charge Conference

1    What was your point?

2             MR. LAX:  For the record, we would renew our request

3    to ask the questions we proposed.

4             THE COURT:  What kind of questions?

5             MR. LAX:  We submitted over the weekend --

6             THE COURT:  Yes, I have them.  I've considered them.

7             One minute.  Questions one through three are the same

8    as the instruction running from page 10 to 12.  If the jury

9    finds for the plaintiff, notwithstanding, the instruction on 10

10   to 12, it necessarily means that the plaintiff thought that the

11   use of illegal force is not justified.  Questions one through

12   three state the same thing in our efforts to get the jury to

13   answer specific questions, then the hopes might be consistent

14   general verdict.  That's improper.  I will not do it.  I think

15   I've covered whatever can be argued about immunity in the chart

16   and continue to -- I decline to give these specific

17   interrogatories to the jury.

18            Interrogatory Number Four in the sense of issue of

19   punitive damages, right?

20            MR. LAX:  Yes, your Honor.

21            THE COURT:  So let's look at the charge of punitive

22   damages.

23            MR. LAX:  Your Honor, just to be clear, we were

24   proposing that these be, that this go to the jury first and if

25   there was a finding that necessitated a damages verdict sheet

1    that that then be sent back which would be basically questions

2    two and three.

3         THE COURT:  I see no reason to subject the jury to

4    specific interrogatories when a general verdict will do the

5    same thing.  So I decline to give those special

6    interrogatories.

7         MR. LAX:  Your Honor, with qualified immunity it is

8    possible for the jury to find excessive force but, nonetheless,

9    Sergeant Quigley had used force that would be objectively

10   reasonable for an officer to think he had authority to use.

11        THE COURT:  It's covered in the instruction.

12        MR. LAX:  Thank you, your Honor.

13        THE COURT:  The charge on punitive damages which

14   begins on page 17 provides follows:

15        "To be entitled to punitive damages, the plaintiff

16   must prove by a preponderance of the evidence the defendant's

17   conduct not only was wrong but also was outrageous in the sense

18   of being malicious or wanton as I've defined the terms."

19        I don't think anything is added by this specific

20   interrogatory and I declined to include it.

21        MR. LAX:  For the record again, your Honor, we propose

22   questions two and three specifically for purpose of qualified

23   immunity.  And again, qualified immunity attaches at least some

24   judges in this court have found when there has to be,

25   necessarily, there has to be a finding of excessive force.  But

I3JAAHIL4                    Charge Conference

1    then what that force is can be broken down in a number of ways

2    and here there's a reasonable view of the facts and we need to

3    know from the jury what they're finding because they could

4    believe, they could find based on the Court's charge that the

5    use of a firearm or the shot was excessive even though they

6    might find facts that might give rise to a belief of probable

7    cause, a reasonable belief of probable cause.

8            THE COURT:  It's not possible.  It says in the charge,

9    top of page 11:

10           "The policeman has probable cause to believe that a

11   person being arrested poses a significant threat of death or

12   serious bodily injury to that policeman or to another, the

13   policeman may use lethal force and even kill the person he is

14   trying to arrest."

15           So unless that instruction fits this case unanimously

16   to the jury, unless the jury finds that that's been proved by a

17   preponderance of the evidence, no verdict can be given to the

18   plaintiff and there's no issue of immunity.

19           If the jury conversely believes that the policeman

20   lacked probable cause or that the person arrested did not pose

21   a significant threat of death or serious bodily injury to that

22   policeman or to another, then the jury will give a verdict for

23   the plaintiff and that takes care of immunity because there is

24   no immunity in this situation.

25           Immunity requires that the policeman acted with

I3JAAHIL4                        Charge Conference

1    probable cause or -- so this charge makes it impossible for the

2    jury to find for the plaintiff if, nevertheless, a policeman

3    has immunity.  It's redundant and just challenges the jury to

4    see if by trick there could be an inconsistent answer to a

5    specific interrogatory that is inconsistent with the general

6    verdict.  I decline to the give the charge.

7               MR. LAX:  On that note, your Honor, I would say we did

8    include even as mistakenly for that very purpose, so it's not a

9    trick.  It's simply how the jury is viewing the facts.

10              THE COURT:  The jury will act responsibly as it always

11   does.  And if it doesn't then I have powers to change the

12   verdict or to issue an order for a new trial.  That's the

13   purpose of the motions.  And if there's substantial evidence

14   that doesn't support the jury verdict, then the jury verdict

15   will go even though it's general.

16              OK.  Anything else?

17              MS. MILLER:  One thing with respect to summation, your

18   Honor.  There was testimony by a Detective Manzano.  I can't

19   really figure out why that testimony was there except perhaps

20   there may be some sort of argument about how long the decedent

21   was in the road.  I know this was argued by Mr. Smallman last

22   time.  The defense now moves to preclude that kind of argument

23   as not being relevant to anything except to being inflammatory.

24              THE COURT:  What are you concerned about?

25              MS. MILLER:  There was an argument made last time and

I3JAAHIL4                    Charge Conference

1    we'd like to preclude it this time as to how long the decedent

2    was in the road.

3            THE COURT:  How long the decedent was what?

4            MS. MILLER:  In the road while Crime Scene was doing

5    what Crime Scene does before the medical examiner came and took

6    the decedent away.  It's not really relevant.  It has nothing

7    to do with damages.  The only reason to say that would be

8    inflammatory.

9            THE COURT:  Mr. Shanies.

10           MR. SHANIES:  There is not going to be any argument

11   about how long the body was left in the road.

12           MS. MILLER:  Fine.

13           MR. SHANIES:  On a similar note we want to raise an

14   issue about Officer Rivera, the undercover.  And she had

15   testified that she had some injuries, a headache, her wrist was

16   hurting.  We didn't object when she gave that testimony because

17   given our theory that going to the hospital was a pretext, I

18   thought it was fair to elicit from her that she claimed that

19   she had actual injuries.  However, since your Honor precluded

20   any evidence about the nature, about interactions between

21   Officer Rivera and the occupants of the vehicle, since that's

22   very attenuated from the incident at issue here and since also

23   no evidence the defendant had any knowledge of those

24   interactions, I would ask that the defendant be precluded from

25   arguing that Tyjuan Hill somehow caused injury to Officer

I3JAAHIL4                    Charge Conference

1    Rivera or was directly or indirectly to responsible for an

2    injury to.

3              THE COURT:  Ms. Miller.

4              MS. MILLER:  No, your Honor, I'm not going to say

5    anything about that.  But we will say is why Ms. Rivera went to

6    the hospital.  And the reason for that is exactly what

7    Mr. Shanies said, that there seemed to be some sort of argument

8    here that the entire group of people working on this operation

9    somehow got together and made up some sort of story.  She

10   actually went because she had some sort of injury.  That's all

11   I am going to say.

12             MR. SHANIES:  We have no issue with that, your Honor,

13   provided it's not accompanied by an implication that Tyjuan

14   Hill was dangerous or injured her.

15             THE COURT:  I don't think there's any implication of

16   that.

17             MR. SHANIES:  Thank you.  All right.  Anything else?

18             MS. MILLER:  No, your Honor.

19             THE COURT:  How long do you think Mr. Smallman is

20   going to be, Mr. Shanies?

21             MR. SHANIES:  I believe last time, your Honor, an

22   hour.  I believe your Honor indicated the same person needs to

23   do the opening summation and rebuttal.  We would ask permission

24   if your Honor would allow us to split that up.

25             THE COURT:  Two different people?

1          MR. SHANIES:  Yes.

2          THE COURT:  Absolutely, not.

3          MR. SHANIES:  OK.  So he would take the hour.  I

4    believe he would want that allot 40 minutes to his main and 20

5    minutes for rebuttal.

6          THE COURT:  He can use his one hour any way he wants.

7          MR. SHANIES:  Yes, your Honor.

8          THE COURT:  He doesn't have to tell me in advance.

9          MR. SHANIES:  I thought that's what you were asking,

10   so I misunderstand.

11         THE COURT:  An hour each side?

12         MS. MILLER:  Yes, your Honor, about an hour.

13         THE COURT:  Not more than an hour, time limit of an

14   hour.

15         MS. MILLER:  I mean, if I'm getting close and I have

16   like one more thing to say --

17         THE COURT:  You'd better not get close, so you don't

18   have to worry about the one more thing to say.

19         MS. MILLER:  I don't think if the jury wants to hear

20   from anybody beyond an hour, to be honest.

21         THE COURT:  That may be stretching it.  OK.  See you

22   tomorrow at ten.

23         The proposed jury charge is Three and proposed verdict

24   form is Four.

25         (Adjourned to Tuesday, March 20, 2018 at ten a.m.)

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   JOANNE LEE

 4   Direct By Ms. Miller . . . . . . . . . . . . 497

 5   Cross By Mr. Hughes  . . . . . . . . . . . . 539

 6                      PLAINTIFF EXHIBITS

 7   Exhibit No.                          Received

 8    23A  . . . . . . . . . . . . . . . . . . 570

 9                      DEFENDANT EXHIBITS

10   Exhibit No.                          Received

11    E2   . . . . . . . . . . . . . . . . . . 525

12    E1   . . . . . . . . . . . . . . . . . . 528

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I3KAAHIL1                    Jury Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CAROL HILL, on behalf of TYJUAN HILL,

4                   Plaintiff,

5             v.                          12 Cv. 8691 (AKH)

6   SGT. PATRICK QUIGLEY,

7                   Defendant.

8   ------------------------------x

9                                        March 20, 2018
                                         10:20 a.m.
10
    Before:
11
                    HON. ALVIN K. HELLERSTEIN,
12
                                         District Judge
13
                         APPEARANCES
14
    LAW OFFICE OF DAVID B. SHANIES
15       Attorney for Plaintiff
    BY:  DAVID SHANIES
16       JOEL WERTHEIMER

17  LAW OFFICE OF PHILIP J. SMALLMAN
         Attorney for Plaintiff
18  BY:  PHILIP J. SMALLMAN

19  LEGAL AID SOCIETY
         Attorney for Plaintiff
20  CLINTON HUGHES

21  NEW YORK CITY LAW DEPARTMENT
    OFFICE OF THE CORPORATION COUNSEL
22       Attorneys for Defendant
    BY:  MELANIE SPEIGHT
23       JOSHUA J. LAX
         PATRICIA MILLER
24

25

I3KAAHIL1                    Jury Trial

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Please be seated.

3          I circulated yesterday a revised version of the two

4   paragraphs to define intent.  The plaintiff ahs submitted a

5   variant of that and the final one is what I'm handing out.  So

6   I'm going to mark this Court Exhibit, the emendation of the

7   plaintiff will be Court Exhibit 5 and the final that I've

8   created is Court Exhibit 6 and that is with you today.

9          Is there any further discussion by the plaintiff?

10  Mr. Shanies?

11         MR. SHANIES:  Your Honor, we do have the same issue.

12  I think one.

13         THE COURT:  Well, I've distinguished carefully the

14  acts which require an intent and the deprivation of

15  constitutional rights which does not require intent.  I've left

16  out from the --

17         MR. SHANIES:  "Dancey".

18         THE COURT:  The Dancey case is a phrase "objectively

19  unreasonable" because that is charged in connection with the

20  definition of what enforcement officer would be used.  It's a

21  phrase that may be appropriate with the factual situation in

22  Dancey which had to do with unlawful seizure.  It doesn't have

23  anything related to the case at hand.  In fact, the phrase

24  "objectively reasonable" is inconsistent with intent.  It

25  creates another standard.  And secondly, it is inconsistent and

1    misleading in relationship to the charge defining how much

2    force an officer can use.  So it's not going to be in there.

3            Is there anything further you want, Mr. Shanies,

4    that's not covered by this charge?

5            MR. SHANIES:  Yes.  Well, understanding your Honor's

6    rulings on this, we would that at a minimum the word "the" be

7    omitted before "acts".

8            Again, this goes to the issue of whether every act

9    needed to be intentional.

10           THE COURT:  Just a moment.

11           MR. SHANIES:  Sure.

12           (Pause)

13           THE COURT:  You're talking about the -- article "the"

14   in line five?

15           MR. SHANIES:  In line?  Sorry.

16           THE COURT:  "Five".  Is that what you're talking

17   about?

18           MR. SHANIES:  I don't think we're talking about line

19   five.  If we're talking about the Section 1983 instruction it

20   would be line 10.

21           THE COURT:  What page?

22           MR. SHANIES:  The first page 1983 claim I am looking

23   at the paragraph that starts with the word "for".

24           THE COURT:  You want me to delete the word "the"?

25           MR. SHANIES:  Yes.

I3KAAHIL1                    Jury Trial

1           THE COURT:  I decline to do so.

2           Anything else?

3           MR. SHANIES:  No.

4           THE COURT:  Subject to the objections you made and my

5    rulings, are you satisfied with the charge?

6           MR. SHANIES:  Yes.

7           THE COURT:  We received Mr. Lax's letter of March 19

8    which assume is filed on ECF.

9           MR. LAX:  Yes, your Honor.

10          THE COURT:  Mr. Lax in his letter raises succinctly

11   the arguments that were made yesterday.  So it's the nature of

12   a motion for rehearing and rehearing is denied.  I've

13   considered these comments yesterday.  I think what I've done is

14   correct and my rulings are correct and I decline to consider

15   them further.  The motion for rehearing is denied.

16          Anything else before we call in the jury?

17          Yes.

18          MS. MILLER:  Your Honor, I was just handed by counsel

19   this morning copies of a PowerPoint presentation that is

20   intended to be used during the summation and we would object to

21   it as being highly inflammatory.

22          THE COURT:  When did you see it, this morning?

23          MS. MILLER:  About 30 minutes ago.

24          THE COURT:  You are not going to be able to use it.

25          MS. MILLER:  OK.  Thank you.

I3KAAHIL1                    Jury Trial

1         THE COURT:  Plaintiffs are not going to be able to use

2    it.  I have not had time to look into it and the nature of

3    these pictures they can insight different emotions and it's

4    very hard for me to view each point.  So the PowerPoint will

5    not be used.  Anything else?

6         Call in the jury.

7         (Jury present)

8         THE COURT:  Good morning, members of the jury.  Be

9    seated everyone.

10        Thank you for getting in.  There were major subway

11   delays on the 2, 3, 4, 5 and 6 lines, which made it very

12   difficult to come in from the Bronx.  So thank you for coming.

13        What we have this morning are the summations.  Each

14   side has an hour.  Mr. Smallman will go first and he'll argue

15   on behalf of his client.  Ms. Miller will go second, arguing in

16   favor of her client and then Mr. Smallman will have a short

17   opportunity to divide his time between his main argument and

18   the rebuttal argument but it won't take more than an hour

19   combination and then we'll be finished with the summations.

20   There'll be a short break between Mr. Smallman's talk and

21   Ms. Miller's talk.

22        I remind you that the lawyers are not giving evidence.

23   The evidence is closed.  These are their arguments about the

24   evidence.

25        Mr. Smallman, please proceed.

1          MR. SMALLMAN:  Thank you, your Honor.

2          Good morning.  May a please the Court, Mr. Foreperson

3    of the jury, on behalf of Carol Hill, my client, on behalf of

4    Mr. Wertheimer, Mr. Shereck, Mr. Shanies and myself, let me

5    begin by thanking you for your close attention, at least as I

6    have observed it, to the events that have taken place in this

7    courtroom beginning a week ago Monday.

8          What did you do?  What did do you?  Where did you

9    first hear those words?  From the witnesses to the execution of

10   Tyjuan Hill.  Those words were directed at defendant Quigley.

11   Why were they directed at defendant Quigley?  He had just

12   placed his police department issued automatic handgun, round in

13   the chamber, pressed it into the back of Tyjuan Hill's head as

14   he was depressed into the roadway of Hamilton Avenue, Brooklyn,

15   New York.  He discharged the round using the most excessive and

16   unreasonable force known to man.

17         What did you do?  What did you do?  The honest answer

18   would have been what I just told you.  Did Patrick Quigley say

19   any of those words when he was before you under oath?

20         Let's talk about the oath for a second, ladies and

21   gentlemen.  The judge called everyone's attention to the oath

22   with each and every witness.  The courtroom stopped.

23   Everyone's eyes on the witness and the following words were

24   spoken:

25         "Do you swear to tell the truth, the whole truth and

I3KAAHIL1                    Summation - Mr. Smallman

1    nothing but the truth, so help you God"?

2            Each of those witnesses responded "yes".  That, ladies

3    and gentlemen, begins and completes a contract with you, a

4    sacred contract from the infancy of this country that if you

5    come in here, a courtroom, under the laws of the United States

6    of America, that is what you agree to do.

7            Can it be said under any circumstance that any of the

8    cops that were with Quigley told you the truth, the whole truth

9    and nothing but the truth?  I submit to you it is "no".  They

10   told you stories about guns that fly, radios that magically go

11   on, anything else they could make up.

12           And why did they tell you these things?  Go back.

13   What did you do?  And in that moment in that place, those six

14   police officers had the option of being good and decent cops

15   good and decent human beings honoring the uniform and the badge

16   they wear by stepping up and telling the truth.  Instead, they

17   chose to lie.  They chose to conspire and run a series of half

18   truths, complete and utter falsehoods.  And maybe, maybe that

19   lie would work except for you.  They never imagined in their

20   wildest dreams, Quigley never imagined in his dreams that he'd

21   be looking at you.  You are the ones who have the power to

22   decide what happened that night, only you, no one else.  It is

23   unique in the world.  No other country has what we have.  No

24   other human being on the planet has the power that you do to

25   decide whether the six lying cops and their story is what

1    really happened there or five independent civilian witnesses

2    who by no means of their own, no grand plan, no scheme, no

3    agenda happened to be at that location at that time.

4            Think about it for a minute.  Suzette Smoot Alena

5    Emerson from Austin, Texas, out to celebrate or have some fun

6    after a job interview, a job discussion or something along

7    those lines with a driver they hired for the week, you think

8    they really planned to be at that intersection at that place

9    and time and witness the horror that unfolded before them?  Are

10   these people really going to get up and argue to you that this

11   is some concerted testimony?  They talked about this.  They

12   made things up.  Did they tell you stories about guns that fly,

13   radios that automatically magically go on?  They did not.  They

14   told you what they saw.  They told you the truth.

15           And ask yourself this, ladies and gentlemen, who

16   called 911 on a cop?  Who calls 911 on a cop?  To do what?

17   Report a crime.  I just watched a cop kill somebody.  Not one

18   call, multiple.  What did the cops tell you?  Oh, I stopped the

19   struggle.  I picked up my radio.  I'm going to call for more

20   cops.  To do what?  Six weren't enough?

21           If you watch TV this weekend, the NCAA --

22           MS. MILLER:  Objection.

23           THE COURT:  He's talking about basketball, Ms. Miller.

24           MR. SMALLMAN:  The NCAA will be on.  When the teams

25   take to the court you're going to see five on each side.  If

1    you happen to be a hockey fan you'll see six on each side.

2               THE COURT:  Not in the NCAA.

3               MR. SMALLMAN:  In the NHL.  In this case it was five

4    on one.  Think about that for a minute.  Think about a

5    basketball game, five on one.  But that's what happened here.

6    Five young strapping, well-trained, well-developed, New York

7    City police officers could not subdue one 22-year-old, 170

8    pound young man.  Couldn't do it.

9               So I'll tell you what the evidence shows you, ladies

10   and gentlemen, that Quigley, the defendant, left a prior

11   location, jumped in a police car, drove it the wrong way

12   against traffic, pulled up to this scene as it was unfolding,

13   withdrew his weapon, ran into the fray, put it on Hill's head

14   and killed him.  That's what the evidence shows you.

15              And you know how you know that?  Because not one of

16   the other five saw Quigley there, not a one.  Tirol, Ouk,

17   Gonzalez, Oliver didn't see him.  So that tells you, ladies and

18   gentlemen, he walked up, said I'm going to take care of this

19   fray, and boy did he.  He became judge, jury and executioner in

20   less than ten seconds.  That is excessive force.  That was

21   intentional.  When you take your weapon and put it on the head

22   of another human being, that's intentional.  There is no

23   mistake.  There was no room for that bullet to go anywhere but

24   directly in his head.  There was no other way to look at this.

25              What does Quigley tell you, the defendant?  Oh, maybe

I3KAAHIL1                    Summation - Mr. Smallman

1    I'll change my story.  Previously I told everybody it was six

2    inches away under oath.  What does the oath mean to that man?

3    Nothing.  Nothing.  Less than nothing.  It's vile.  When I

4    think I can get away with it early on I'll tell you the gun was

5    six inches away.

6              Their witness, the high paid expert Welti $17,500

7    bucks to come in here and it will you the truth.  The gun was

8    on Hill's head.  His head.  You're going to mistake that

9    feeling, folks?  No, you're not, not for a second, not for an

10   instant.  And after he decides to pull the trigger with a round

11   in the chamber Mr. Hill is dead before he hits the ground.

12             Could we see the video please.

13             THE COURT:  Identify what it is before you put it on.

14             MR. SMALLMAN:  Yes, sir.  This would be People's

15   Number Two.

16             THE COURT:  Not "people".  You are in the wrong court.

17   "Plaintiff's".

18             MR. SMALLMAN:  Sorry.  Plaintiff's Exhibit.

19             (Video played)

20             MR. SMALLMAN:  Watch this as it unfolds, ladies and

21   gentlemen.

22             (Video played)

23             MR. SMALLMAN:  Anything untrue about that?  Any

24   question about what it depicts?  Let me posit this to you.

25   That's been in evidence since the very beginning of this case.

1    Every cop that came to this witness stand that was called to

2    the scene of Hamilton and West Ninth had the opportunity to

3    view that.  Did the defendant get up and show that video to any

4    of those witnesses and say show us where the gun is in this

5    video?  Show us where the gun is that Hill had in this video.

6    And they didn't.  And do you know why?  Because it wasn't

7    there.  But the friendly and charming 240-pound Officer Oliver

8    upon seeing this or perhaps being aware that he was being

9    filmed, comes up to Juan Garcia, Garcia rolls down the window,

10   "Get the fuck out of here if you know what's good for you."New

11   York City police officer, 240 pounds, decked out in blue

12   telling this to a potential witness to a crime.  While he is

13   speaking those words to Juan Garcia other civilians are calling

14   911 to report the crime that they just witnessed.  It is beyond

15   dispute, folks, that that video is in the immediate aftermath

16   of Quigley killing Hill.  Immediate.  Seconds.  But they got to

17   clear the decks so the cover up can start.

18        Go further.  Elena Emerson and Suzette Smoot when they

19   testified tell you that after Oliver came and chased us, we

20   drove even closer to the body and looked at it.  Did you see a

21   gun?  No.  You know why?  They hadn't had a chance to drop it

22   there yet.  Be a little dicey to drop a gun when the civilians

23   are right there looking.  Real dicey.  So now they move along

24   and lo and behold the magic gun appears.  Let's talk about the

25   gun for a minute.

I3KAAHIL1                        Summation - Mr. Smallman

1          In another version from the defendant who he probably

2     didn't even bother to tell his attorneys before they opened to

3     you, you may recall the opening --

4          MS. MILLER:  Objection.

5          THE COURT:  Overruled.

6          MR. SMALLMAN:  -- where one of the attorneys over

7     there crouched down in front of you and threw a gun back over

8     the left side of the head.  Nice little display.  Problem is

9     it's not true.  Do you know why it's not true?  Because on

10    rebuttal after hearing from Dr. Welti, defendant Quigley tells

11    you, "The gun came up passed the chin", "The gun came up passed

12    the nose", "The gun came up over his head".  Those are

13    Quigley's words.  And Quigley puts the gun directly back over

14    Mr. Hill's head.  And he tells you that why?  So he could shoot

15    him in the head.

16          The problem is that when he shoots him in the head

17    Elena Emerson and Suzette Smoot tells you there is answer

18    explosion of dust.  That wasn't dust.  That was Mr. Hill's

19    head.  How do you know that?  Because it went in the

20    defendant's mouth and on his clothes.  So why isn't it on the

21    gun?  They don't have an answer for that.  They have no answer

22    for that.  You know why?  Because the gun wasn't there.  The

23    Office of the New York City Medical Examiner, one of the finest

24    in the world examined that with a fine-tooth comb, with all of

25    the modern-day technology, all of the care, gloves, masks,

1    clean decks, paper on, pure chain of custody, complete

2    integrity, no blood.

3              And beyond that where does the gun lie after they drop

4    it?  On Mr. Hill, right next to the pool of blood that's oozing

5    from his head.  Violent.  In evidence is the gun.  They could

6    come up here and wave it around as much as they want, folks.

7    Let them be my guest.

8              The handcuffs that they found appropriate to place on

9    Mr. Hill who was no longer moving and lifeless, have blood

10   visible to the naked eye right there in the photos.  You can

11   bring that gun into the jury room with you, subject to whatever

12   the judge permits.  You can look at it.

13             THE COURT:  They can't, Mr. Smallman.

14             MR. SMALLMAN:  I'm sorry, your Honor.

15             THE COURT:  The gun does not go into the jury room.

16             MR. SMALLMAN:  OK.  If you need to look at it and ask

17   the judge then it will be up to him as to how closely he

18   decides is appropriate.  There is no blood on this.  There

19   never was blood on there and there never will be blood on there

20   because it was planted by the cops.  Part of the cover up.

21             All of these were experienced police officers.  They

22   new exactly what the drill is.  What do you have to do to

23   arrest somebody?  They know the scale that you can go up in

24   terms of effectuating an arrest, words, actions, APSs, more

25   cops, more ASPs.  But at no point can you get to the execution

1   of somebody in the top of the head. It doesn't exist. It's

2   not permitted but if you decide to say that the guy I shot had

3   a gun, then maybe you got yourselves some -- and that's just

4   what they did here. That's exactly what they did here. We're

5   going to put a gun in Mr. Hill's hands literally. Literally

6   dropped it in his hands. And then we're going to say, well, I

7   had to shoot him. He had a gun.

8        Well, he is never anything other than face down even.

9   Their they're forced to admit that. So I ask you, ladies and

10  gentlemen, how is it humanly physically possible to shoot or

11  attempt to shoot another human being in the circumstance that

12  Mr. Hill was? We got one cop on his right arm. I believe

13  that's Gonzalez. We got another cop on his left arm. That's

14  Tirol. You got Casella simultaneously beating him with an ASP

15  on the left leg and another cop holding on for dear life

16  supposed on his right leg. You got four limbs. They're all

17  covered by their testimony. And guess who is sitting on his

18  back? Oliver, all 240 pounds of him.

19       But he goes to great lengths to tell you folks, I'm on

20  his back but I'm not putting any weight or any pressure on him.

21  Well, Officer Oliver, what's the purpose of sitting on his back

22  if you are not trying to depress him? They're lying. And if

23  they're going to lie about those little things they're going to

24  lie you to you about the whole thing.

25       You get in on a cover-up. You get in on a conspiracy

I3KAAHIL1                    Summation - Mr. Smallman

1   you're in for the whole show, the whole show.  You could figure

2   out which one of them dropped the gun.  It was Tirol, dollars

3   to doughnuts.  He's the one who says, I got my hands on it.

4   Does he provide an elimination sample?  Let's make sure we

5   clear up this investigation.  Do it the right way.  Nope?

6   We're going silent.  Another version of the hospital.  Hospital

7   number two, we're not going to cooperate.  We're not going to

8   talk to anybody.  We're not going to get to the bottom of this.

9   You folks can get to the bottom of it.  You have the power to

10  do so and by your verdict you can say so.

11          All six of these cops by their own accounts are not

12  injured, nothing wrong.  Well, maybe the gun blew up next to

13  one's head.  He might have a little tinnitus.  That's

14  understandable.  They all go to the hospital.  One of them even

15  goes to two hospitals and lies about it.

16          Who do they call?  Union reps.  What in the world,

17  ladies and gentlemen, do union reps have to do at a hospital?

18  They are not doctors.  They are not nurses.  They are not

19  medical personnel.  They're there to help sort through the

20  crap.  They're there to help put this together.  Think about

21  it.  We don't talk to each other.  We ride to the hospital in

22  silence.  We ride back from the hospital in silence.  We don't

23  call anybody.  We don't talk to each other.  We're a bunch of

24  monks sitting in silence.

25          Mind you, think for a second of this circumstance

I3KAAHIL1                    Summation - Mr. Smallman

under which they engage in this behavior.  One of their own has

just murdered somebody in the middle of a Brooklyn street.

There's nothing to ask about?  There's nothing to talk about?

Oh, I submit to you folks, they talked plenty.  They talked

plenty.  But they lied to you about doing so.  Another lie, an

outright lie, looking at you and lying to you after swearing to

tell the truth, the whole truth and nothing but the truth.

        They may not all be in with the same energy.  Did you

take a look at Gonzalez as he testified?  He looked like a man

on fire when he got out of that witness chair.  Couldn't wait

to get out of here.  Officer Tirol, is his testimony worthy of

your belief, worthy of credibility?  He is the one who

testified about the radio.  He's in the midst of, according to

him, what amounts to a life and death struggle.  But as a

trained police officer I am going to disengage from this

struggle, stand up and yell "gun", "gun", "gun", "gun", "gun",

"gun".  Do you believe he actually did that?  They played the

tape.  Stop for a minute and think about what was happening

while he is supposed to have said those words.  All of the

other cops kept telling you, when we're on Hill we're ordering

him to stop resisting.  Give us your hands.  Stop resisting.

Give us your hands.  Stop resisting.  Do you hear a word of any

of that dialogue on that tape?  You don't.  Because he's lying

to you.  He's lying to you.  You don't hear any street noise.

You don't hear any "give us your hands" and you know what else

I3KAAHIL1                      Summation - Mr. Smallman

1   you don't hear?  The gunshot that's supposed to happen in this

2   place in that time.  All lies.  Where's the gunshot?

3           Do you know what Tirol did?  More vile behavior.  He

4   made a call on the radio after Mr. Hill was dead.  That's why

5   there's no other noise.  That is why you don't hear a gunshot.

6   That is the cover-up folks early in.  He's in all the way.

7   He's in.

8           You probably recall what the subject of that case is,

9   the shooting of Mr. Hill by the defendant Quigley.  Wouldn't it

10  makes sense that all of the witnesses who came here, certainly,

11  the police officers, knew exactly what this was going to be

12  about?  You have heard about prior testimony, statements given

13  by some of these witnesses and other locations at other times,

14  so there really is no mistaking what this is about.  And I

15  didn't hear any of these cops tell us that they killed a lot of

16  people or that they were involved in a lot of gun fights.  So

17  they're not mistaking this event with any other.

18          Keeping that in mind while I was prepping, I decided

19  to count how many "I don't know", "I don't remember", "I can't

20  recall".  In 30 pages of testimony Tirol answered "I don't

21  remember", "I can't recall" 40 times.  What is there not to

22  recall?  I didn't ask him a question like, What was the speed

23  of the bullet when it left Quigley's gun, something he might

24  not know.  Where were you?  Who did you see?  What did you do?

25  Who did you talk to?  I don't recall.  I don't remember.  Well,

I3KAAHIL1                    Summation - Mr. Smallman

1    what don't you remember about it?  A lie, l-i-e, a lie, with

2    this up in the air.

3            Let's stay with the gun for a second.  Pardon me if I

4    don't look at you but I need to refer to this.

5            Lieutenant Casella, what can you contribute to

6    Lieutenant Casella's experience?  Certainly, knowledge?  Very

7    much so.  He's passed at least two department exams to go

8    pretty good up in the ranks.  Not many lieutenants in the

9    police department in charge of other men, a leader so to speak.

10    Please continue is the question.

11            Then I think officer Ouk kicked the gun out of his

12    hand.

13            To where?

14            When he kicked it it kind of like bounced or whatever

15    and it handed on the curb that was a couple of feet away.

16            Airborne pieces of metal.  Do you believe that?  I

17    urge you not to because it is a lie.

18            Officer Ouk, what does he say about all of this?

19            Did you touch the gun?

20            No.

21            Did you kick the gun?

22            No.

23            Did you slide the gun with your foot?

24            No.

25            Did you see any other cop touch the gun?

1           No, I didn't.

2           Did you see any other officer quick the gun?

3           No.

4           Did you see any other officer slide the gun with his

5   foot?  No.

6           Did you take any action associated with the gun?

7           No.

8           The defendant Quigley.

9           Did you see it move to the curb?

10          Yes, I did.

11          How did it get there?

12          I ordered Officer Ouk to secure the firearm.

13          And one of those pregnant pauses that was quite common

14   in his testimony.

15          So I observed him kind of move it with his foot out of

16   way out of his hand.

17          You saw Officer Ouk move the gun with his foot?

18          Yes.

19          How far did he move the gun with his foot?

20          A few feet.

21          Could you help the jury understand, did he have his

22   foot on the gun the whole way as he moved it or did he kick it

23   or did the gun move on its own?

24          From what I recall, he reached with his foot and kind

25   of dragged it with his foot to the curb.

I3KAAHIL1                        Summation - Mr. Smallman

1          Which is true?  Do you know which is true, ladies and

2     gentlemen?  None.  None.  Ouk is lying.  You know Quigley's

3     lying.  He's as much as admitted it right in front of you.

4     He'll doctor his testimony to whatever a witness says.  In fact

5     the judge had to point out to him, it's your recollection,

6     defendant Quigley, not because somebody else said something.

7     That should speak volumes.

8          There were multiple 911 calls and you can have any of

9     them read back, played back but basically, they're all people

10    saying, What are the cops doing?  They just killed somebody.

11    They killed him.

12         You want to talk about the oath one more time?

13    Darious Smith, former police officer, now a reverend, I submit

14    to you that at least the oath meant something to him.  Was

15    there anything about his testimony that wasn't sincere?  Was

16    there anything about his testimony that wasn't straightforward?

17    Anything about his testimony that wasn't direct in response to

18    questions posed to him both on direct and cross?  What did he

19    tell you?  I'm in the car as close as I am to you, maybe

20    another row back and I see Quigley come out with his gun.

21         And I submit to you, ladies and gentlemen, he is fired

22    up.  He has just had to run from another location to this one

23    in the car the wrong way and this is when Darious Smith sees

24    him jumping out of that car.

25         He is ready to roll.  And what do you know, ladies and

1    gentlemen, that within 15 seconds Tyjuan Hill is dead.  What

2    does that leave you time to do?  Quigley says, I maced him.  I

3    put cuffs on him.  I did all of these things.  Bologna.  No

4    other cop sees him there.  Did you see Quigley?  No.  Did you

5    see Quigley?  No.  Did you see Quigley?  No.  Bang.  That's

6    what happened.  Then they see Quigley when Hill is dead.

7         We have the burden here as it will be explained to you

8    by his Honor of what the appropriate legal standard is to

9    maintain our case as the plaintiffs.  Basically, it's half of

10   the evidence, plus anything, a sheet of paper, a piece of hair.

11   That's all.  Please keep his Honor's instructions in mind when

12   you begin to deliberate and hopefully, I will have a few

13   moments with you again before this is done.

14        THE COURT:  Members of the jury, do you want a

15   bathroom break before we hear Ms. Miller or would it be enough

16   to stretch in your place?

17        OK.

18        THE JUROR:  No.  Thank you.

19        THE COURT:  Just keep going?

20        THE JUROR:  Yes, sir.

21        THE COURT:  How about just getting up and stretch?

22        THE JUROR:  Sure.

23        (Pause)

24        THE COURT:  OK.  Ms. Miller.

25        MS. MILLER:  Thank you, your Honor.

1          THE COURT:  Sit down please everybody.

2          MS. MILLER:  Good morning.

3          A few seconds ago I objected to not so much hockey.

4     It was basketball.  I don't care about that.  It's TV.  And

5     that's what's here.  It's an illusion that's been created for

6     you based on television, based on gross stereotypes, all that

7     is not this case and all that should not be left at the

8     doorstep of this man.  And I hope -- and the judge told me, he

9     told me you're a smart jury and I agree -- I hope you are not

10    fooled by that.

11         The evidence in this case is absolutely overwhelming

12    in favor of the defendant.  Overwhelming.  And what we told you

13    in the opening, what I said in the opening -- counsel didn't

14    remember but it was me -- is exactly what happened.  That's

15    exactly what happened in this case.  But I'll tell you what

16    didn't happen.  I'll get to it in a minute.  But counsel just

17    said that Officer Quigley, Sergeant Quigley, Mr. Quigley ran up

18    with a gun in his hand and just shot Mr. Hill in the head.  A

19    monster would do that, a monster.  You met him, not once but

20    twice.  You don't always get to meet a witness twice in the

21    course of a trial.  He is not a monster.

22         More importantly, he's been on the job for 14 plus

23    years.  He's never fired his gun, never, except this one time.

24    And I told you in the opening cause something was different

25    here and we'll talk about that in a minute.  But think about

I3KAAHIL1                    Summation - Ms. Miller

1     it.  Now suddenly, suddenly he's running around with a gun in

2     his hand, just walks up to somebody and shoots him in the back

3     of the head.  Completely inconsistent.  It's TV.  And it's

4     offense I too.

5          Now, what I told you in the opening is exactly what

6     happened here.  Mr. Hill had a gun in his bag.  He did it.  He

7     didn't discard it in the car when he was in the car and he ran.

8     He didn't do that.  He kept it.  He didn't stop when Officer

9     Oliver told him to stop.  He didn't discard the gun then.  He

10    didn't discard it with Officer Tirol, when Officer Tirol got

11    him.  He didn't stop struggling.  And at some point Officer

12    Tirol hands over an ASP to Lieutenant Casella, right?  And from

13    that moment now the gun comes out.  The gun comes out, a choice

14    that Mr. Hill made, an unfortunate choice that he made.

15         Now, as soon as that gun comes out -- and this is the

16    law by the way.  I mentioned to you in the opening to please,

17    we're relying on you.  You made a promise to follow the law,

18    the law and evidence and I'm going to talk about that in a

19    minute.  But the law and the evidence dictates that as soon as

20    that gun comes out that is a verdict for Mr. Quigley, a defense

21    verdict.  And as soon as he points the gun, Mr. Hill points the

22    gun in any particular direction that is a verdict for the

23    defendant.  And while certainly when he comes around with the

24    gun, finger on the trigger, that is a verdict for the

25    defendant.  Pointing it at anybody, verdict for the defendant.

I3KAAHIL1                    Summation - Ms. Miller

1    The law is clear.  The evidence is clear.

2              What's really stopping, I think what's really stopping

3    a defense verdict in this kind of case is that it's tragic.

4    It's sad.  A man lost his life.  But that's not the law.  And

5    counsel talked about an oath.  You all took an oath and as I

6    said in the opening we're relying on you to follow that oath,

7    to follow it.

8              Now let's begin with my remarks.  You are going to get

9    a thing called the verdict sheet.  And the verdict sheet has a

10   bunch of questions but this one question concerning liability.

11   And it says:

12             Has plaintiff Carol Hill proved her case by a

13   preponderance of the evidence against defendant Patrick

14   Quigley?  That's the question.  And the answer is, no, she has

15   not.  Couple of things about it.  First of all as counsel

16   pointed out, it's plaintiff's burden.  It's their burden.  And

17   one thing that's interesting about the verdict, if for some

18   reason and I just told you the evidence is overwhelmingly in

19   favor of this man.  But if for some reason some of you are like

20   on the fence, then the plaintiff has not met their burden.

21   Something to keep in mind.

22             What is it you're measuring?  The judge is going to

23   tell you in a few minutes what it is you are looking at and he

24   is specifically going to say what the law is that applies.  He

25   is going to say the question is whether the totality of the

I3KAAHIL1                    Summation - Ms. Miller

1    circumstances provided probable cause for an officer to believe

2    that he or others faced a significant threat of death or

3    serious physical harm.  And probable cause exists when the

4    facts and circumstances taken together are persuasive to

5    convince an ordinary intelligent experienced officer that there

6    was a fair probability of that.  That's it.  That's all you are

7    measuring.

8            Notice a couple of things.  One, plaintiff's burden is

9    one.  Two, it's just the threat, a significant threat.  When

10   this gun is pointed at night in someone's hand with a finger on

11   the trigger, that is a threat.

12           And the question, another thing you should keep in

13   mind is the shot, meaning what you are looking at is whether

14   it's right to fire the shot.  What I mean by that is not where

15   the shot lands, just the action of the shot that you measure.

16   And the judge will tell you officers can use lethal force.  And

17   that's the law whether you like it or not, it's the law.  They

18   can use it if there's a threat.  That is, fire the gun.  That's

19   it.  Under that analysis this is a defense verdict.  Sad,

20   understand, but it's a defense verdict.

21           Now, sometimes the truth is very obvious.  The truth

22   is Mr. Hill had a gun.  You can do all the mental gymnastics

23   you want.  You can play all the guns you want to play.  He had

24   a gun.

25           (Continued on next page)

1          MS. MILLER:  That's a truth.

2          Officer Tirol, as I said before, at some point hands

3    the ASP to Mr. Casella, detective Casella.  Then that gun comes

4    out.  And that's a truth.  And when that gun comes out from

5    under Mr. Hill, obviously, obviously, Officer Tirol, who is

6    down on the left side, moves in such a fashion that his radio

7    is pressed.  And this is what you hear.

8          (Audio played)

9          THE COURT:  What was the exhibit?

10         MS. MILLER:  Sorry, your Honor?

11         THE COURT:  What exhibit?

12         MS. MILLER:  Exhibit C, Defendant's Exhibit C.

13         A couple of interesting things about it.  The

14   suggestion is that somehow or another this is concocted.  You

15   can hear the voices.  I mean, that's quite a performance.

16   Quite a performance.  At that moment to come up with that, oh,

17   let's hurry and up do this.

18         In the voices is trauma.  These officers experienced

19   trauma.  No one expected him to pull out a gun.

20         To say that it's made up is incredible.  That's the

21   best they can do?  Made up.  When I say they, I am talking

22   about the lawyers.

23         Now, you don't hear anything else, right?  You don't

24   hear the gunshot that comes after that.  Of course not.

25   Because he presses down in the struggle.  As we heard, that

1    happens with these radios.  And then he goes back and it's

2    depressed, and now you don't hear it.  But what you hear is a

3    dispatcher saying, you need 85?  You need help?  What's going

4    on?  What's happening?

5         Then you hear Mr. Quigley get over the dispatch and he

6    says the location, and shortly after that you hear request for

7    a bus, which means an ambulance.

8         And you can hear in the voices.  This is not staged.

9    This is not made up.

10        Now, before I get to the evidence that was presented,

11   the evidence, over here, for you to believe what is being

12   presented by this table, this is what you are going to have to

13   believe in order to find for the plaintiff in this case.  This

14   grand conspiracy.

15        The plaintiff's theory is there was a brutal beating,

16   right?  We get that Mr. Emerson and Ms. Smoot.  Brutal beating

17   that also includes a sexual assault.  At some point the

18   officers huddle around after they mercilessly beat this person.

19   They have a conference, I think is the word by Ms. Smoot, a

20   conference.  They then execute Mr. Hill.

21        They then plant a gun -- by the way, they plant a gun

22   in his left hand.  That's the allegation.  Because the officer

23   is saying the gun came out in the left hand.  Think about that

24   for a second.  Most people are right handed.  If you are going

25   to have some grand conspiracy, don't you put it in the right

1   hand?  We are going to make this really clever, put it in the

2   left hand.

3           And you know what is funny -- and it's not funny.

4   It's actually really sad -- the allegation here.  Ms. Hill took

5   the witness stand.  Wouldn't it have been so easy to say, was

6   Mr. Hill right handed or left handed?  Wouldn't it be easy to

7   do that?  Nobody asked her.  Why?

8           Now, let's go back to our grand conspiracy.  Put the

9   gun in the left hand, which, again, there is some handy dandy

10  gun that's out.  Oh, get the gun.  Go get it.  I think counsel

11  called it the drill.  That's TV.  That's movies.  That's not

12  life.

13          And then, oh, by the way, let's have some officers say

14  that they saw the gun and let's have other officers say they

15  didn't, because that's really good for this grand conspiracy.

16          And then let's also put the gun not by the decedent,

17  but let's put it somewhere else, because that's a really good

18  conspiracy.  And, oh -- and this is a good one -- and while we

19  are doing all of this, let's put some DNA on it.

20          By the way, as you recall from Ms. Lee's testimony

21  yesterday, the DNA swabs had no blood on it, right?  So that

22  means that if you're going to plant DNA, somebody on the scene

23  wearing gloves, maybe two pairs of gloves and a shower cap and

24  everything else that's necessary to keep a piece of DNA and

25  some integrity to it.  Of course these officers totally know

I3K8HIL2                    Summation - Ms. Miller

1    how to do that.

2             Somebody had to swab somebody's cheek to get DNA and

3    then plant it on the trigger, trigger guard, and a little bit

4    on the grip to make sure all that happens, and that's the grand

5    conspiracy.

6             And we are going to do all of that on Hamilton Avenue,

7    in the middle of the night, with people all around.  And then

8    we are going to call an 85 to make sure as many officers as

9    possible arrive on the scene.

10            That is what you would have to believe in order to

11   find for plaintiff.

12            Now, let me just say this.  Do you remember detective

13   Manzano's testimony?  You may not because it wasn't really that

14   long and, honestly, I don't even know the significance of it.

15   But whatever.  Perhaps it will be told in rebuttal.  But when

16   he got off the witness stand, he fell.  Do you remember that?

17   He tripped and he fell.

18            Now, why do I mention that?  First of all, who is

19   behind this grand conspiracy?  The guy that trips off the

20   witness stand.  Officer Tirol, the guy that didn't know when it

21   was time to leave the witness stand.  Remember he didn't know

22   the questioning was over.  Those are your guys in the grand

23   conspiracy.  For sure.

24            But I mention Manzano because when he trips -- lots of

25   witnesses took the witness stand.  What is expected is you get

1     up on the witness stand, you do your thing, you get off the

2     witness stand.  Nobody expects anybody to trip unexpectedly.

3            When that happened, I am sure you know that there was

4     a juror sitting next to you.  I am sure you know that Ms. Jones

5     was sitting over there.  But I bet you don't know exactly what

6     each one was doing.  I bet you don't know.  And of course you

7     don't know because the unexpected has happened.

8            Now think about that at night, in the middle of the

9     night, Hamilton Avenue.  Officers are trying to arrest

10    somebody.  They don't have him pinned to the ground.  That

11    doesn't make any sense at all.  You're around him and you're

12    trying to get his hands.

13           People struggle with arrests.  That's part of the job,

14    OK.  The unexpected happens.  A gun is pulled out from the left

15    side.  That's why people don't remember exactly where everybody

16    was and what exactly everybody was doing at that time.  It

17    makes perfect sense.  Why?  Because it's true.

18           Now, let's go to the evidence that was presented to

19    you.  Counsel in the beginning of the case told you, Mr.

20    Shanies told you that Ms. Smoot, Emerson, Garcia, those are the

21    key to the case.  The key.  OK.

22           Before I get into the fantastic story that they told

23    you, let's just look at this Exhibit 2 again.

24           (Video played)

25           MS. MILLER:  Stop right there.

1              This is Mr. Garcia.

2              Go ahead.

3              (Video played)

4              MS. MILLER:  Look at Ms. Emerson.  She is the one in

5    the upper left-hand corner.  She tells you the fantastic story

6    that she gave you.  She has got Mr. Garcia right in her way

7    there.  Doesn't see anything.

8              Let's look further.

9              (Video played)

10             MS. MILLER:  Stop right there.

11             Now we switch over to the cell phone picking up

12   whatever the cell phone picks up.  And if you look carefully,

13   if you see the person in the white shirt, right, there is

14   somebody directly behind that person, because if you go a few

15   frames further, that person, that officer pops out.  Right

16   there.  Meaning you can't see what's going on on the left side.

17   You can't see it.  And most certainly Ms. Emerson and Ms.

18   Smoot, they can't see past that.  And we know officers were

19   around.  They cannot see.

20             Now, you then have, as was pointed out by Mr. Lax's

21   cross, at some point there is another individual, another

22   officer, steps -- it's a little blurry -- he steps in such a

23   way that you can't see the sneakers of Mr. Hill.  All that

24   means -- look, again, people, I don't know why people say the

25   things they say.  I really don't.  But they didn't see

1    anything.  And they told you also in their testimony that at

2    the moment of truth, so to speak, that is when the actual

3    incident happened, they said they couldn't see hands.  And

4    nobody said they saw anybody with a gun, not even a police

5    officer.

6            That's their vantage point.  That's what they saw.

7            And keep in mind also, look at all of the lights

8    flashing.  And there's car headlights because there is traffic

9    going through there.  Mr. Smith -- I will get to him in a

10   second -- where is he?  He is up a little further but in the

11   far left-hand lane.  Right?  So it's three lanes of

12   traffic -- excuse me.  Far right-hand lane.

13           So Mr. Hill and the officers are in the far left, and

14   then Mr. Smith, Ms. Smoot and her crew are way over on the

15   right-hand side, far right lane.  And Mr. Smith also, he is in

16   the passenger side of his car or van that he's in.  So he is

17   looking past his friend there, Mr. Cory.

18           They are not seeing everything.  Same vantage problem.

19   There's officers around.  The gun is on the left.

20           My esteemed colleague here, one thing I want to show

21   you on this video.  It's hard to see, but take a look

22   at -- this is after the shot has been fired.  Now watch the

23   heads, the person in the white shirt and the person that sort

24   of pops out, the officer that pops out and looks like he is

25   pointing.

1           Go ahead.

2           (Video played)

3           MS. MILLER:  See, right there.  They are both turning

4    this way.  Counsel said I didn't have him point out the gun.

5    Because you can't really see it.  But if you want to, if you

6    look carefully, there is something black there on the curb.

7    But we are not going to sit there and say, oh, come on.  But

8    what is important is --

9           THE COURT:  Do you have a pointer with a light that

10   would show what it is you're pointing to?

11          MS. MILLER:  I don't.

12          If you look at the gentleman in the white shirt and

13   you look at the person, the officer in uniform that sort of

14   pops out, you see their heads turn.  You can see right now the

15   head has turned.  And that's because they are looking.  They

16   are looking where that gun is.

17          Let me tell you something else on the conspiracy piece

18   which I forgot to mention to you.

19          Officer Ouk testified he didn't kick the gun.  He said

20   it.  All right.  So here is the grand conspiracy.  Let's get

21   together and say --

22          THE COURT:  Ms. Miller, can you with a pencil identify

23   where it is you want the jury to see.

24          MS. MILLER:  Yes.  There you go.

25          See his head is turned and this officer is coming out

1    also.  And if you play a little bit further, turned head.

2            Look, I don't want to overstate evidence to you.

3    That's what Ms. Lee said.  She took an ethics course.  I don't

4    want to overstate this to you.  If you don't see it, you don't

5    see it.  But I look at this video and you can see that head is

6    turned, and that's because they are looking exactly where that

7    gun is.

8            Now with respect to Ms. Smoot and Ms. Emerson.  OK.

9    This is exactly what I am talking about, about illusion and

10   getting you to get away from your job, which is the law and the

11   evidence.

12           These folks begin their case with Ms. Smoot, and the

13   first thing they show is this picture, Plaintiff's 39.

14           I mean, this is after.  The crime scene tape is up.

15   They say crime scene.  By the way, it is a term of art.  It

16   doesn't mean a crime has been committed.  It's a term of art.

17           There is yellow tape around there and the decedent.

18           Ms. Smoot was not there when this photograph was

19   taken.  This was not her vantage point.  Why did they show this

20   to you?  To show you the decedent.  Because it's sad.  Of

21   course.  But that's the illusion being created here.

22           What else happens with illusions?  Now we get

23   witnesses to tell you about a five- to six-minute beating, a

24   beating.  Absolutely no medical evidence to support it.  Five

25   to six minutes of a beating.  By the way, both these gals,

1    women, are in the IT world. So I mean, where is the video for

2    that?

3            The fact of the matter is these people were out doing

4    whatever they were doing, very specific to tell you that they

5    had a big meal and fewer than six drinks. Very specific to

6    tell you about that. They were doing whatever they were doing.

7    They were taking selfies, they heard a gunshot, and that's what

8    got their attention.

9            How they went from that -- and Ms. Smoot does a 911

10   call, by the way. She says a man has been shot. She says

11   that. How they go from there to coming to you in this

12   courtroom, with this fantastic story, and changing a man to a

13   boy. How did that happen? How did that happen?

14           Also, with respect to Ms. Smoot, they show you this

15   picture with Ms. Smoot -- they show it to her -- of Officer

16   Tirol. Plaintiff's 55. That's what they show you.

17           Now, Officer Tirol is on the left-hand side. We just

18   went through vantage point. He is way over on the left. He is

19   on the left-hand side of Mr. Hill. Mr. Hill is on an angle

20   from the left looking on the far left-hand lane. He is on the

21   left side of Mr. Hill. I just showed you that in that video

22   you can't see behind the white shirt until someone pops out.

23   Ms. Smoot from her vantage point comes in and says, that is the

24   man. She doesn't know that is anybody. How did she come up

25   with that?

I3K8HIL2                    Summation - Ms. Miller

1              Now Officer Tirol, he becomes the one that has planted

2       the gun.  The picture they should have showed you is the one

3       that we put in.  Perhaps not very artfully, but we did put it

4       in.  Exhibit 56.  There is Tirol.  There is the radio.  That's

5       the picture you need.  Because now you know how the thing

6       pressed.

7              Now Mr. Smith.  Before I leave that, why would you

8       present as evidence Ms. Smoot, Ms. Emerson, Mr. Garcia, talking

9       about this grueling beating, sexual assault, all these things,

10      when the medical evidence doesn't support it?  How do you know

11      that?  Because we called somebody.  We called a doctor to tell

12      you there is nothing to support that.  Nothing.

13             Now, look at these folks.  You have got a whole bunch

14      of lawyers here.  We are missing a lawyer today.  That's the

15      DNA cross-examination guy.  Why don't you hire an expert to say

16      our guy is wrong, there is evidence of the beating.  Our DNA

17      guy is wrong.  They don't give you that.  Illusion.  TV.

18      Movies.  Not life.

19             Mr. Smith.  Again, Mr. Smith, as I explained, he is

20      way on the far right.  Is he a liar?  I wouldn't say he is a

21      liar.  He saw whatever he saw.  But I will say this.  Some of

22      the things he said actually support what you have been told.

23             First of all, not to be disparaging, he is fired

24      Newark police officer.  He was terminated from his job.  We

25      have no evidence as to why, but he was terminated.

1      He is in Red Hook in the middle of the night, doing

2  whatever he is doing, and he says that he sees an individual,

3  Mr. Hill, resisting, resisting arrest.  Completely inconsistent

4  with Smoot, Emerson, the key witnesses of the case, that said

5  he was lying still and they just executed him.  But they bring

6  this witness who completely contradicts their evidence.

7      He says the whole thing takes a matter of seconds.  He

8  says at one point hands are open, maybe closed, on Mr. Hill.

9  That's his perspective.  OK.  He says at no point did Mr. Hill

10  put his hands behind his back.  Completely consistent with the

11  officers.  Inconsistent with the three livery cab folks.

12      He says he sees a handcuff on the right wrist.  This

13  is important because this man is the one that put that handcuff

14  on, exactly as he told you.  He managed to get underneath

15  Mr. Hill and put that handcuff on.  And now we have a witness

16  from them -- thank you -- that says handcuff on the right hand.

17      But here is where I take issue with Mr. Smith.

18  Mr. Smith says absolutely no gun.  No gun.

19      Now, and this is where I say compare to Ms. Lee.  Ms.

20  Lee, honest witness.  She just tells you what she saw -- what

21  she tested, right.  She is not going to go any further.  She is

22  not going to take your place and tell you what happened that

23  night.  She is not going to do that.  She is going to say this

24  is the DNA and this is what I found.

25      Mr. Smith.  Absolutely no gun.  No gun whatsoever.

I3K8HIL2                    Summation - Ms. Miller

1    The honest answer is I didn't see one.  Big difference.  Big

2    difference.  The honest answer is, I didn't see it.  OK.  Of

3    course he didn't see it from his vantage point.  Of course, of

4    course, of course.  The dishonest answer is absolutely no gun.

5         How did he get there?  How did he get to that?

6         Now, the officers, all the officers came here and

7    spoke to you and they said different things.  As I mentioned

8    before, this was a traumatic event for them.  A couple of

9    officers, most of the officers saw the gun.  A couple of

10   officers didn't see the gun.

11        Officer Gonzalez is on the right-hand side.  Gun comes

12   out on the left.  He says he didn't see it.  He also says he

13   didn't have full control of Mr. Hill's right arm, which is how

14   the right arm gets loose, it gets free.

15        These things are happening in split seconds.  We spent

16   four to five days here talking about this.  Six days, whatever

17   the amount of time is.  It's happening like this.  Very, very

18   quick.

19        Officer Tirol told you he was on the left, he was

20   struggling, trying to get the arm out.  The arm eventually

21   comes out.  Comes out with a gun in it.  He tries to grab for

22   it and does actually grab the gun.  There's your second DNA.

23   Remember, there was at least two people.  That's him.

24        Grabbing for it and he loses it.  Think of that.

25   Somebody pulls out a gun and his instinct is to grab for it to

I3K8HIL2                    Summation - Ms. Miller

1    protect other people.  That's what the officers were doing.  He

2    loses grip of it and now the gun comes away.

3            Officer Ouk tells you he doesn't see the gun.  Of

4    course.  It's small.  It's small.  I showed you this in the

5    opening statement.  It's little.  It's the size of my hand,

6    right?  A woman.  Mr. Hill is a man.  That's why not everybody

7    is seeing it.

8            Officer Tirol, he sees the gun.  He is not standing up

9    and then saying, gun, gun, gun.  That's ridiculous.  That's an

10   insult to you.  He grabs the gun and he is yelling

11   simultaneously, as he is trained to do, gun, gun, gun, gun,

12   gun.

13           Why is he doing that?  He is letting other officers

14   know there is a gun now.  Mr. Hill has introduced into this

15   dynamic a weapon, unexpected, nobody thought that was going to

16   happen.  He loses grip of it, it goes around, comes around.

17   Don't trust my motions.  It's your memory.  It's the evidence

18   as you heard it.  But generally the gun comes out, comes

19   around, comes up, right in his face.

20           Now, if that is not a threat, a threat that warrants

21   the firing under the law, allows the firing of a weapon, I

22   can't think of another scenario.  He is that close where he

23   sees finger on the trigger.  And you have DNA on the trigger.

24           Is this pleasant?  Of course not.  It's terrible.  But

25   you can't hang it on him.

1          Now, lieutenant Casella also testified.  Devastating

2    testimony for them.  Absolutely devastating.  And it's a trick,

3    you know.  It's a trick.  If you have testimony from officers,

4    let's say, that is going to completely destroy your case, you

5    call them as witnesses.  And you're saying is that true, is

6    that so, is that your testimony, to create an illusion to you.

7          Lieutenant Casella comes here and he says, I see the

8    gun, I see the finger on the trigger, and I see the gun come

9    out.  It's true.  It's true.  I am not going to overstate

10   evidence to you.  He doesn't have it coming out like this.  He

11   remembers that.  But it doesn't matter.  For your purposes for

12   this case, for this lawsuit, against this man, it doesn't

13   matter.  When the gun comes up like this, defense verdict.

14   When the gun is out, defense verdict.  And most certainly comes

15   up like this in his face, defense verdict.

16         One other point.  There was a Officer Cofresi called.

17   Here again we get to the illusion.  Again, I don't know why he

18   was called, but he was called.  And the testimony was that he

19   went to the hospital.  You have no other information about him.

20   He is asked on direct, you showed up at the hospital.  Nobody

21   asked him why.  Nobody asked him who he is.  Again, it's

22   illusion.  Some mysterious person who is going to coordinate

23   this grand conspiracy, which includes planting DNA evidence.

24   Then we find out on cross the only reason he was there is he

25   took Officer Rivera to the hospital.  He was part of the team

1     that night and he took her to the hospital.

2           Now, as pointed out by counsel on cross, she wasn't

3     there when the shot was fired, Ms. Rivera.  But there was a

4     reason she had to go to the hospital.  She was the UC that

5     night.

6           Now, let me talk about Patrick Quigley, his testimony.

7     As I said before, you met him twice.  You don't get to meet

8     witnesses twice.  He was honest.  And counsel made this comment

9     about four to five inches away.  Look, he said on his

10    examination that he was close, right?  Then he hears Dr. Wetli

11    testify, and Wetli says the science is at the time the shot was

12    fired, Mr. Hill's head was in contact with the barrel.

13          Does that make him a liar?  No.  He stands up and

14    says, well, I guess that's the truth because that's the

15    science.  That is what he is telling you.  That is not a

16    monster, by the way, who executed somebody.  That is not a

17    liar.  He is saying that's the science.  OK.

18          Now, you might say to yourself how do you reconcile

19    those two things?  Well, lieutenant Casella and Mr. Smith told

20    you that Mr. Hill was moving up at the time all this happened.

21    Gun comes out, moving up, head moving up.  Sergeant Quigley,

22    Mr. Quigley, goes to fire because gun is coming up, head is

23    coming up.  In the split second that he pulls the trigger,

24    Mr. Hill's head makes contact with the weapon.

25          What does that tell you?  That tells you how close

I3K8HIL2                          Summation - Ms. Miller

1    everybody is.  In his mind, in his memory, his gun, he thought,

2    was still a distance.  But when the contact happens, Mr. Hill

3    has moved up with that gun.  That's the easy explanation of

4    that.  If I'm wrong, here is your expert to say so.

5              Now, just a couple of last points here.

6              Look, when there is prostitution in the neighborhood,

7    the people come and try to clean it up.  When somebody is

8    running with a gun, the police come and try to get that person.

9    When you have any problem, the police come.  Right?  And

10   sometimes this work is dangerous.  Posing as a prostitute is

11   dangerous work.  Dealing with people who are struggling and

12   suddenly pull out a weapon is dangerous work.  But they do it.

13   Sergeant Quigley does it.  And sometimes, sometimes in this

14   dangerous work there may be a time where an officer has to use

15   deadly force.  It's a choice they don't want to make.  It's

16   pretty clear Sergeant Quigley doesn't want to make a choice

17   like that.  He never did it in his entire career except on that

18   one night.

19             They are faced with a threat.  Again, your measure.

20   Was there a threat?  Yes.  When they are faced with that and

21   they have to make that kind of choice, then it's kind of your

22   turn now, right?  This is your turn.  To tell him, to tell him,

23   that what he did you understand.  Right?  He needs to hear that

24   from somebody, and you're the only ones that can say that.

25             Now, Mr. Smallman has a rebuttal.  I don't get to say

I3K8HIL2                    Rebuttal - Mr. Smallman

1    anything else.  The only thing I ask is -- I don't know what

2    new theory you're going to here, I don't know what new illusion

3    is going to be created for you.  I don't know.  But think if I

4    could get up here again, what would I say?  The answer on the

5    verdict sheet is no.

6          Thank you.

7          THE COURT:  Let's take a bathroom break before we hear

8    Mr. Smallman in rebuttal.  Close your books and place them on

9    your chair.  We will take ten minutes.

10          Don't discuss the case, please.  Keep an open mind.

11   We are not finished.

12          (Jury exits courtroom)

13          (Recess)

14          (Jury present)

15          THE COURT:  We will now hear Mr. Smallman in rebuttal.

16          MR. SMALLMAN:  Thank you, your Honor.

17          Good afternoon.

18          This case is not about giving defendant Quigley a

19   label.  If his lawyers want to call him a monster, that's up to

20   them.  I am not here to do that.  That's not my intention.  If

21   by your verdict his actions give him that label, so be it.

22          He remains the one who unreasonably withdrew his

23   weapon, round in chamber, approached a man thrown on the ground

24   or close to it, placed that weapon on his skull and fired a

25   shot.  Excessive, unreasonable, and he knew exactly what he was

I3K8HIL2                        Rebuttal - Mr. Smallman

1    doing.

2           Officer Tirol and his magical radio, let's listen to

3    exactly what the testimony is.  Not some lawyer's

4    interpretation.  Not some attorney's spin on it.  This is the

5    words -- these are the words that were spoken supposedly under

6    oath by Tirol.

7           THE COURT:  What page?

8           MR. SMALLMAN:  343, starting on line 21:

9    "Q.  What you're describing, Officer Tirol, in response to the

10   judge's question, is the possibility that something may occur

11   and inadvertently activate your radio?

12   "A.  Yes.

13   "Q.  You're not saying that's what happened that night, are

14   you?

15   "A.  That's correct.  I'm not saying that."

16          So what's the deal with the radio?  They could play it

17   all day long for you, all night long, into tomorrow.  There is

18   no gunshot in the time frame that it's supposed to convey.

19   There is no, give us your hands, there is, no stop resisting.

20   It's not there.  It can't be there.  And that's why this little

21   conspiracy of theirs fails.  Because when the science develops

22   later on, after they put the conspiracy in motion, they don't

23   have time to think about this.

24          What they saw was one of their own execute a man.

25   Knowing cops, experienced cops, know the only way to counter

1    that is with the same or equal amount of force.  What is the

2    equal amount of force to a gun, a second gun.

3            There is a very sad expression going around these days

4    called suicide by cop.  Tragic.

5            So I ask you this, ladies and gentlemen.  A young man

6    22 years of age, about to enter the prime of his life,

7    testimony from his own mother is he is in good condition,

8    physical and mental.  Is he about to run head long into a

9    suicidal gun battle with New York City police officers?  Does

10   it make any sense at all?

11           They would have you --

12           THE COURT:  Counsel, at the sidebar, please.

13           (At the sidebar)

14           THE COURT:  Mr. Smallman, we didn't allow Ms. Miller

15   to bring in the fact of this prior conviction and his parole,

16   his potential parole violation.  So you should not open the

17   door to testimony that wasn't allowed.

18           MR. SMALLMAN:  I was going to argue the likelihood

19   that he would engage in a gun battle with a gun that had no

20   round in the chamber.

21           MS. MILLER:  That's not what you said, though.

22           MR. SMALLMAN:  I said suicide by cop.

23           THE COURT:  You asked him why would he want to engage

24   in a gun battle.

25           MR. SMALLMAN:  With a gun that had no bullet.

1           THE COURT:  Because he didn't want to be apprehended

2    and that's why he ran away and that's why he is putting up a

3    fight.  You're going into territory that I didn't allow.  Are

4    you going to deal with this now?

5           MR. SMALLMAN:  I am going to say it defies that he

6    would withdraw a weapon that was not capable of being

7    discharged surrounded by five police officers.

8           THE COURT:  That's OK.

9           MS. MILLER:  That's OK except that he has already made

10   the comments that he made, and I think your Honor needs to --

11          THE COURT:  I think I need to say something to the

12   jury.

13          (In open court)

14          THE COURT:  Members of the jury, what you heard about

15   suicide by policemen is not a proper comment and the

16   speculation why he, Mr. Hill, would do what he did in the

17   circumstances that existed is not a proper argument given

18   various other rulings I made during the trial.

19          So I ask you to eliminate that from your minds, as if

20   it never was spoken.

21          MR. SMALLMAN:  Officer Tirol and Officer Gonzalez

22   tackled Mr. Hill at the beginning of the conflict.  They would

23   have you believe that subsequently it's determined that he had

24   a gun in his waistband.  Now, there are 400 pounds of police

25   officers tackling him and pressing him into the ground.  An

1    autopsy report was introduced to you.  Nowhere contained in

2    that autopsy report is any injury that one might consider

3    consistent with having a gun in your waist while you're slammed

4    into the ground by 400 pounds of police officer.

5            In addition, the autopsy report, or at least as

6    interpreted by the defense counsel, says no injury at all.  But

7    yet officer Casella, lieutenant Casella, tells you, I'm beating

8    him with an ASP.  So which way is it?  You can't have it both

9    ways.  Is Casella lying to you about beating him with an ASP?

10   Seems not because he asked Tirol to give it to him.  Tirol said

11   I gave it to him.  So he started to beat him with an ASP.

12   Somehow that doesn't show up on the autopsy?  Maybe $17,500

13   expert wasn't so good at all.

14           But there is no doubt that Quigley's gun was pressed

15   into Hill's skull at the instant the shot was fired.

16           The gun that was recovered did not have a round in the

17   chamber.  And as the crime scene detective Florio says to you,

18   you could have pulled that trigger all night long and nothing

19   would have happened.  Nothing.

20           There are six bullets, seven bullets in the clip, a

21   mixed load.  Some of those bullets were tested or DNA was

22   withdrawn from them on the head stand.  None of it was tested.

23   Those items may well have had significant DNA evidence on them

24   but were not tested.  Those are the ones that would have

25   required the handling and the force to actually get the bullets

1    inside the clip.

2            There's a million ways that DNA could have gotten on

3    that, folks.  You heard the cross-examination of that witness,

4    with as little as a handkerchief.  What they did, they did.

5    How it got there, it got there.  How is a human being, with

6    Officer Oliver sitting on his back, one cop with his right arm,

7    one cop with his left arm, Casella beating his left leg, and

8    Rodriguez holding his right leg, all four limbs are accounted

9    for by police officer testimony.  In that circumstance, they

10   would have you believe that a gun is withdrawn, that can't even

11   be fired.

12           How does the gun get from one place to the other?

13   Completely unknown.  There is no credible testimony to say that

14   this gun was in his left hand, was a few feet away, and

15   magically gets up on the curb.  That curb is eight inches,

16   ladies and gentlemen.

17           MS. MILLER:  Objection.  There is no testimony on

18   that.

19           MR. SMALLMAN:  There is a picture in evidence.

20           THE COURT:  The jury's recollection will control.

21           MR. SMALLMAN:  And it is your recollection that

22   controls, not some lawyer's argument.  Your recollection of

23   what was said here and what was not said here.  And what you

24   believe ought to have been said here.  They would have you

25   believe all different versions of this gun.

1          Well, if there is more than one version, only one can

2     be true.  So that makes at least two of these other officers

3     liars.  Do you believe Ouk?  Do you believe Casella?  Do you

4     believe Quigley?  Because they all can't be right and they all

5     told you these things under oath.  There is no mistake here,

6     folks.  This is not a mistake.  This is not error.  This is

7     lie.  L-I-E.

8          You want to point out the video.  I will remind you,

9     they had every opportunity with each and every one of those

10    witnesses to walk them through that video.  This is not what

11    some lawyer tells you.  Somebody is turning their head.  Don't

12    be misled.  Don't be misled.  That video has been available

13    since day one.  Quigley could have walked through it.  Casella

14    could have walked through it.  Ouk could have walked through

15    it.  Rodriguez, Oliver, all of them.  You know why they didn't

16    show the video to you?  Because there is no gun in there.

17    There never was.  That's why they didn't show the video.

18         They made fun of this guy Manzano, made light of him.

19    Why did they even bring him here?  Well, stop and think for a

20    second.

21             MS. MILLER:  Objection.  We didn't call him.

22             THE COURT:  Overruled.

23             MR. SMALLMAN:  Officer Manzano has no ax to grind

24    here.  He was a police officer on duty that night and,

25    thankfully, thankfully, had a very detailed memo book.  He had

1    it brought up to him and he read it off a computer screen, if

2    you recall.  He had no trouble remembering what he did that day

3    and where he was.  And where he was is critical, and I will

4    tell you why.

5         He gets detailed originally to Hamilton and Henry to

6    guard a crime scene of two automobiles.  At 12:30 in the

7    morning a Sergeant LaTorre re-details him to Hamilton and West

8    9th to guard the remains of Tyjuan Hill.  Not a gun, the

9    remains of Tyjuan Hill, and that's exactly the entry that was

10   in his memo book and that's exactly what he testified to.  The

11   gun was gone.

12        So what does that tell you?  Florio took the gun, by

13   his testimony, shortly after I arrived at ten minutes after 11.

14   Manzano doesn't even get to the scene until 12:30, an hour and

15   20 minutes later.  Chain of custody?  It can't be broken

16   because it was never established.  No cop took ownership of

17   this gun at any moment in time.  All it is is a series of

18   passes, like a lateral in a rugby game.  Here it is, here it

19   is, here it is.

20        Does that make a bit of sense to you?  This is the

21   weapon that supposedly put everything in motion but no cop

22   picks it up?  The best they can tell you is maybe somebody

23   kicked it?  And if there is no chain of custody and Ms. Lee

24   knew that, do you think this police department ever told Ms.

25   Lee exactly what happened here?  No.  They fudged the paperwork

1   all the way up and made it look as though it was legit.

2          MS. MILLER:  Objection.

3          THE COURT:  Sustained.

4          MR. SMALLMAN:  Was the person who swabbed the gun here

5   before you, Burgos?

6          MS. MILLER:  Objection again.

7          THE COURT:  Counsel, sidebar.

8          (At the sidebar)

9          THE COURT:  What is your objection?

10          MS. MILLER:  My objection is this is utter

11   speculation.  I mean, I understand argument for purposes of a

12   summation.  I get it.  But this is pure speculation.  Sorry.  I

13   apologize.

14          THE COURT:  The problem I have, Mr. Smallman, is your

15   rebuttal is straying from rebuttal.  Your rebuttal is no longer

16   rebuttal.  That is something you should have brought up in the

17   original part of your case.  It is like a split beginning.

18   Don't pursue this line.

19          MR. SMALLMAN:  I'm sorry, sir.

20          THE COURT:  Don't go further with this.

21          (In open court)

22          MR. SMALLMAN:  I would like to read you some testimony

23   from Darious Smith who was taken to task about his ability to

24   see, what his ability to recall, and where his angle was.

25          Page 161, starting at line 1, direct testimony from

I3K8HIL2                    Rebuttal - Mr. Smallman

1    Darious Smith:

2    "Q.  At any time did you see the young man take a gun in his

3    left hand and extend his arm out to the left side?

4    "A.  No.  Both his hands were on the ground pushing himself up.

5    There was no gun.

6    "Q.  At the moment the shot was fired" --

7                THE COURT:  "There was no gun," is that a quotation?

8                MR. SMALLMAN:  This is reading from the transcript.

9                THE COURT:  He said there was no gun?

10               MR. SMALLMAN:  Yes.

11               Line 5:

12   "Q.  At the moment the shot was fired, could you see the young

13   man's hands?

14   "A.  I could see the hands.  I can see the gun when it went

15   off.  I could see the muzzle flash.  There was no gun."

16               Those lawyers had every opportunity to shake him from

17   that story if they chose.  It's your recollection.

18               Darious Smith, Susette Smoot, Elena Emerson, Juan

19   Garcia, what do they have to gain by coming here and testifying

20   to you about what they observed?

21               The defendant is the only one who has a stake in this

22   game and stuff.  Every motive to lie to save his skin.  His

23   cohorts, the same.  They are the ones whose credibility should

24   be at issue to you.  They are the ones with motivations to

25   fabricate.  I don't remember.  I can't recall.  Who kicked the

I3K8HIL2                        Rebuttal - Mr. Smallman

1    gun.  Who shoved it with his foot.  Lies, ladies and gentlemen.

2    Just lies.

3          It's not our job to prove to you that there was a

4    conspiracy here.  I suggest to you that the evidence indicates

5    that there was.  Conspiracy is generally considered to be a

6    meeting of a minds of more than one.  It could be as many as a

7    thousand.  I am not even trying to argue to you that all six of

8    these people are in for the same depth.  All it takes is two.

9    But that's what happened here.  A conspiracy at the scene

10   began, travelled to the hospital, and it continued thereafter.

11         None of that makes a bit of sense.  Just stop and

12   think about going to the hospital.  Every cop involved here

13   winds up at the hospital.  Even Oliver who goes to a different

14   hospital and said, I had to be taken to Lutheran.  Why?  And

15   then tell you they don't talk after one of their own just

16   killed somebody? Not true.  Not worthy of your belief.  Not

17   for a minute.

18         I want to go back to the video in a second.  I will

19   tell you who wasn't in there.  Tirol, Oliver and Quigley.

20         MS. MILLER:  Objection, your Honor.  That is

21   absolutely not the evidence in this case.

22         THE COURT:  I don't know what he is doing, and I don't

23   hear you.

24         MS. MILLER:  If counsel is referring to Exhibit 2 and

25   just said what he said, there is no evidence to support that in

I3K8HIL2                          Rebuttal - Mr. Smallman

1    this case.  None.

2                THE COURT:  The jury will recall from its own

3    recollection of what is in the case and what is not.

4                MR. SMALLMAN:  You ask the court's permission, you can

5    review that video time and time again to your satisfaction.

6    Because it's your recollection that controls.

7                There was testimony from Officer Quigley that he fired

8    this shot because Tyjuan Hill was pointing his gun at Casella.

9    There is testimony in this case that at that exact same moment

10   in time from Casella himself that I was at his feet beating him

11   with an ASP.

12               MS. MILLER:  Again, objection.

13               THE COURT:  Overruled.

14               MR. SMALLMAN:  Again, I will tell you, ladies and

15   gentlemen, it is your recollection of this testimony that will

16   control.  So if you have any question about its accuracy and my

17   comments on it to you, please ask that it be reread to you.

18               Casella is at his feet, beating him with an ASP when

19   Quigley fires the gun.  Casella also tells you, I never see

20   Quigley get there.  That's consistent with all of them.  And

21   they also tell you I don't see Oliver sitting right on his

22   back.

23               So if you had breakfast this morning with anybody else

24   in your household and there is a dining room table or kitchen

25   table, imagine the testimony telling you that someone the size

1    of Oliver was sitting on top of that kitchen table but somehow

2    you didn't see him, and somehow you didn't see the person on

3    the other side of the table or know what they were doing.

4    Because that's what these folks would have you believe.

5            THE COURT:  Five minutes left, Mr. Smallman.

6            MR. SMALLMAN:  Thank you, sir.

7            At the end of the day, and I am placing it before you

8    quite simply, and I hope succinctly, this is a case of

9    civilians seeing cops act badly.  This is a case of civilians

10   calling 911 on the cops.  Think about that for a second.

11   Civilians calling 911 to report police behavior.  Are there

12   inconsistencies in how many strikes?  Perhaps.  Are there

13   inconsistencies on whether I saw the bottom of his shoe or his

14   feet at that moment in time?  If these civilians came in and

15   gave you one story, that is the argument they would be making

16   to you.  It's contrived.  It's made up.  They got together and

17   they are all here to put one story against the defendant.

18           Instead, without an ax to grind, with no agenda,

19   taking time out of their lives, they come here and simply tell

20   you what they saw to the best of their recollection.  And for

21   this they should be taken to task.  I think they should be

22   applauded.

23           On the other hand, you have six people at least with

24   an agenda, a clear agenda, and they can't even get their

25   stories straight.  And when they don't give you a straight

1    story, I submit to you that based on that oath, they have lied

2    to you.  So please listen carefully when the judge tells you

3    what you can do with testimony that you believe to be false.

4    It's yours to do whatever you want.

5            Part of what your function is going to be in this case

6    is the consideration of damages.  One of those factors is going

7    to be the value of a human life.  I have no idea what a human

8    life is worth.  That's your province.  You folks are more than

9    able to figure that out.  But I do tell you this.  That

10   Mr. Hill's life is gone.  So you figure what he could have

11   done, what might have been, a walk on the beach, a subway ride,

12   a ball game.

13           MS. MILLER:  I am going to object here.

14           THE COURT:  Sustained.

15           MR. SMALLMAN:  The other aspect --

16           THE COURT:  The quality of a life is not at issue.

17           MR. SMALLMAN:  The other aspect of this case involves

18   punitive damages.  If you find that the behavior of these

19   defendants, the defendant and his fellow cops --

20           MS. MILLER:  Objection to that as well.

21           THE COURT:  Overruled.

22           I will give you instructions on damages.  Damages are

23   gone into only if there is liability, and damages have to be

24   proved.  If you find compensatory damages, you also can go on

25   to find punitive damages, and that's the context in which Mr.

1    Smallman is touching upon.

2         But this is no longer rebuttal, Mr. Smallman, so you

3    should stop this.  You can't lead from rebuttal from that which

4    you should have said originally.  Rebuttal is only to counter

5    what Ms. Miller said.

6         MR. SMALLMAN:  Yes, sir.

7         THE COURT:  Since she didn't get into this, Mr.

8    Smallman can't get into this.

9         So why don't you wrap it up, Mr. Smallman.

10         MR. SMALLMAN:  You are certainly capable and competent

11    to do any task this jury is required to do.  That is absolutely

12    evident.

13         We have brought for you witnesses who were present at

14    the time this event took place.  We have presented to you

15    witnesses with an unbiased take on the events that unfolded

16    before them the evening of September 20, 2012.

17         We ask you to take all of that into consideration.

18    All anybody wants out of this is justice for the events that

19    have been described to you.  We feel we have proved our burden

20    above and beyond.  And we put this in your hands, for your

21    wisdom, knowledge and decision.

22         Thank you.

23         THE COURT:  Thank you, Mr. Smallman.

24         Members of the jury, it's 20 to 1.  Can you please

25    come back here a quarter to 2, a quarter before 2.  An hour for

1    lunch.  Is that too little?

2              Then I will give you instructions which will last

3    about an hour and a half and then you will begin your

4    deliberations.

5              Close up your books.  Give them to Ms. Jones on your

6    way out.

7              Do not discuss the case.  Do not form any opinions.

8    Keep an open mind until you hear my instructions.

9              (Jury exits courtroom)

10             THE COURT:  Have a good lunch.

11             MS. MILLER:  May I just raise one point with respect

12   to Mr. Smallman's rebuttal?

13             THE COURT:  Please sit down, everyone.

14             MS. MILLER:  Mr. Smallman repeatedly, first with

15   respect to suicide by cop and then later with respect to his

16   comments concerning damages, which, by the way, were not raised

17   in the first part of the summation, in any event, he has

18   clearly suggested something to this jury that is inappropriate

19   and I think at this point --

20             THE COURT:  I missed his remarks.  What did he say?

21             MS. MILLER:  He made comments once again about the

22   life of Mr. Hill.

23             THE COURT:  What did he say?  Do you remember?

24             MS. MILLER:  Why would he engage in any of this?  Take

25   a walk on the beach.  Then he went on later to say more things.

I3K8HIL2                    Rebuttal - Mr. Smallman

1          THE COURT:  In terms of punitive damages.

2          MS. MILLER:  Punitives and compensatory.

3          THE COURT:  I want to find the remark.  I am asking

4    where it was said.

5          I sustained your objection and I told the jury to

6    disregard it.

7          MS. MILLER:  What we are raising at this point is

8    whether all of it together warrants some sort of instruction by

9    your Honor that there was simply no evidence presented.  For

10   whatever reason the decision was made not to present evidence,

11   which precluded us from presenting counter evidence.

12         THE COURT:  Evidence of what?

13         MS. MILLER:  Evidence of Mr. Hill and what he may or

14   may not have done with his life, evidence as to why he would

15   interact with officers the way that he did, all of that

16   together.  And I know your Honor at sidebar, we discussed this.

17         THE COURT:  Why don't you write something that you

18   want me to say and I will say it.

19         MS. MILLER:  Thank you, your Honor.

20         Have a good lunch.

21         (Luncheon recess)

22         (Continued on next page)

23

24

25

I3KAAHIL3                    Jury Charge

1

2                        AFTERNOON SESSION

3                          1:45 p.m.

4          THE COURT:  Be seated, everyone.  I have Ms. Miller's

5    suggestion for a change which we'll mark Court Exhibit 7.  I

6    decline to give it.  However, I've changed the format and

7    structure of my charge on compensatory damages and I've

8    distributed it to the lawyers.  I intend to give that.

9          MR. SHANIES:  Nothing further, your Honor, subject to

10   our prior objections about the pain and suffering piece.

11         THE COURT:  What's your prior objection?

12         MR. SHANIES:  Regarding the beating prior to the

13   shooting but your Honor said that you won't be submitting that

14   to the jury.

15         THE COURT:  Beating?  What do you mean by "beating"?

16         MR. SHANIES:  There was testimony that the officers

17   kicked, punched and struck, so that part of the excessive force

18   your Honor has said you would not charge the jury on it.

19         THE COURT:  Not in this trial.  In the previous trial

20   I said that but you didn't raise this issue here, not that I

21   remember.  But any way --

22         MR. SHANIES:  Other than that we have no issue.

23         THE COURT:  Defense?

24         MS. MILLER:  Fine, your Honor, other than what we

25   submitted and your Honor has ruled on that.  This is fine.

1              (Jury present)

2              THE COURT:  Good afternoon, everyone.  Please be

3      seated.

4              We've now reached the final stage in this trial.  What

5      I'm going to be doing now is tell you really three things, the

6      rules and procedures that generally apply to a civil jury

7      trial; second, how you determine if the plaintiff has proved

8      that the defendant violated the law that the plaintiff claims

9      he violated; and third, the procedures by which you should

10     conduct your deliberations.

11             First, I want to tell you how grateful I am for your

12     patience and attendance and attention throughout the trial.

13     You have been a great jury.  I've watched you.  You paid

14     attention to all the evidence and it's an imposition on your

15     life.  I'm grateful for that as well.  It's an important duty

16     in our country to serve on a jury if you're called to serve.

17     You've all eight been called to serve and I think your service

18     has been magnificent.

19             Thank you.

20             You've heard all the evidence in the case.  You've

21     heard the final arguments of the lawyers.  My duty at this

22     point is to instruct you as to the law.  It's your duty to

23     accept these instructions of law and apply them to the facts as

24     you determine them.  You must take the law as I give it to you.

25     If any attorney has stated legal principles different from what

I3KAAHIL3                    Jury Charge

1    I state in my instructions, it's my instructions that count.

2    You should consider my instructions as a whole when you

3    deliberate rather than singling out any one instruction as

4    stating the law.  You should not be concerned about the wisdom

5    or lack of wisdom of any rule that I state.  Regardless of any

6    opinion that you may have about what the law should be, it

7    would violate your sworn duty to base a verdict upon any view

8    of the law other than that which I give you in these

9    instructions.

10           You jurors are critical to the administration of

11   justice in this country.  The United States Constitution and

12   the statutes provide for the right to a jury trial.  This right

13   to trial by jury is a vital safeguard of individual liberties.

14   As jurors you pass upon or decide the fact issues in a case.

15   You are the sole and exclusive judges of the facts.

16           You review the weight of the evidence.  You determine

17   the credibility of the witnesses.  You resolve any conflicts

18   that might exist in the testimony and there are sharp conflicts

19   in this case and you draw whatever reasonable inferences are

20   appropriate from the facts as you see them.

21           The evidence consists of the answers given by

22   witnesses, the testimony they gave as you recall it and the

23   exhibits that were received in evidence.  You must base your

24   verdict solely upon the evidence developed at trial or the lack

25   thereof.

1    What I say is not evidence.  What the lawyers said in

2    their opening and closing statements, their objections and

3    their questions is not evidence.  Only the witness's answers

4    and the exhibits, responsive answers are testimony.

5    You may not consider any testimony or exhibits that I

6    directed you to disregard or that I directed to be stricken.

7    If an answer has been stricken you must entirely disregard it

8    as though the words were never spoken.  If I sustained an

9    objection to a question before the witness answered, you must

10   disregard that question and you may draw no inferences from the

11   wording of questions or speculate about how witnesses might

12   have answered.

13   The plaintiff, Carol Hill, alleges that defendant,

14   Patrick Quigley, violated her son Tyjuan Hill's rights under

15   the United States Constitution.  As the plaintiff Ms. Hill must

16   prove the facts to support the allegations by a preponderance

17   of the evidence.

18   When a party is required to prove a fact by a

19   preponderance of the evidence, it means that the party must

20   prove that the fact is more likely true than not true.  A

21   preponderance of the evidence means the greater weight of the

22   evidence.  In determining if a claim has been proved by a

23   preponderance of the evidence you may consider all of the

24   relevant testimony of all witnesses regardless of who calls

25   them and of all exhibits regardless of who may have offered

1    them.  If you find that a credible evidence on a given issue is

2    evenly divided between the parties, that is, it is equally

3    probable that Ms. Hill is right as that defendant is right,

4    then you must decide the issue against Ms. Hill because

5    Ms. Hill has the burden of proof by a preponderance of the

6    evidence.  So if the evidence on an issue is equal, by

7    definition that is burden has not been satisfied.

8         But she has to prove no more than a preponderance.  If

9    you find that the scales tip -- just imagine -- however

10   slightly in Ms. Hill's favor whichever way you look at it, then

11   Ms. Hill is more likely than not to have proved the issue she's

12   proved by a preponderance.  The scales if even, mean that

13   defendant wins.  If the scales tip ever so slightly, Ms. Hill

14   wins.  So we're not involved with proof beyond a reasonable

15   doubt.  The burden here is by a preponderance of the evidence.

16        Now, the evidence you heard concerns events on the

17   evening of September 20, 2012 in the vicinity of the

18   intersection of Hamilton Avenue near its intersection with West

19   Ninth Street in Brooklyn, New York.  There was an incident

20   involving law enforcement and Mr. Hill.  During that incident

21   defendant, Patrick Quigley, used lethal force against Tyjuan

22   Hill.  Plaintiff claims that the force against Tyjuan Hill by

23   defendant Quigley was excessive and unreasonable in violation

24   of his constitutional rights.  Defendant denies the plaintiff's

25   allegations.  Defendant asserts that he acted properly as an

1    officer of the NYPD, that Mr. Hill was resisting arrest and

2    that Mr. Quigley had probable cause to believe that Mr. Hill

3    posed a threat of death or serious physical injury to him and

4    his fellow officers.  Neither the plaintiff's nor the

5    defendant's allegations are proofs.  They are merely

6    assertions.  You, the jury, are to evaluate the proofs and

7    determine if the plaintiff's assertions as to the alleged

8    violations of Mr. Hill's constitutional rights were proved by a

9    preponderance of the evidence.

10           Plaintiff's claim is grounded under Section 1983 of

11   Title 42 of the U.S.C.  That's how it comes into the court.

12   Cases that arise under the laws or statute of the Constitution

13   of the United States come into federal court.  This case arises

14   under Section 1983.  Section 1983 provides a remedy for

15   individuals who have been deprived of their constitutional

16   rights under color of state law.  So let me start by reading

17   you the pertinent part of Section 1983.

18           Every person who under color of any statute,

19   ordinance, regulation, custom or usage of any state, subjects

20   or causes to be subjected any citizen of the United States to

21   the deprivation of any rights privileges or immunities secured

22   by the Constitution and laws shall be liable to the party

23   injured in an action at law, suit in equity or other proper

24   proceeding for redress.

25           I will break up this action in different parts so you

1    can understand it.

2            Section 1983 in general provides that persons who

3    under color of law violate the constitutional rights of another

4    person shall be liable to that other person.

5            Plaintiff alleges that Tyjuan Hill's constitutional

6    rights to life and liberty were violated by defendant Patrick

7    Quigley's use of excessive force in trying to arrest Tyjuan

8    Hill.

9            In order to prove a claim under Section 1983 plaintiff

10    must prove by a preponderance of the evidence four things.

11            First, that the defendant acted under color of state

12    law.

13            Second, that the defendant acted in a manner to

14    deprive Mr. Hill of his constitutional right not to have

15    excessive force used against him.

16            Third, that the acts and conduct of the defendant was

17    the proximate cause of Mr. Hill's death.

18            Fourth, that the defendant acted with an intention to

19    commit the acts that deprived Mr. Hill of his constitutional

20    rights or acted with reckless disregard when committing those

21    acts.

22            I'll go into each of these four things in detail.

23            If and only if you find that the plaintiff has proved

24    all the elements of this claim, then you should determine

25    whether and to what extent the plaintiff is entitled to

1    damages.  I will later discuss the issue of damages.  Now let

2    me go into each of the elements.

3        First, under color of state law -- this is not going

4    to be a contested issue here -- the parties did not dispute

5    that Patrick Quigley was an officer of New York City Police

6    Department.  As an officer of the police department he was

7    acting in the course of his duties.  It was under the color of

8    state law.  So that issue is resolved.

9        The second element requires that the plaintiff prove

10   by a preponderance of the evidence that defendant acted in a

11   manner to deprive Mr. Hill of a constitutional right.

12       Plaintiff alleges that defendant used excessive force

13   when he shot Tyjuan Hill.

14       Defendant claims that he shot in self-defense to

15   protect himself and other officers seeking to arrest Tyjuan

16   Hill and that he was acting lawfully as a police officer in

17   trying to effectuate an arrest of Tyjuan Hill and he was acting

18   within his immunity as a police officer.

19       Let me go into all of that.

20       The police have the right and responsibility to arrest

21   a person when they have a reasonable basis to believe that the

22   person committed a violation of law.  You heard testimony about

23   how police on the scene attempted to arrest Tyjuan Hill during

24   a sting operation looking to arrest people involved in

25   prostitution.  Prostitution is a crime under the New York Penal

I3KAAHIL3                        Jury Charge

Law.  It does not matter if the violation they suspected Tyjuan
of committing was serious or not serious, whether it was a
minor infraction, a misdemeanor or a felony.  If a person
violates the law, the police have the right to arrest him.  And
doing that the police may use force if force is necessary to
effectuate an arrest or to overcome a person's resistance to
being arrested.

          If the person to be arrested flees, the police may use
force to apprehend and arrest that person.  The police may use
any such force as is reasonable in the circumstances to
successfully arrest someone who the police officer has probable
cause to believe committed a crime but the police may not use
excessive force, that is more force than is reasonably
necessary to effectuate an arrest, or to subdue someone who is
fleeing to avoid being arrested.  If the policeman uses
excessive force in subduing such a person, the person's
constitutional right to life and liberty and due process of law
are violated.

          Was the force reasonable or was it excessive?

          Excessive force is unreasonable force.  You determine
the reasonableness of the force used based upon the facts and
circumstances confronting an officer on the scene.  If a
policeman has probable cause to believe that the person being
arrested poses a significant threat of death or serious bodily
injury to that policeman or to another, the policeman may use

1    lethal force and even kill the person he is trying to arrest.

2              A policeman also is not required to retreat from the

3    scene.  If the policeman has probable cause to believe that the

4    person arrested poses a significant threat of death or serious

5    bodily injury, the policeman may use lethal force against that

6    person and has an immunity from liability if that is what

7    happened.  The question is whether the totality of

8    circumstances provided probable cause for an officer to believe

9    that he or others faced a significant threat of death or

10   serious physical harm.

11             Probable cause exists when the facts and circumstances

12   taken together are of such weight and persuasiveness as to

13   convince an officer of ordinary intelligence, judgment and

14   experience that there was a fair probability that Mr. Hill

15   posed a significant threat of death or serious physical injury

16   to the officer or to the others.

17             I want to read that again.

18             Probable cause exists when the facts and circumstances

19   taken together are of such weight and persuasiveness as to

20   convince an officer of ordinary intelligence, judgment and

21   experience that there was a fair probability that Mr. Hill

22   posed a significant threat of death or serious physical injury

23   to the officer or to others.

24             The question must be answered based upon what was

25   known and reasonably understood by the officer on the scene

1    when he employed the force.  It's not an after judgment.  It's

2    not a Monday morning quarterback judgment.  You have to put

3    yourself in the place of the policeman and ask what he knew,

4    what he reasonably understood when he employed his force.

5           Probable cause is not based on hindsight and it does

6    not require certainty.  It does not require that the officer be

7    correct.  In making your determination you must consider that

8    police officers are often forced to make split-second decisions

9    about the amount of force necessary when circumstances are

10   tense, uncertain and rapidly evolving.

11          Thus, it is not relevant if the police officers who

12   were struggling to subdue Tyjuan Hill could have done so

13   without the use of lethal force.  It's not relevant if they in

14   some way provoked Mr. Hill.  If Patrick Quigley had probable

15   cause to believe that he or others faced a serious threat of

16   serious harm in arresting Tyjuan Hill, then Patrick Quigley's

17   use of lethal force was reasonable.

18          If the use of force was objectively reasonable, the

19   fact that a defendant had malicious intention when applying it

20   would not make the use of such force a violation.  Similarly,

21   the fact that a defendant had good intentions when applying

22   objectively unreasonable force would not make the use of such

23   force permissible.  If the defendant used excessive force, then

24   he exceeded the bounds of his lawful authority and violated

25   Mr. Hill's constitutional rights.  If defendant did not use

1    excessive force, then he did not exceed the bounds of his

2    lawful authority and did not violate Mr. Hill's constitutional

3    rights.

4            The third element of a Section 1983 claim -- Are you

5    all right with what I've said so far?

6            So the third element of a Section 1983 claim is that

7    the conduct of the defendant was the proximate cause of the

8    injury complained of.  "Proximate cause" means that there must

9    be a sufficient causal connection between the acts or omissions

10   of the defendant and the death of Tyjuan Hill.  An act or

11   omission is a proximate cause if it is a substantial factor in

12   bringing about or actually causing injury.  That is, if the

13   injury or damage was a reasonably foreseeable consequence of

14   the defendant's acts or omissions.  If an injury was a direct

15   result or a reasonably foreseeable consequence of the

16   defendant's acts or omissions, it was proximately caused by

17   such acts or omissions.

18           In other words, the defendant's acts or omissions have

19   such an effect of producing an injury or reasonable persons

20   would regarding it as being a cause of the injury, then the act

21   or omission is a proximate cause.  A proximate cause need not

22   always be the nearest cause either in time or in space.  The

23   question is whether the acts at issue are substantially the

24   cause of the injuries complained of.  There may be more than

25   one proximate cause of an injury or damage.  Many factors or

the conduct of two or more people, may operate at the same

time, either independently or together to cause an injury.  To

satisfy this requirement of proximate cause.

      The fourth element of a claim under Section 1983 is

that the defendant acted intentionally or recklessly when he

committed the facts that derived Mr. Hill of his constitutional

right not to be subjected to excessive force.  In order for the

plaintiff to establish this element, plaintiff must show by a

preponderance of the evidence that the defendant intended to

commit the acts that deprived Tyjuan Hill of his constitutional

right or acted with reckless disregard that his actions would

deprive Tyjuan Hill of his constitutional right.  You have to

find intent or recklessness in Sergeant Quigley's actions, not

in whether he intended also to deprive Mr. Hill of his rights

under the constitution.  An act is intentional if it is done

knowingly.  That is if it is done voluntarily and deliberately

and not because of mistake, accident negligence or any other

innocent reason.  An act is reckless if it is done with a

conscious disregard of its known probable consequences.

      Carol Hill filed this lawsuit as administrator of the

estate of her son, Tyjuan Hill.  Under New York Law Tyjuan

Hill's claim against defendant survives his death and it can be

pursued by the administrator of his estate.  Thus, Carol Hill

is really asserting Tyjuan Hill's claim.  She can recover

damages only to the extent that Tyjuan Hill could have

I3KAAHIL3                    Jury Charge

1    recovered damages.  If you find a plaintiff has proved by a

2    preponderance of the evidence all of the elements of Tyjuan

3    Hill's claim that the defendant violated his constitutional

4    right, Carol Hill as administrator of his estate is entitled to

5    recover damages from the defendant on behalf of Tyjuan Hill's

6    estate.  She is entitled to recover a sum of money from the

7    defendant fairly and justly compensating the estate of Tyjuan

8    Hill for Tyjuan Hill's loss of life.

9             The issue of liability and the issue of damages are

10   separate issues.  The first question on a verdict form which

11   I'll be giving you, one-page document.  The foreperson will

12   be -- I'll tell you about this a little later -- will be

13   filling this out and when the jury comes to a unanimous vote on

14   a particular question.

15            So the first question is:

16            Has plaintiff, Carol Hill, proved her case by a

17   preponderance of the evidence against defendant, Patrick

18   Quigley?

19            That's the question of liability.  If she has, check

20   the box "yes".  If she has not, you check the box "no".  Your

21   verdict must be unanimous.

22            Once you decide liability and if you find liability

23   you go on to the second question.

24            If you found that plaintiff Hill has proved her case

25   by a preponderance of the evidence, how much should plaintiff

I3KAAHIL3                    Jury Charge

1    recover?

2              And the box says, compensatory damages in the amount

3    of blank and you fill that amount in.

4              So the issue of liability and the issue of damages are

5    separate issues.  If you find that the defendant violated

6    Tyjuan Hill's constitutional right and is therefore liable to

7    plaintiff you check that box on the verdict sheet.  I told you

8    that.

9              If Carol Hill as administrator of Tyjuan Hill's estate

10   is entitled to recover damages from the defendant a recovery is

11   measured by the loss of Tyjuan Hill's life.  The measure of the

12   value lost to Tyjuan Hill, not to Carol Hill as his mother.

13             Damages have to be proved.  Damages should not be

14   based on sympathy or speculation.  Plaintiff has the burden to

15   prove damages by a preponderance of the evidence.  The

16   difficulty in proving damages in this question is that the

17   right to life cannot be quantified and no one can prove how

18   much life is worth.  In valuing an intangible like this you

19   have to use common sense and proportion.  Tyjuan Hill's estate

20   has a right to recover compensation for the loss of his life.

21   As I said before, when the issue came up, loss of life is not

22   measured by the quality of life.  You should not speculate

23   whether his life would be good or bad, enjoyable or not

24   enjoyable.  If you grant compensatory damages it's for the loss

25   of his life, plain and simple.

1       Pain and suffering, although part of compensatory

2   damages is not relevant in this case.  The evidence is that

3   death was instantaneous and without pain and suffering.

4       Also, loss of potential earnings, wages and income

5   although generally a factor in awarding compensatory damages is

6   not a factor in this case.  Plaintiff did not offer proof of

7   any loss of potential earnings.  In the absence of proof you

8   should assume that there was no loss of income, wages or

9   earnings.

10      Plaintiff has also sought punitive damages.  To be

11  entitled to punitive damages from the defendant plaintiff must

12  prove by a preponderance of the evidence that the defendant's

13  conduct not only was wrongful but was outrageous in a sense of

14  being malicious or wanton.  An act is maliciously done if it is

15  prompted by ill-will or spite towards the rights of another.

16  An act is wanton if done with reckless or careless disregard

17  for the rights of another.

18      The purpose of punitive damages is to punish a

19  defendant for shocking conduct and to set an example to deter

20  others from committing similar acts in the future.  Punitive

21  damages are to be awarded only if you believe that the

22  defendant acted so outrageously as to make appropriate a

23  punishment and to deter for the future.

24      Any award you give shall be reasonable and in

25  proportion to the degree that you find the conduct to be

1    shocking and the need to deter such conduct in the future.  An

2    award of punitive damages is discretionary.  That is, if you

3    find that the legal requirement of punitive damages are

4    satisfied, then you may decide to award punitive damages or you

5    may decide not to award punitive damages.

6            On the verdict form question three deals with punitive

7    damages.  It reads:

8            If you have found that plaintiff, Carol Hill, should

9    recover damages in addition to any compensatory damages that

10   you have found should plaintiff recover punitive damages?

11   There's box for "yes" and a box for "no".  And if you answer

12   "yes" you are to fill in the amount of punitive damages in your

13   discretion the plaintiff should recover.  Once again, your vote

14   as to be unanimous.

15           Now if you get to the issue of damages do not consider

16   the costs of an attorney.  Federal law provides that successful

17   plaintiff's lawyers are given an award of fees separate and

18   apart from what a plaintiff gets.  This award of attorney's

19   fees is a matter to be determined by the Court.  So you should

20   not take into consideration if you fix damages if you get that

21   far, that the plaintiff may have to pay attorneys.  She

22   doesn't.  It's a separate award.

23           That finishes the substantive laws.  I'm now going

24   into how to deal with evidence.  Everybody OK so far?  Need any

25   repetition or clarification?

1          JUROR NO. THREE:  Can you define preponderance?

2          THE COURT:  Define preponderance?

3          JUROR NO. THREE:  Yes.

4          THE COURT:  Think of it as a scale of justice.  If it

5    tips ever so slightly a person either has proved a

6    preponderance, for example, the plaintiff has to prove a

7    preponderance of the evidence.  If I raise it every so slightly

8    over my outstretched arm that gives you the idea of a

9    preponderance.  Something more than equal.  If it's equal, by

10   definition the preponderance has not been proved and the

11   defendant wins.  If it's a little more than equal in favor of

12   the plaintiff, the plaintiff wins.

13         JUROR NO. THREE:  Thank you.

14         THE COURT:  Do you understand that?

15         JUROR NO. THREE:  Yes.

16         THE COURT:  Any other clarification needed?

17         First, let me tell you about direct and circumstantial

18   evidence.  You may rely upon either in reaching your decision.

19   Evidence is direct and exhibits that are admitted into evidence

20   show facts or when the testimony sworn to by witnesses who have

21   actual knowledge of them from something they have derived from

22   the exercise of their senses, such as something they heard,

23   something they saw, something they spelled, something they

24   touched and so on.

25         Circumstantial evidence is evidence that continues to

prove a disputed fact by proof of other facts.  You infer on

the basis of reason and experience and common sense from an

established fact the existence or the nonexistence of some

other fact.  Circumstantial evidence is of no less value than

direct evidence.  As a general rule the law makes no

distinction between direct and circumstantial evidence.

It's after lunch and after lunch sometimes I get a

sleepy time.  Does anyone need any water or stretching or

anything else like that?  Don't be shy.  You need some water?

I'll now discuss inferences.

An inference is not a suspicion or a guess.  It's a

reasoned logical decision to conclude a disputed fact exists on

the basis of another fact that you know exists.  There are

times when different inferences may be drawn from facts whether

proved by direct or circumstantial evidence.  Plaintiff may ask

you to draw one set of inferences while the defendant may ask

you to draw another.  It's for you and you alone to decide what

inferences you will draw.

An inference is a deduction or a conclusion that you,

the jury, are permitted but not required to draw from the facts

that have been established for either direct or circumstantial

evidence.  In drawing inferences you should use your common

sense.

So while you are considering the evidence presented to

you, you are permitted to draw from the facts that you find to

1    be proven such reasonable inferences that as would be justified

2    in light of your experience.  Here again, let me remind you

3    that whether based upon direct or circumstantial evidence or

4    upon the logical reasonable inferences drawn from such

5    evidence, you must be satisfied that the plaintiff has proved

6    her claim by a preponderance of the evidence.

7              There have been things said in the openings and

8    summations of counsel about whether particular witnesses should

9    be believed.  I'm sure that it's clear to you by now that you

10   are being called upon to resolve various factual issues in the

11   face of different and irreconcilable pictures painted by the

12   parties.  You will now have to decide if the plaintiff has

13   proved her case by a preponderance of the evidence.  An

14   important part of this decision will involve making judgments

15   about the testimony of the witnesses you've listened to and

16   observed.  In making those judgments you should carefully

17   scrutinize all the testimony of each witness, the circumstances

18   of under which each witness testified and any other matter in

19   evidence which may help you to decide the truth and the

20   importance of each person's testimony.

21             Let me first give you some general guidance in how to

22   evaluate testimony.  After that I'll discuss some additional

23   issues raised by the witnesses who have testified in this case.

24             There's no magic formula for evaluating testimony.

25   You bring to this courtroom all the experience and background

I3KAAHIL3                    Jury Charge

of your lives and your everyday affairs.  You determine for

yourself everyday and in a multitude of circumstances the

reliability of statements which are made to you by others.  The

same tests that you use in your everyday matters of importance

are the tests that you use in your deliberations.

        Your decision whether or not to believe a witness may

depend on how that witness impressed you.  What was the quality

of the witness's observation of the events about which the

witness has testified?  Was the witness's vision clear or was

it obstructed?  What was the condition of the lighting?  Did

events happen very fast at about the same time and at various

places?  Was the witness candid, frank and forthright in

filling in with inferences what the witness did not see by

observation?  Did the witness seem as if he or she was hiding

something?  Being evasive or suspect in some way?

        How did the way in which the witness testified on

direct-examination compare with the way in which the witness

testified on cross-examination?

        Was the witness's testimony consistent or self

contradictory?  Did the witness appear to know what he or she

was talking about?  And did the witness strike you as someone

who was trying to report his or her knowledge accurately?

        In evaluating credibility you may consider evidence of

a witness's prior inconsistent statements.  A prior

inconsistent statement is the sworn statement made at an

earlier time that is inconsistent with the witness's trial

testimony.

Statements made in response to interrogatories and

statements made in depositions are sworn statements.

If you find that the witness made an earlier statement

that conflicts with his or her trial testimony, you may

consider that fact in deciding how much to credit the witness.

You may consider if the witnesses purposely made a

false statement or if was an innocent mistake.  You may

consider if the inconsistency turns on an important fact or on

a minor detail.

The quality of the witness's explanation for the

inconsistency should be considered and whether you find the

witness's explanation appealing to your common sense.  It's

your duty based on all the evidence and your own judgment to

decide if the prior statements you've heard were inconsistent

with the trial testimony and if so how much weight, if any, to

give to the statement made during the trial?

How much you choose to believe a witness may be

influenced by the witness's bias.  Does the witness have a

relationship with one of the parties that may affect how he or

she testified?  Does the witness have an interest in the

outcome of the case, some incentive, loyalty or motive that

might cause that witness to shade the truth?  Or does the

witness have some bias, prejudicial or hostility that may have

I3KAAHIL3                    Jury Charge

1    caused the witness, consciously or not, to give you something

2    other than a completely accurate account of the facts that

3    witness testified about?

4            The testimony of a law enforcement officer should be

5    considered by you just as any other evidence in the case.  In

6    evaluating the officer's credibility you should use the same

7    guidelines that you apply to any other witness.  You should not

8    give or more less credence to the testimony of a witness merely

9    because he or she is a law enforcement officer.

10           If a witness has an interest in the outcome, the

11   witness may not necessarily be incapable of giving truthful

12   testimony.  It's for you to decide to what extent, if at all,

13   the witness's interest has affected or colored his or her

14   testimony.  But evidence that one witness is biased, prejudiced

15   or hostile with respect to someone else requires you to view

16   that witness's testimony with caution, weigh the evidence with

17   care and to subject it to a careful consideration.

18           You should consider the witness's ability to express

19   himself or herself ask yourselves whether the witness's

20   recollection of the facts stands up in light of all the other

21   evidence in the case.

22           If you find that a witness willfully testified falsely

23   as to a material fact, you have the right to reject the

24   testimony of that witness in its entirety.  Alternatively, even

25   if you find that a witness has testified falsely or

1     inaccurately about one matter, you may reject as false or

2     inaccurate that portion of the witness's testimony and accept

3     as true any other portion of the witness's testimony that

4     recommends itself to your belief or which you may find

5     corroborated by other evidence in the case.

6          So what you must try to do in deciding credibility to

7     size up a person in light of his or her demeanor, the

8     explanations given and all the other evidence in the case just

9     as you would in any important matter whether you are trying to

10    decide if a person is truthful, straightforward and accurately

11    that person's recollection.  In deciding the question of

12    credibility use your common sense, your good judgment and your

13    experience.

14         You may have heard evidence that witnesses have

15    discussed the facts of the case with lawyers before the

16    witnesses appeared in court.  There is nothing unusual or

17    improper about a witness meeting with lawyers before

18    testifying.  However, you may consider such meetings in

19    evaluating credibility.

20         It's perfectly legitimate for counsel to attack the

21    credibility of any witness by attempting to impeach the

22    witness.  You should neither favor nor disfavor a witness

23    simply because a lawyer sought to impeach the witness during

24    the examination.

25         You heard testimony from individuals classified as

1    experts.  Joanne Lee and Charles Wetli.  These witnesses

2    expressed their opinions about matters at issue in this case

3    because they had special knowledge, skill, experience and

4    training with regard to that issue.  They presented their

5    evidence to assist you to understand the evidence or to reach

6    your independent decision on the facts.

7         In evaluating opinion testimony you may consider each

8    witness's qualifications, opinions, reasons for testifying and

9    all other considerations that you would use in evaluating any

10   other witness's testimony and give the testimony of that expert

11   whatever weight you decide it deserves.  Do not substitute the

12   witness's opinion for your own reason, your own judgment and

13   your own common sense or because I permitted a witness to be

14   classified as an expert.  It's your determination of the facts

15   that counts.  You are the excusive judges of the facts.

16        As I said before, you are not to be swayed by

17   sympathy.  You are to be guided solely by the evidence in this

18   case.  And the crucial question you must ask yourselves as you

19   sift through the evidence is has the plaintiff proved her claim

20   against the defendant by a preponderance of the evidence?

21        Once you allow prejudice or bias or sympathy to

22   interfere with your thinking, with your careful evaluation of

23   the facts of the case there's a risk that you will not arrive

24   at a true and just verdict.  You should not consider any

25   personal feelings you may have by the personal characteristics

I3KAAHIL3                    Jury Charge

of any of the parties or of their lawyers, race, religion,
national origin, sex or age play no part in this case and it
will be equally improper for you to allow any feeling you may
have about the nature of the claim to influence you in any way.

          The parties in this case are entitled to a trial free
from prejudice.  Our judicial system cannot work unless you
reach your verdict through a fair and impartial consideration
of the evidence.  Your verdict must be based exclusively on the
evidence or lack of evidence in the case in determining if the
plaintiff has proved the case by a preponderance.

          You've heard testimony that the defendant utilized
specific investigative policing techniques.  There is no legal
requirement that law enforcement officials used any specific
investigative techniques.  Law enforcement techniques are not
your concern.  Your concern is to determine if the plaintiff
proved her case by a preponderance of the evidence.

          You've heard the attorneys objecting.  I'm finished
with the evidence of the case.  Now these are some general
rules.  You see from the remaining pages there's not much to
go.

          It is the duty of attorneys on each side of the case
to object when the other side offers testimony or other
evidence which the attorney believes is not properly
admissible.  Counsel have the right to ask the Court to make
rulings of law and request conferences at the side bar.  You

I3KAAHIL3                        Jury Charge

1  should not show any prejudice against an attorney or his client

2  because the attorney objected to the admissibility of evidence,

3  ask for a conference out of the hearing of the jury or ask the

4  Court for a ruling on the law.  It's only the evidence that you

5  consider.  Sometimes I sustained objections.  Sometimes I

6  overruled objections.  My rulings should not affect your

7  decision in any way.  And you should draw no inferences from my

8  comments or rulings against any lawyer or any lawyer's client.

9           As I've already told you, it's the duty of the

10  attorneys to offer evidence and to press objections on behalf

11  of their side.  They have the obligation under their code of

12  ethics zealously to represent their clients.  However, it's my

13  function as judge to cutoff counsel from improper lines of

14  arguments or questioning.  You should draw no inference from

15  that.  It's irrelevant whether I like a lawyer or whether you

16  believe I like a lawyer.  The issue before you is not which

17  attorney is more likable or better or worse.  The issue is

18  whether Ms. Hill has proved her claim by a preponderance of the

19  evidence.

20           From time to time I asked questions of the witnesses

21  or sought clarification of various issues.  My statements and

22  my questions are also not evidence.  You give no greater weight

23  to a witness's answer just because I asked the question.  Makes

24  no difference who asked the questions.  It's a witness's

25  responsive answers that count.

1        I've not meant to indicate any opinion as to the facts

2   of what your verdict should be.  You are the excusive judges of

3   the facts and it is your verdict, not mine.  The rulings I made

4   during the trial are not any indication of my views of what

5   your decision should be.  You are to understand the Court has

6   no opinion.  I have no opinion as to the verdict you should

7   render in this case.  It's your job, not mine.  You are to

8   perform the duty of finding the facts without bias or prejudice

9   or sympathy.  Perform your duty in matter to complete fairness

10  and impartiality.

11        If you took notes during the case they are to be used

12  solely to assist the person who took the notes.  They're for

13  the purpose of aiding that person's recollection and not to

14  substitute for someone else's recollection.  The fact that a

15  particular juror has taken notes entitles that juror's views to

16  no greater weight than those of any other juror.  The notes are

17  personal, not for anybody else and not to prove a point to

18  anyone else.

19        During your deliberations you have any doubt as to any

20  testimony you think important, you may request a portion of the

21  official transcript to be made available to you.  We'll either

22  read it back to you or give you a transcript to read in the

23  jury room.

24        As to the exhibits in the case, the lawyers will

25  collect them and have them available to you.  If you want to

I3KAAHIL3                    Jury Charge

1    see anything, just ask and we'll give it to you or show it to

2    you in court.

3         Let me tell you about deliberations and verdicts.

4    Each juror is entitled to his or her opinion.  But each juror

5    must exchange views with all fellow jurors, for that is the

6    very essence of jury deliberation, to discuss and consider the

7    evidence, to listen to the arguments of each other, to present

8    your individual views, to consult with one another and finally,

9    to reach agreement based solely and wholly on the evidence.

10        Each of you must decide the case for yourself after

11   consideration with your fellow jurors of the evidence in the

12   case.  You should not hesitate to change an opinion if after

13   discussion with your fellow jurors their view appears to be

14   correct and yours does not.  However, if after carefully

15   considering all of the evidence and the arguments of your

16   fellow jurors you entertain a conscientious view that differs

17   from theirs you should stick to your conscientious conviction

18   and not abandon it simply because you are outnumbered.  Your

19   final vote which must be unanimous must reflect each

20   individual's conscientious conviction as to how the issues of

21   this case should be decided.

22        You will begin your deliberations when all of the

23   jurors are present and able to listen to each other's point of

24   view.  If there's any question about which you need

25   clarification or any testimony that you want given back to you

I3KAAHIL3                         Jury Charge

1    or any exhibit that you want to see, the foreperson will send

2    me a note.  Ms. Jones will give you the notepaper.  The note

3    should be dated, set the time, describe the particular item

4    that you want but not give me any one's opinions or any idea of

5    what is going on in the jury room.  When you reach a verdict

6    which must be unanimous the foreperson will fill out that

7    verdict form.  You will send in a note, not the verdict form.

8    You send in a note that the jury has reached a verdict.  I will

9    call you out and that verdict form will be read in open court.

10            As you retire to begin your deliberations your first

11   task of business is to select a foreperson.  The Court's

12   tradition by default is that the juror sitting in the number

13   one seat, Mr. Castellano, is the foreperson if nobody else is

14   elected foreperson but it's your decision.  That's the first

15   act that you do and the first note of the foreperson whoever

16   selected it is to send out to me is that so and so is the

17   foreperson.

18            I remind you again that your verdict must be

19   unanimous.

20            This completes my charge.  Before you retire I need to

21   consult with the lawyers about anything I missed or misstated

22   or anything they think needs to be added and I'll be right back

23   to you.  I'll see the lawyers at side bar.

24            (Continued on next page)

25

I3KAAHIL3                      Jury Charge

1              (side bar)

2              MR. SHANIES:  Nothing.

3              MS. MILLER:  Nothing, your Honor.

4              THE COURT:  OK.  So the jury deliberate will

5     deliberate until five o'clock.

6              MR. SHANIES:  Yes.

7              THE COURT:  And then if no verdict reached, come back

8     tomorrow to the ten.

9              Now this snow predicted for tomorrow, I don't know if

10    the Court will be opened or closed.  How sure are we on that

11             COURTROOM DEPUTY:  I will call them and I also gave

12    them the number to call before they leave in the morning.

13             MS. MILLER:  Your Honor, if they wanted to stay later

14    to get it done tonight?

15             THE COURT:  I can't.

16             MS. MILLER:  OK.

17             (Continued on next page)

18

19

20

21

22

23

24

25

I3KAAHIL3                      Verdict

1          (In Open Court)

2          THE COURT:  The lawyers have not comments or

3  objections, so you're ready to retire but before you do

4  Ms. Jones will give the verdict form to Mr. Castellano and the

5  verdict form and we are now going to swear the court security

6  officer.

7          (Security officer sworn)

8          THE COURT:  The jury will now retire.  It's now three

9  o'clock.  How late do you want to deliberate.

10         FOREPERSON:  4:45.

11         THE COURT:  So when you are ready to go the tell the

12 court security officer and you can leave.  Now sit down for a

13 moment please.

14         Heavy snow is predicted for tomorrow.  It's possible

15 the court will be closed.  It's possible that one or more of

16 you will live in an area that gets hit harder than what we have

17 here.  So there's an open question.  Ms. Jones will give you a

18 number to call or will call you, but otherwise we you should be

19 here at ten o'clock.

20         OK.  You may retire.

21         (At 3:00 p.m., the jury retired to deliberate)

22         THE COURT:  Please be seated, everyone.

23         I have three notes Exhibits Eight, Nine and Ten.

24 Exhibit Number Eight timed 3:04 p.m. reads as follows:

25         "We have chosen Juror No. Four,  Lior D. Gensler, to

I3KAAHIL3                    Verdict

1   be the foreman".

2           And Mr. Gensler signed it.  Number Nine reads as

3   follows:

4           "May we continue until five p.m."?

5           Signed Lior E. Gensler, timed 4:38 p.m.

6           And Number Ten:

7           "We've come to a verdict."  Lior E. Gensler 4:52 p.m.

8           Bring in the jury.

9           (Jury present)

10          THE COURT:  Be seated, everyone.

11          Members of the jury, I'm required to read your notes

12  which I'll do now.  We've marked Court Exhibit Eight the note

13  sent out at 34:04 p.m. reading as follows:

14          "We have chosen Juror No. Four, Lior D. Gensler, to be

15  the foreman."  Signed Lior D. Gensler.

16          Number Nine:

17          May we continue until five p.m.  Signed Lior D.

18  Gensler.  Signed at 4:38 p.m.

19          And Number Ten:

20          "We have come to a verdict."  Lior D. Gensler,

21  4:52 p.m.

22          Do you have a verdict?

23          FOREPERSON:  We do.

24          THE COURT:  May we see it.

25          FOREPERSON:  Yes, both copies.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I3KAAHIL3                    Verdict

1              (Pause)

2              FOREPERSON:  We didn't know if we had to do both.

3              THE COURT:  I'm returning the verdict form to

4    Mr. Gensler.

5              (Pause)

6              COURTROOM DEPUTY:  Will the jurors please answer

7    "present" when your name is called.

8              Juror No. 1, Michael Castellano.

9              THE JUROR:  Here.

10             COURTROOM DEPUTY:  Juror No. Two, David Vaczek.

11             THE JUROR:  Present.

12             COURTROOM DEPUTY:  Juror No. Three, Ayanna Alcid.

13             THE JUROR:  Present.

14             COURTROOM DEPUTY:  Juror No. Four, Lior Gensler.

15             THE JUROR:  Present.

16             COURTROOM DEPUTY:  Juror No. Five, Krystal Ramos.

17             THE JUROR:  Present.

18             COURTROOM DEPUTY:  Juror No. Six, Ines Campoverde.

19             THE JUROR:  Present.

20             COURTROOM DEPUTY:  Juror No. Seven, Sandra Speller.

21             THE JUROR:  Present.

22             COURTROOM DEPUTY:  Juror No. Eight, Celia Abel.

23             THE JUROR:  Present.

24             COURTROOM DEPUTY:  Will the foreperson please rise.

25             Has the plaintiff, Carol Hill, proved her case by a

I3KAAHIL3                    Verdict

1  preponderance of the evidence against defendant, Patrick

2  Quigley?

3          THE COURT:  Read off your verdict form.

4          FOREPERSON:  No.

5          COURTROOM DEPUTY:  That's it.

6          THE COURT:  May I have the verdict form again.

7          FOREPERSON:  Yes.

8          THE COURT:  Both copies.  Show it to the lawyers,

9  please.

10         (Pause)

11         Show both copies.

12         (Pause)

13         THE COURT:  You may sit, Mr. Genzler.

14         Does either side wish the jury to be polled?

15         MR. SMALLMAN:  Yes, sir.

16         THE COURT:  Brigitte.

17         COURTROOM DEPUTY:  Has the plaintiff, Carol Hill,

18  proved her case by a preponderance of the evidence against

19  defendant Patrick Quigley?  No.

20         Juror Number One, is that your verdict?

21         THE JUROR:  Yes.

22         COURTROOM DEPUTY:  Juror No. Two, is that your

23  verdict?

24         THE JUROR:  Yes.

25         COURTROOM DEPUTY:  Juror No. Three, is that your

I3KAAHIL3                    Verdict

1    verdict?

2            THE JUROR:  Yes.

3            COURTROOM DEPUTY:  Juror No. Four, is that your

4    verdict?

5            THE JUROR:  Yes.

6            COURTROOM DEPUTY:  Juror No. Five, is that your

7    verdict?

8            THE JUROR:  Yes.

9            COURTROOM DEPUTY:  Juror No. Five, is that your

10   verdict?

11           THE JUROR:  Yes.

12           COURTROOM DEPUTY:  Juror No. Six, is that your

13   verdict?

14           THE JUROR:  Yes.

15           COURTROOM DEPUTY:  Juror No. Seven, is that your

16   verdict?

17           THE JUROR:  Yes.

18           COURTROOM DEPUTY:  Juror No. Eight, is that your

19   verdict?

20           THE JUROR:  Yes.

21           THE COURT:  Is there anything else from the lawyers

22   before I discharge the jury?

23           MR. SMALLMAN:  No, your Honor.

24           THE COURT:  Ms. Miller?

25           MS. MILLER:  What was the question?

I3KAAHIL3                    Verdict

1            THE COURT:  Is there anything else?

2            MS. MILLER:  No, your Honor.

3            THE COURT:  Members of the jury, I thank you for your

4    service.  I know that you're pressed, so I'm not going to

5    deliver a very long speech.  I do want to say that it is a

6    privilege to serve with juries.  Every trial judge in this

7    court loves to work with juries because they bring people from

8    all walks of life in to share this very awesome procedure of

9    coming to judgment on someone's very important activities and

10   sometimes even more.  So thank you very much for your service.

11   As I said before, you should not discuss the case amongst you

12   but now you can.  You've already done that in your

13   deliberations.

14           We're going to keep the books and tear them up.  So

15   there's no record of this.  What you say to each other is

16   private and in confidence.  You are not required to tell anyone

17   about it.  It someone calls, you don't have to respond.  On the

18   other hand, if you want to, you can.  You are free.  You're

19   completely free of any restraint at all.  I tell juries that's

20   good idea however to keep the confidence of one another.  What

21   you said to each other in the jury room was confidential,

22   candid and confidential and perhaps you owe it to each other to

23   keep that confidence.  But it's up to you.

24           Thank you again.  Thank you so much.

25           FOREPERSON:  Thank you, your Honor.

1           (Jury dismissed)

2           THE COURT:  Be seated, please.

3           Rule 50 providing for judgment as a matter of law

4    provides for 28 days within which to make a motion.  Rule 59

5    provides for a motion for a new trial, also provides 28 days to

6    make the motion.  You don't need to decide now but Mr. Shaneis

7    if -- he is not here.

8           Mr. Smallman, if it is desired to make such a motion

9    and you want more time I suggest the following:

10          File your motion timely because that may be

11   jurisdiction.  However, if you want more time than that and

12   it's agreed to by defendants, you could make your own schedule

13   as to briefing as long as your motion is filed.  So I don't

14   require in this situation that motions to be accompanied by

15   supporting papers but pay attention to the jurisdiction for a

16   while.  Got it?

17          MR. SMALLMAN:  We will, judge.  Thank you.

18          THE COURT:  I thank you both.  I think it was an

19   effort.  It was very difficult.

20          It was very difficult, Ms. Hill, and no matter what

21   the outcome I think all of us have to pay attention to fact

22   that a life was lost and a mother suffers.  So there's no

23   rejoicing at the judgment whether you think it right or wrong.

24   There's only regret.  Things happen in such a way that a young

25   life was lost and a mother suffers and for this I'm very sorry.

I3KAAHIL3                    Verdict

1              Thank you, all.  Thank you for a splendid trial.

2                          (Adjourned)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25