UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

CAROL HILL, *as Administratrix of the Estate of*
*Tyjuan Hill*,

                                  Plaintiff,

        -against-

SGT PATRICK QUIGLEY,

                               Defendant.

------------------------------------------------------------- x

**OPINION AND ORDER
DENYING PLAINTIFF'S
MOTION FOR A NEW TRIAL**

12 Civ. 8691 (AKH)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/28/18

ALVIN K. HELLERSTEIN, U.S.D.J.:

        This case concerns a tragic series of events that ended with the loss of Tyjuan

Hill's life. On September 20, 2012, Mr. Hill was shot and killed by Patrick Quigley, a Sergeant

in the New York Police Department. Sgt. Quigley ("Defendant") maintains that his use of force

was legally justified because he had probable cause to believe that Mr. Hill, whom officers were

attempting to arrest, posed a significant threat of death or serious physical injury to those around

him. Carol Hill ("Plaintiff"), Tyjuan Hill's mother and Administratix of the Estate of Tyjuan

Hill, claims that the use of force was excessive and violated the Fourth Amendment. The case

was first tried to a jury in September 2016, ending in a mistrial after the jury was unable to reach

a unanimous verdict. After a second trial in March 2018, the jury returned a unanimous verdict

in favor of the defendant. Now before the Court is Plaintiff's motion for a new trial under

Federal Rule of Civil Procedure 59. For the reasons that follow, the motion is denied.

## Background

        The Court assumes the parties' familiarity with the facts and procedural history of

this case, which has been litigated through two trials. What follows is an abbreviated summary.

On September 20, 2012, New York Police Department officers in Brooklyn's 76th precinct were conducting an undercover prostitution sting in the area of Huntington and West 9th Street. Officer Cairley Rivera, posing as a prostitute, was standing on the corner of Henry and Huntington Street when she was approached by a vehicle with four male passengers. After a brief conversation concerning the price for sexual acts, a passenger exited the vehicle and attempted to pull Officer Rivera into it. Officer Rivera radioed for backup, and a take-down vehicle with other officers arrived. Three of the males in the car submitted to arrest, but the fourth, Tyjuan Hill, fled the scene on foot. *Id.* Several of the officers gave chase, and Officer Tirol eventually tackled Hill several blocks away at the corner of Hamilton and West 9th Street. Soon thereafter, Officers Gonzalez, Oliver, Ouk, Casella, and Quigley converged on the scene to assist Officer Tirol in attempting to place Mr. Hill in handcuffs. A struggle ensued. The officers succeeded in handcuffing one of Mr. Hill's wrists, but were unable to fasten the handcuffs to the second wrist. Sgt. Quigley arrived last on the scene, placed his left shin on Mr. Hill's back, and assisted his fellow officers. Moments later, Sgt. Quigley claims, Mr. Hill extracted a handgun from his waistband and pointed it at the officers. Sgt. Quigley then fatally shot Hill in the back of the head. A gun was found a short distance away from Mr. Hill's body, situated atop a nearby curb. A forensic examination of the gun revealed traces of Hill's DNA on the trigger of the firearm.

Plaintiff Carol Hill filled this action as Administratrix of Tyjuan Hill's estate on November 29, 2012, under the Civil Rights Law, 42 U.S.C. § 1983. After years of discovery and motion practice, the case was tried to a jury in September 2016. Plaintiff asserted two claims at the first trial: excessive force against Sgt. Quigley for the shooting and failure to intervene against Officers Casella, Gonzalez, Oliver, Ouk, and Tirol. After lengthy deliberations, the jury

was unable to reach a unanimous decision against any of the defendants. A mistrial was declared. In an Order dated January 25, 2017, I held that defendants Casella, Gonzalez, Oliver, Ouk, and Tirol were entitled to judgment as a matter of law on plaintiff's failure to intervene claims against them. *See* Order Granting Motion for Judgment as a Matter of Law in Part and Denying in Part, *Hill v. Quigley et al.*, 12 Civ. 8691 (S.D.N.Y. Jan. 25, 2017). Plaintiff's claim against Sgt. Quigley remained for retrial.

The case was tried to a jury a second time in March 2018. As in the first trial, defendant "offered testimonial, expert, and forensic evidence—including traces of Hill's DNA on the trigger of the firearm, an audio recording of the incident, and supporting testimony from the other officers that Hill threatened Quigley with a firearm—that would allow a reasonable juror to infer that Quigley shot in self-defense." *Id.* at *2. Arguing that Sgt. Quigley's use of force was excessive, plaintiff introduced eyewitness testimony from bystanders sitting in nearby cars that Mr. Hill did not have a gun at the time of the shooting and that, in any event, he could not, pinned face down to the ground, have brandished a gun in the manner that Sgt. Quigley and the other officers claimed. The jury returned a verdict in favor of the defendant, and the Court entered judgment in defendant's favor on April 27, 2018. Plaintiff timely filed this motion for a new trial under Rule 59 on May 25, 2018. For the reasons that follow, the motion is denied.

## Discussion

Federal Rule of Civil Procedure 59 grants a court discretion to "grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). In general, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Hugo Boss Fashions,*

*Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 623 (2d Cir. 2001) (internal quotation marks omitted). A new trial may also be granted "if substantial errors were made in admitting or excluding evidence, or in charging the jury." *Fleming v. Stradford*, No. 10 CIV. 3345 (KPF), 2018 WL 1033234, at *16 (S.D.N.Y. Feb. 22, 2018) (internal quotation marks omitted).

### A.    Jury Instructions

Plaintiff's motion for a new trial is premised largely on two supposed errors in my charge. The first, based on the Second Circuit's decisions in *Rasanen v. Doe*, 723 F.3d 325 (2d Cir. 2013), and *Callahan v. Wilson*, 863 F.3d 144 (2d Cir. 2017), was not adequately raised before the jury was charged. Reviewed for plain error, I find that the error in my charge did not affect plaintiff's substantial rights. Fed. R. Civ. P. 51(d)(2). Plaintiff's remaining arguments concerning the jury instructions, including issues raised by *Dancy v. McGinley*, 843 F.3d 93 (2d Cir. 2016), are without merit. The motion is therefore denied.

### 1.    Excessive Force Instruction Under *Rasanen v. Doe* and *Callahan v. Wilson*

"A jury instruction is erroneous if it 'misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Callahan*, 863 F.3d at 148 (quoting *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013)). In general, "[a]n erroneous jury instruction requires a new trial unless the error is harmless." But where, as here, "the challenging party failed to object to the charge at trial," courts "review for plain error, that is 'if the error affects substantial rights.'" *Rasanen*, 723 F.3d at 332 (quoting Fed. R. Civ. P. 51(d)(2)). Under plain error review, a new trial should be granted only when the jury is deprived of "adequate legal guidance to reach a rational decision." *Callahan*, 863 F.3d at 149 (internal quotation marks omitted) (quoting *Rasanen*, 723 F.3d at 334–35). As the Second Circuit has explained "the plain error exception to Rule 51's objection requirement 'should . . . be invoked

with extreme caution in the civil context.'" *Rasanen*, 723 F.3d at 333 (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996)). "To constitute plain error, a court's action must contravene an established rule of law," *Lavin–McEleney v. Marist Coll.*, 239 F.3d 476, 483 (2d Cir. 2001), and "go[] to the very essence of the case," *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).

Plaintiff first claims that my charge failed adequately to instruct the jury on the standards that govern a police officer's use of deadly force in a case brought under Section 1983. Specifically, plaintiff points to a line of Second Circuit cases, starting with *Rasanen v. Doe* and *Callahan v. Wilson*, which hold that a jury "'must' be instructed that the use of deadly force is '*unreasonable unless* the officer had probable cause to believe that the suspect posed a significant threat of death or serious physical injury to the officer or to others.'" *Callahan*, 863 F.3d at 151 (quoting *Rasanen*, 723 F.3d at 334). Put differently, a jury in a deadly force case should be given the probable instruction in restrictive terms—i.e., that the use of deadly force is *unreasonable unless* the officer had probable cause, rather than that an officer *may* use deadly force *if* the officer has probable cause. *Id.* As discussed below, my charge failed to do so.

This issue was not raised by either party before the jury was charged. Plaintiff's counsel did not submit a request to charge on excessive force prior to either trial in this case, *see* Plaintiff's Request to Charge, ECF 206, nor was the issue sufficiently raised during the charge conference, held on March 19, 2018, the afternoon before the jury was charged. At the conference, plaintiff's counsel specifically requested that I instruct the jury that a police officer may use lethal force if he has "probable cause to believe that the person poses a significant threat of death or serious physical injury to the policeman or to another." *See* Trans. at 598–99. While identical language appeared elsewhere in my proposed charge, plaintiff's counsel argued, and I

agreed, that the jury should receive consistent language throughout. After this exchange,

plaintiff's counsel stated that "[p]utting aside our objection to the immunity issue I think that

correctly states the standard." Trans. at 599.[1] Plaintiff's counsel then made the following

request:

> MR. SHANIES: So the next also relates to this paragraph. We would ask for a sentence following that final sentence stating the converse proposition which is that if the policeman does not have probable cause to believe that the person poses a significant threat of death or serious bodily harm, the police officer may not use lethal force.
>
> THE COURT: I resist redundancy. That's redundant.
>
> MR. SHANIES: Respectfully, your Honor, we see a lot of ways where the jury can find there is not excessive force and in many cases it's not balanced by a statement that if the officer does exceed the standard that it would be excessive force.
>
> THE COURT: It's said in the last sentence and now I'm defining excessive force in. It's said in the last paragraph. I'm sorry. There's a balance in this paragraph and this is the definition. Then I go [on] to say the question is whether the totality of the circumstances provided probable cause, et cetera. . . . I'm going to leave it the way it is.
>
> MR. SHANIES: OK.

Trans. at 599–600. This colloquy is insufficient to preserve plaintiff's objection. Rule 51(c)(1)

provides that "[a] party who objects to an instruction or the failure to give an instruction must do

so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed.

R. Civ. P. 51(c)(1); see also *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 60 (2d Cir. 2002) ("The

'objections to a charge must be sufficiently specific to bring into focus the precise nature of the

alleged error.'" (quoting *Palmer v. Hoffman*, 318 U.S. 109, 119 (1943))). Plaintiff failed to do

---

[1] Plaintiff's objection to the use of the word "immunity" in two places in the charge is discussed in greater detail below.

so. Plaintiff's counsel "never so much as cited" the relevant cases, "and never explained why" the instruction plaintiff now seeks "was required." *Rasanen*, 723 F.3d at 332; *Jarvis*, 283 F.3d at 61 (finding an objection was not preserved where the challenging party "made no legal argument" and "cited no authority" in support of the proposed instruction). Simply asking for the "converse proposition" for the purpose of "balance[ing]" the paragraph is not sufficient. Trans. at 599–600. Moreover, granting plaintiff's request would not have remedied the error, for *Rasanen* and *Callahan* teach that a jury should be given *only* the restrictive "unless/only" instruction, not that the permissive "may/if" formulation should be balanced by the restrictive instruction. *See Callahan*, 863 F.3d at 151. Because plaintiff's objection was not properly preserved, it is subject to plain error review.

Nonetheless, although plaintiff's counsel failed to advance the relevant cases, and my research in formulating the deadly force charge did not identify them, the record shows that my instruction on this particular point was inconsistent with the law of this Circuit. *See* Trans. at 598–600. My instruction on excessive force read as follows:

> If the person to be arrested flees, the police may use force to apprehend and arrest that person. The police may use any such force as is reasonable in the circumstances to successfully arrest someone who the police officer has probable cause to believe committed a crime but the police may not use excessive force, that is more force than is reasonably necessary to effectuate an arrest, or to subdue someone who is fleeing to avoid being arrested. If the policeman uses excessive force in subduing such a person, the person's constitutional right to life and liberty and due process of law are violated.
>
> Was the force reasonable or was it excessive?
>
> Excessive force is unreasonable force. You determine the reasonableness of the force used based upon the facts and circumstances confronting an officer on the scene. *If a policeman has probable cause to believe that the person being arrested poses*

*a significant threat of death or serious bodily injury to that policeman or to another, the policeman may use lethal force* and even kill the person he is trying to arrest.

A policeman also is not required to retreat from the scene. If the policeman has probable cause to believe that the person arrested poses a significant threat of death or serious bodily injury, the policeman may use lethal force against that person and has an immunity from liability if that is what happened. The question is whether the totality of circumstances provided probable cause for an officer to believe that he or others faced a significant threat of death or serious physical harm.

Probable cause exists when the facts and circumstances taken together are of such weight and persuasiveness as to convince an officer of ordinary intelligence, judgment and experience that there was a fair probability that Mr. Hill posed a significant threat of death or serious physical injury to the officer or to the others.

I want to read that again.

Probable cause exists when the facts and circumstances taken together are of such weight and persuasiveness as to convince an officer of ordinary intelligence, judgment and experience that there was a fair probability that Mr. Hill posed a significant threat of death or serious physical injury to the officer or to others.

. . .

Thus, it is not relevant if the police officers who were struggling to subdue Tyjuan Hill could have done so without the use of lethal force. It's not relevant if they in some way provoked Mr. Hill. If Patrick Quigley had probable cause to believe that he or others faced a serious threat of serious harm in arresting Tyjuan Hill, then Patrick Quigley's use of lethal force was reasonable.

Trans. at 682–85 (emphasis added).

By failing to give the restrictive "unless/only" formulation of the probable cause instruction, my charge was inconsistent with the cases cited above. *See Callahan*, 863 F.3d at 151. However, jury instructions must be read collectively, "in light of the charge as a whole."

8

*Callahan*, 863 F.3d at 148; *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 165 (2d Cir. 2017). Taken in context with the remainder of my instructions, this deviation did not affect plaintiff's "substantial rights," Fed. R. Civ. P. 51(d)(2), and therefore does not rise to the level of plain error.

The central concern highlighted by *Rasanen* and *Callahan*—that is, the difference "between the permissive 'may/if' language and the restrictive 'unless/only' language"—is that the jury may not understand "that an officer's use of deadly physical force is reasonable, and therefore legally permissible, only" when the probable cause standard is met. *Callahan*, 863 F.3d at 151. However, my charge repeatedly instructed the jury that their task was to evaluate whether Sgt. Quigley had probable cause to believe that Tyjuan Hill posed a significant threat of death or serious bodily injury. Trans. at 682–85. Indeed, the issue of probable cause was the central question in the case. For instance, defense counsel in summation framed the case as follows:

> [T]he question is whether the totality of the circumstances provided probable cause for an officer to believe that he or others faced a significant threat of death or serious physical harm. And probable cause exists when the facts and circumstances taken together are persuasive to convince an ordinary intelligent experienced officer that there was a fair probability of that. That's it. That's all you are measuring.

Trans. at 638–39. Plaintiff did not object.[2]

The jury was instructed that "[i]f a policeman has probable cause to believe that the person being arrested poses a significant threat of death or serious bodily injury to that policeman or to another, the policeman may use lethal force." Trans. at 682–83. There is no

---

[2] Plaintiff's summation rested on the theory that the gun found at the scene containing traces of Mr. Hill's DNA had been planted. *See, e.g.*, Trans. at 626. There is no reason to believe that this distinction was relevant to this case.

9

ambiguity in that charge. Even though it diverges from the language required by the Court of Appeals, individual aspects of a charge should not be read in isolation. *See, e.g., Callahan*, 863 F.3d at 148. In the following paragraph, after explaining that a police officer is not required to retreat from the scene, I instructed the jury: "The question is whether the totality of circumstances provided probable cause for an officer to believe that he or others faced a significant threat of death or serious physical harm." Trans. at 683. Immediately thereafter, I twice reiterated the probable cause standard, *see* Trans. at 683, further focusing the jury's deliberations. The jury also was specifically instructed that although an officer is permitted to use force to effectuate an arrest, "the police may not use excessive force, that is more force than is reasonably necessary." Trans. at 682. My instructions did not, as the Court of Appeals found objectionable in *Callahan*, contain a litany of "permissive" language that "diluted" the probable cause standard. *Callahan*, 863 F.3d at 151–52. Read in context, the error plaintiff identifies did not affect plaintiff's substantial rights. Fed. R. Civ. P. 51(d)(2).

Finally, the fact that the jury instructions at issue in *Rasanen* were reversed for plain error does not alter the result here. Like this case, *Rasanen* involved a police shooting and turned on whether the force employed by the shooting officer was excessive. 723 F.3d at 328–29. But the similarities end there. Unlike the charge given in this case, the district court in *Rasanen* failed to instruct the jury on the fundamental probable cause standard, derived from *Tennessee v. Garner*, 471 U.S. 1, 3, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."), and *O'Bert ex rel. O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) ("It is not objectively reasonable for an officer to use deadly force . . . unless the officer has probable cause to believe that the suspect poses a

10

significant threat of death or serious physical injury to the officer or others."). Instead, the district court gave the following instruction:

> In other words, even if there was a lawful search, the officer has no right to use . . . excessive deadly force. Whether or not the force used in conducting the search was unnecessary, unreasonable and violent is an issue to be determined by you in light of all the surrounding circumstances. On the basis of that degree of force, a reasonable and prudent police officer would have applied in effecting the search under the circumstances disclosed in this case.
>
> Here, where the parties' factual contentions are disputed, you must consider the question of what events actually occurred. You must determine whether the plaintiff proved that on May 17, 2002, the decedent, an unarmed man, was shot and killed unnecessarily by defendant, Daniel Brown, or whether the shooting occurred during the course of his attacking the police officer and trying to turn his gun against him, as the defendant contends.

*Rasanen*, 723 F.3d at 330–31. When pressed by the jury for additional guidance on the meaning of "deadly excessive force," the district court declined to elaborate, instead choosing to reiterate its original charge and direct the jury to various provisions of a New York State Police administrative manual. *Id.* at 329. The Court of Appeals determined that failing to instruct the jury on probable cause in an excessive force lawsuit was egregious and "undermine[d] 'the very integrity of the trial.'" *Id.* at 334 (quoting *SCS Commc'ns*, 360 F.3d at 343). In the case before me, however, in the context of the charge as a whole, the jury was given "adequate legal guidance to reach a rational decision." *Callahan*, 863 F.3d at 149 (quoting *Rasanen*, 723 F.3d at 334–35). Plaintiff is not entitled to a new trial on this ground.[3]

---

[3] Unlike in *Callahan*, which presented a nearly identical instructional issue, plaintiff did not preserve his objection. *Callahan*, 863 F.3d at 151 ("Unlike *Rasanen*, which considered the excessive force charge under plain-error review because no clear objection was made to that portion of the charge, plaintiffs here clearly preserved their objection." (citation omitted)). The precise issue posed here—whether the failure to give the restrictive probable cause instruction in the context of the overall charge constitutes plain error—has not been addressed by the Court of Appeals.

2.    Remainder of the Court's Instruction on Excessive Force

Plaintiff also identifies other supposed errors in my excessive force charge, none of which warrants a new trial.

Plaintiff first takes issue with the Court's description of the case, given to the jury at the start of the charge:

> Now, the evidence you heard concerns events on the evening of September 20, 2012 in the vicinity of the intersection of Hamilton Avenue near its intersection with West Ninth Street in Brooklyn, New York. There was an incident involving law enforcement and Mr. Hill. During that incident defendant, Patrick Quigley, used lethal force against Tyjuan Hill. Plaintiff claims that the force against Tyjuan Hill by defendant Quigley was excessive and unreasonable in violation of his constitutional rights. Defendant denies the plaintiff's allegations. *Defendant asserts that he acted properly as an officer of the NYPD, that Mr. Hill was resisting arrest and that Mr. Quigley had probable cause to believe that Mr. Hill posed a threat of death or serious physical injury to him and his fellow officers.* Neither the plaintiff's nor the defendant's allegations are proofs. They are merely assertions. You, the jury, are to evaluate the proofs and determine if the plaintiff's assertions as to the alleged violations of Mr. Hill's constitutional rights were proved by a preponderance of the evidence.

Trans. at 678–79 (emphasis added). Specifically, plaintiff takes issue with my description of the defendant's case, italicized above. Plaintiff claims that the inclusion of the first two clauses, which referred to whether Sgt. Quigley acted properly as a police officer and whether Mr. Hill resisted arrest, "compounded the *Rasanen/Callahan* error" by leading the jury to believe that these clauses constituted separate defenses to plaintiff's excessive force claim. Pl. Memo., ECF 402, at 7. In overruling the same objection at the charge conference, I held: "I think it's their summary, Mr. Shaneis, [and consistent with] what I read to the jury originally. I'll leave it alone and there are specific instructions later on that made it quite clear." Trans. at 591. This ruling

12

was not in error. My description of the case was intended to inform the jury of each side's contentions, and to set the stage for the legal descriptions and standards that followed. My introductory remarks did not undermine anyone's rights.

Plaintiff also argues that references to "immunity" within the charge improperly invited the jury to speculate on the question of qualified immunity. The word "immunity" appeared twice in my charge. The first reference appears in a section of the charge in which I repeated each side's contentions:

> Plaintiff alleges that defendant used excessive force when he shot Tyjuan Hill. Defendant claims that he shot in self-defense to protect himself and other officers seeking to arrest Tyjuan Hill and that he was acting lawfully as a police officer in trying to effectuate an arrest of Tyjuan Hill and he was acting within his *immunity* as a police officer. Let me go into all of that.

Trans. at 681. Then, I followed that with substantive descriptions:

> If the policeman has probable cause to believe that the person arrested poses a significant threat of death or serious bodily injury, the policeman may use lethal force against that person and has an *immunity* from liability if that is what happened. The question is whether the totality of circumstances provided probable cause for an officer to believe that he or others faced a significant threat of death or serious physical harm.

Trans. at 681, 683. The jury was not misled.

The reference to "immunity" did not muddle the applicable legal standards. The doctrine of qualified immunity is a question of law for the Court, *see Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (describing qualified immunity as a legal question that "ordinarily should be decided by the court long before trial"), and plaintiff acknowledges that the jury was not instructed on it. Charges are to be read in context. Particular sentences are not to be extracted and microscopically criticized. *See, e.g., Callahan*, 863 F.3d at 148. Read in context with the

remainder of the sentence and those immediately thereafter, the reference to "immunity" did not confuse the applicable legal standards.

      3.     <u>Jury Instruction on Intent Under *Dancy v. McGinley*</u>

Plaintiff's last contention is that the Court's instruction on intent was inconsistent with the Second Circuit's decision in *Dancy v. McGinley*, 843 F.3d 93 (2d Cir. 2016). Because my instructions were consistent with the law, plaintiff's motion on this ground also is denied.

*Dancy* also involved allegations of police misconduct and excessive force. The case was brought by two high school students, Jayvon Etling and Jarquez Dancy, who were arrested after an altercation with two Poughkeepsie, New York police officers. *Id.* at 100. After hearing a radio transmission about an attempted robbery in the area, Officers McGinley and Williams stopped Etling and Dancy as they walked home from a friend's house. *Id.* Officer McGinley engaged Etling first, and an altercation between them ensued. *Id.* at 103. At the same time, Officer Williams walked Dancy towards a patrol car. *Id.* What followed was unclear, but Dancy claimed when he protested Officer McGinley's treatment of Etling, Officer Williams slammed his face into the hood of the car, causing a ringing in his ear. *Id.* After being interrogated overnight and detained until his mother bonded him out the following morning, Dancy was taken to a local hospital and diagnosed with a fractured jaw. *Id.* Dancy filed suit under Section 1983 asserting, among other things, an excessive force claim. *Id.* at 104. The case was litigated through two trials, and the jury ultimately found in favor of Officer Williams. *Id.* at 99.

On appeal, Dancy argued that the district court did not adequately instruct the jury on the intent necessary to sustain a claim under Section 1983. Specifically, "[t]he district court instructed the jury that, to impose liability, it was required to find that Williams 'acted

intentionally or recklessly' rather than 'merely negligent[ly]' in performing the acts alleged, and it suggested that if Williams's actions were 'merely negligent,' Dancy could not recover even if his injuries resulted from that negligence." *Id.* at 116. The Court of Appeals reversed, holding that the district court's instructions lacked clarity and "improperly placed the burden on Dancy to prove intent, not only as to the seizure but as to the injury as well." *Id.* The Court explained that although Section 1983 required an intentional act, "as long as an officer deliberately performed acts that constitute a seizure, the Fourth Amendment has been triggered, regardless of whether it was accomplished by the exact method intended." *Id.* Put differently, the Court held that "[i]ntent is not relevant . . . as to the officer's underlying motivation for his actions during the course of a seizure," and a plaintiff "need not prove that the officer intended to violate his rights, or intended that a 'certain result be achieved.'" *Id.* at 116–17 (citations omitted) (quoting *Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000)). Rather, all that is required is some intentional act that proximately causes the plaintiff's injuries. *Id.* at 118.

This issue was raised by plaintiff's counsel at the charge conference. Counsel specifically cited *Dancy*, which was decided just after the first trial in this case, and, without having given me the charge that plaintiff requested, argued at the conference that the Court instruct the jury that liability may be proven where "the defendant took some intentional or reckless action that was objectively unreasonable and proximately caused Mr. Hill's injury." Trans. at 594. After reviewing the case and drafting additional language on the issue overnight, I proposed the following charge:

> The fourth element of a claim under Section 1983 is that the defendant acted intentionally or recklessly when he committed the facts that [deprived] Mr. Hill of his constitutional right not to be subjected to excessive force. In order for the plaintiff to establish this element, plaintiff must show by a preponderance of the evidence that the defendant intended to commit the acts that

15

deprived Tyjuan Hill of his constitutional right or acted with
reckless disregard that his actions would deprive Tyjuan Hill of his
constitutional right. You have to find intent or recklessness in
Sergeant Quigley's actions, not in whether he intended also to
deprive Mr. Hill of his rights under the constitution. An act is
intentional if it is done knowingly. That is if it is done voluntarily
and deliberately and not because of mistake, accident negligence or
any other innocent reason. An act is reckless if it is done with a
conscious disregard of its known probable consequences.

Trans. at 686.

Plaintiff again objected, arguing that the phrase "objectively unreasonable" should
be included in this portion of the charge. I declined so to instruct the jury, stating:

The [Dancy] case [uses] a phrase "objectively unreasonable." . . .
It's a phrase that may be appropriate with the factual situation in
[Dancy] which had to do with unlawful seizure. It doesn't have
anything related to the case at hand. In fact, the phrase
"objectively reasonable" is inconsistent with intent. It creates
another standard. And secondly, it is inconsistent and misleading
in relationship to the charge defining how much force an officer
can use. So it's not going to be in there.

Trans. at 616–17. This ruling was not in error.

Plaintiff's argument places undue emphasis on a single sentence in *Dancy*, that
"[o]bjectively unreasonable actions during the course of a seizure, even if based on a mistake,
are unconstitutional." *Dancy*, 843 F.3d at 117. Again, plaintiff divorces this sentence from
context and misapprehends the central focus of *Dancy*. The Fourth Amendment's
"reasonableness" standard, derived from *Graham v. Connor*, 490 U.S. 386, 397 (1989), is
different from the intent that must be proven for an excessive force claim. As the Court in
*Dancy* put it:

Once a seizure has been set in motion by an intentional act, the
Fourth Amendment's "reasonableness" standard applies to the
manner in which the seizure is executed. This applies to all officer

16

actions, "without regard to their underlying intent," and lasts at least until "the point at which the arrest ends and pretrial detention begins." Thus, once a seizure is initiated, an officer's objectively unreasonable conduct may violate the Fourth Amendment regardless of whether the officer intended any injury to result.

*Id.* at 117 (citations omitted) (quoting *Graham*, 490 U.S. at 395 n. 10, 397). The law requires than the officer act intentionally. The standard of intentionality cannot be lessened by an adverb, "objective reasonableness." As long as the police officer acted "intentionally," the fourth element was satisfied. The jury was instructed accordingly.

The jury just had heard the requirements of the third element plaintiff had to prove by a preponderance of the evidence: whether the amount of force employed by Sgt. Quigley was excessive or not. Using the phrase "objectively unreasonable" to qualify "intentional" would have conflated two elements of plaintiff's burden, and confused, rather than enlightened the jury. *Dancy* does not require that I do that. *Dancy*, 843 F.3d at 117

Moreover, the element of intent was not disputed by the parties. There was no question that Sgt. Quigley acted intentionally. He so testified, stating that he believed that it was necessary to shoot Mr. Hill to save his life and the lives of his fellow officers. Plaintiff seeks to argue an issue that does not exist. The jury was instructed that it must "find intent or recklessness in Sergeant Quigley's actions, not in whether he intended also to deprive Mr. Hill of his rights under the constitution." Trans. at 686. This charge was consistent with *Dancy*, and plaintiff is not entitled to a new trial.

## B. Evidentiary Rulings

Plaintiff also takes issue with several of the Court's evidentiary rulings. In general, "an erroneous evidentiary ruling warrants a new trial only when a substantial right of a party is affected, as when a jury's judgment would be swayed in a material fashion by the error."

*Restivo v. Hessemann*, 846 F.3d 547, 573 (2d Cir. 2017) (internal quotation marks omitted). As noted above, a new trial is an extraordinary remedy that "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Hugo Boss*, 252 F.3d at 623 (internal quotation marks omitted). For the reasons that follow, plaintiff is not entitled to a new trial on the basis of the challenged evidentiary rulings.

1.    <u>911 Calls</u>

Plaintiff argues that the Court erred by conditionally excluding a 911 call placed by Darious Smith, a civilian eyewitness to the shooting. At trial, Smith testified that he saw the struggle between Mr. Hill and the officers and that, although Mr. Hill was resisting arrest, he did not have a gun in his hand at the time of the shooting. Plaintiff also sought to introduce Smith's 911 call, placed immediately after the shooting, to corroborate his in-court testimony. Acknowledging that the 911 call was hearsay, plaintiff offered the evidence under the excited utterance and present sense impression exceptions to the hearsay rule. *See* Fed. R. Evid. 803(1)–(2). Rather than admit a recording or transcript of the call, I held, under Rule 403, that plaintiff could introduce Smith's 911 call on redirect examination, but only if Smith's credibility was impeached on cross examination. This ruling was not in error.

A district court has broad discretion to admit relevant, probative evidence under Federal Rule of Evidence 401, and to exclude otherwise relevant evidence under Rule 403 when its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The 911 call at issue here did nothing more than restate Smith's in-court testimony. Balanced against its limited probative

value, I determined that the emotional, frantic nature of the call was cumulative and likely to create a danger of unfair prejudice to defendant, and excluded the call on that basis. Nonetheless, I held that if the call became relevant—i.e., if the witness's credibility was impeached—plaintiff could introduce the call to rehabilitate Smith's credibility. In this way, my ruling struck a balance that was consistent with Rule 403.

In any event, Smith's 911 call would have done nothing more than corroborate his in-court testimony, which, was not impeached. The evidence was cumulative, potentially prejudicial, and marginally relevant in the context of the testimony elicited at trial. My ruling was not erroneous, much less an abuse of discretion, and plaintiff has not demonstrated that exclusion likely swayed the jury in a material fashion. *Restivo*, 846 F.3d at 573.

2. Owen's Expert Testimony

Plaintiff also challenges the Court's November 2, 2018 ruling that excluded the testimony of Jennifer Owen, a purported audio and voice identification expert. A central issue at trial was whether Mr. Hill brandished a firearm during the course of his arrest. In addition to the officers' testimony that Mr. Hill had done so and that a gun was found later not far from him at the scene, defendant relied on a police radio transmission on which someone can be heard shouting "gun gun gun gun gun!" That those words were spoken was undisputed. However, the parties dispute when they were spoken. Defendant argued, based on testimony from officers on the scene, that Officer Tirol shouted the words immediately before Sgt. Quigley pulled the trigger, and that Tirol's radio inadvertently caught the exclamation during the struggle with Mr. Hill. Plaintiff argued, based on testimony of civilian eyewitnesses sitting in automobiles stopped nearby, that Mr. Hill did not appear to have a gun in his hand. Plaintiff argued that Officer

Tirol's exclamation—"gun gun gun gun gun!"—was contrived, that it was shouted immediately after the shooting to cover Sgt. Quigley.

To support plaintiff's argument, plaintiff proposed to call Jennifer Owen, a purported audio and voice identification expert, to testify that the exclamation—"gun gun gun gun gun!"—could be heard on an iPhone video recording made by the civilian witnesses immediately after the shooting. After manipulating the iPhone video in an effort to enhance the sounds, Ms. Owen listened to the iPhone video and the police recording several times and isolated a portion of each she deemed similar. She then conducted what she called a statistical comparison of the energy and pitch of the two samples. From the comparison, Ms. Owen sought to testify that the two samples were materially similar in energy and pitch. And since they were found to be similar, and since the iPhone recording was made after the shooting, Ms. Owen offered to testify that Officer Tirol's shout occurred after the shooting, as a cover-up. *See* Owen Expert Report, ECF 324, Ex. B, at 7–8, 20 (stating that the objective of the analysis was to "explore the possibility that two different recorders" had captured the same speech). After a *Daubert* hearing held November 2, 2018, I ruled that Ms. Owen's testimony was inadmissible under Fed. R. Evid. 702. I believe that my ruling was correct.

Federal Rule of Evidence 702 provides the standards for admissible expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As a gatekeeper, a judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).[4]

Several aspects of Ms. Owen's methodology were unreliable. First, Ms. Owen admitted in her report and proffered testimony that the audio samples on which her testimony would be based were not long enough to conduct a full voice identification analysis. Instead, her analysis was limited to a comparison of energy, also known as amplitude or volume, and pitch, commonly known as how high or low one's speech is. Both measures are, in Ms. Owen's words, "auxiliary methods" for audio comparison. *See* Owen Expert Report, ECF 324, Ex. B, at 20. Ms. Owen also readily acknowledged that the two samples varied significantly "in light of the different acoustical backgrounds of the recordings." *Id.* Based on these limitations, Ms. Owen's proffered testimony would have concluded that that the similarities in energy and pitch, themselves auxiliary methods for comparing audio samples, were due to actual similarities between the two recordings, but any differences could be explained away by differences in acoustical background, notwithstanding the fact that she claimed to have controlled for acoustical background in other parts of her analysis. It was also not clear from Ms. Owen's

---

[4] The Supreme Court in *Daubert* "identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 593–94).

report or testimony what precise methodology she used to control for background noise, which she described was a crucial aspect of the analysis.

It was also unclear how Ms. Owen selected the particular samples she analyzed to prove the point she wished to make. So far as the Court can discern, it appears that Ms. Owen simply listened to the two recordings several times, isolating portions she deemed similar and conducting statistical testing on the samples she selected by ear. Her report states: "Audibly, I can say with confidence that it is highly probable that both recordings captured the speech 'gun, gun, gun, gun, gun, gun' . . . ." *Id.* at 9. Every aspect of Ms. Owen's analysis appears to have been reasoned backward from her conclusion, without a reliable methodological or statistical basis for selecting among possible samples. Without some scientifically reliable methodology, her proffered testimony was not reliable.

Additionally, beyond reciting simple statistical figures, Ms. Owen performed no statistical comparison to determine whether the similarities between the mean energy and pitch data were statistically significant. For instance, Ms. Owen offered to testify that the mean frequency of the two samples differed by just under seven percent, that the mean Fo figures[5] differed by just under eight percent, and that the mean energy figures differed by less than two percent. *Id.* But raw data would have told the jury next to nothing. Ms. Owens did not conduct any analysis of statistical significance, nor could she explain based on her experience in the field whether the differences she identified were meaningful or should be discarded.

"[I]t is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. Indeed, "any step that renders the analysis unreliable under the *Daubert* factors

---

[5] Ms. Owen testified that the mean Fo figure measured the harmonic mean.

renders the expert's testimony inadmissible" in its entirety. *Id.* Ms. Owen's methodology failed this test.

After I ruled, the video was played again, and counsel and I listened carefully for any sounds that would enable a jury to conclude that "gun gun gun gun gun!" was shouted on the iPhone recording. There was none, and counsel could point to none. The Court did not err in excluding Ms. Owen's proffered testimony.

## C.    The Court's Questioning Under Rule 614

Finally, plaintiff argues that in my questioning of witnesses at trial, I exceeded my authority under Federal Rule of Evidence 614. Rule 614(b) provides that "[t]he court may examine a witness regardless of who calls the witness." Consistent with the Rules, it is well settled that trial judges have "an active responsibility to insure that issues are clearly presented to the jury." *United States v. Pisani*, 773 F.2d 397, 403 (2d Cir. 1985). "[T]he questioning of witnesses by a trial judge, if for a proper purpose such as clarifying ambiguities, correcting misstatements, or obtaining information needed to make rulings, is well within that responsibility." *Id.*

After reviewing the record, it is clear that the Court's questions were even-handed and intended to illuminate the issues for the jury, rather than to advocate for either party. *See Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 993 (2d Cir. 1991). My questioning was therefore "an entirely proper exercise of [my] power under Rule 614(b) of the Federal Rules of Evidence." *Reale v. Bd. of Educ. of City of New York*, 213 F.3d 626 (2d Cir. 2000). And in any event, the Court expressly instructed the jury that it was to draw no inference from the Court's questioning of witnesses:

> From time to time I asked questions of the witnesses or sought clarification of various issues. My statements and my questions

23

are also not evidence. You give no greater weight to a witness's answer just because I asked the question. Makes no difference who asked the questions. It's a witness's responsive answers that count.

I've not meant to indicate any opinion as to the facts of what your verdict should be. You are the exclusive judges of the facts and it is your verdict, not mine. The rulings I made during the trial are not any indication of my views of what your decision should be. You are to understand the Court has no opinion. I have no opinion as to the verdict you should render in this case. It's your job, not mine.

Trans. at 700–701. Plaintiff is not entitled to a new trial based on the Court's questioning of witnesses, or any other ground plaintiff has argued.

The drafting of a jury charge is challenging. It must accurately state the law, expressed in statutes and cases that often contain ambiguities and contradictions.

A charge takes approximately an hour and a half to deliver and must be understood by eight persons of varying intelligence. Few people are experienced in listening that long. Each trial judge tackles the challenge in his or her own style. I deliver my charge standing and watching the faces of the jurors for signs of inattentiveness. I repeat when I feel jurors do not quite understand, and I answer their questions, either by rereading what I had written or adding to it extemporaneously. That is my method of being accurate and understood.

The issue in this case is whether my charge gave the jury adequate legal guidance to reach a rational decision. I believe that the charge I gave was understood by the jury, and that the jury applied the proper standards in the proper way. Thus, I deny plaintiff's motion.

**Conclusion**

For the reasons discussed in this opinion, plaintiff's motion for a new trial is denied. The clerk is instructed to terminate the motion (ECF 401).

SO ORDERED.

Dated:    August 28 2018
          New York, New York

ALVIN K. HELLERSTEIN
United States District Judge